UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

BRANDON WILLIAMS,

                              Plaintiff,

               v.                                                          5:23-CV-153
                                                                              (FJS/TWD)
SYRACUSE UNIVERSITY, BOARD OF TRUSTEES
OF SYRACUSE UNIVERSITY, ROBERT HRADSKY,
KARA ZARNOWSKI, JOHN ROMANO, and
ILIKEA FUENTES, in their individual and official
capacities,

                              Defendants.
_____

APPEARANCES                                      OF COUNSEL

BOUSQUET HOLSTEIN PLLC                            JOHN L. VALENTINO, ESQ.
One Lincoln Center, Suite 100                    KAVITHA JANARDHAN, ESQ.
110 West Fayette Street
Syracuse, New York 13202
Attorneys for Plaintiff

HANCOCK ESTABROOK, LLP                           JOHN G. POWERS, ESQ.
1800 AXA Tower I                                 MARY L. D'AGOSTINO, ESQ.
100 Madison Street
Syracuse, New York 13202
Attorneys for Defendants

SCULLIN, Senior Judge

## MEMORANDUM-DECISION AND ORDER

## I. INTRODUCTION

        This case concerns the February 8, 2022 arrest and criminal prosecution of Plaintiff

Brandon Williams ("Plaintiff"), a Black male undergraduate student at Syracuse University

("SU"), and SU's discipline of Plaintiff for conduct underlying and connected with his arrest. *See*

*generally* Dkt. No. 7, Amended Complaint.

Plaintiff brings claims under 42 U.S.C. §§ 1983, 1985, and 1986 (First, Second, and Third Causes of Action) asserting false arrest, excessive force, and failure to intervene, respectively; Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, *et seq*. ("Title IX") (Fourth Cause of Action), asserting gender discrimination in connection with his disciplinary proceedings; 42 U.S.C. § 1981 (Fifth Cause of Action) asserting race discrimination in connection with his arrest and disciplinary proceedings; and under New York State common law for claims of assault (Sixth Cause of Action), battery (Seventh Cause of Action), false arrest and false imprisonment (Eighth Cause of Action), intentional infliction of emotional distress ("IIED") (Ninth Cause of Action), negligent infliction of emotional distress ("NEID") (Tenth Cause of Action), and negligent hiring, training, and supervision (Eleventh Cause of Action).

Plaintiff seeks to recover compensatory and punitive damages from Defendants Syracuse University ("Defendant SU") and the Board of Trustees of Syracuse University ("Defendant SU Board"), as well as from individual Defendants Robert Hradsky, Kara Zarnowski, John Romano, and Ilikea Fuentes in both their individual and official capacities. *See id.*

Plaintiff alleges that Defendant SU is a private, non-profit institution of higher education located in Syracuse, New York that, at relevant times, received federal funding and/or federal financial assistance. Plaintiff contends that Defendant SU Board has 45 voting members and has authority to promulgate the Student Code of Conduct Handbook and other rules and policies that govern student life at SU. Plaintiff maintains that Defendants Zarnowski, Romano, and Fuentes are sworn public safety officers and employees of the SU Department of Public Safety ("DPS"). Plaintiff contends that, in their official capacities, these Defendants enforce rules and policies promulgated by Defendant SU Board, including the Code of Student Conduct. Plaintiff also contends that these Defendants exercise law enforcement authority within Defendant SU's

2

campus and any properties that Defendant SU owned, controlled, or administrated pursuant to a Memorandum of Understanding ("MOU") between DPS and the City of Syracuse Police Department ("SPD").  Plaintiff asserts that Defendant Hradsky was, at relevant times, the Dean of Students and Associate Vice President of the Student Experience, and, in his official capacity, is responsible for implementing policies relating to student discipline and campus safety.

Defendants move pursuant to Federal Rule of Civil Procedure 12(b)(6) to dismiss all claims against them.  *See* Dkt. No. 21.  Plaintiff opposes this motion in part.  *See generally* Dkt. No. 38 (sealed memorandum of law); Dkt. No. 43 (redacted memorandum of law).  Plaintiff indicates that he "voluntarily dismisses his First, Eighth, and Eleventh Causes of Action for false arrest, false imprisonment, and negligent hiring, supervision, and retention," and his Fourth Cause of Action under Title IX "as it relates to individual Defendants Zarnowski, Romano, Fuentes, and Hradsky."  Dkt. No. 43 at 20 n.8.  Plaintiff also brings a cross-motion for leave to amend to add causes of action for breach of contract and breach of the implied covenant of good faith and fair dealing.  *See* Dkt. No. 38; Dkt. No. 43 at 40.  Defendants file a reply in further support of their motion to dismiss and in opposition to Plaintiff's motion to amend, *see* Dkt. No. 47; and Plaintiff files a reply in further support of his motion to amend, *see* Dkt. No. 51.  Finally, the parties have filed motions addressing sealing and/or redaction of documents in this case.  *See* Dkt. No. 27; Dkt. No. 30; Dkt. No. 32.

## II. ALLEGATIONS IN THE AMENDED COMPLAINT[1]

On February 8, 2022, Plaintiff, a Black male student at Defendant SU, was walking to class when he crossed paths with Jane Roe and the two had a brief interaction.  *See* Dkt. No. 7, Amended Complaint ("Am. Compl."), at ¶¶ 34-40.  This interaction formed the basis for Plaintiff's arrest, criminal prosecution, and Defendant SU's disciplinary actions against him.  *See, generally id.*

Jane Roe was at the relevant time a female student at Defendant SU who had been friends with Plaintiff on a social media platform, occasionally seen him on Defendant SU's campus, romantically pursued Plaintiff's friend, and would sometimes appear at lunches and social events where Plaintiff was present.  *See id.* at ¶¶ 15-16.  On February 12, 2019, Plaintiff was sitting with a friend at lunch when Jane Roe sat with them uninvited, started an argument with Plaintiff, picked up a ketchup bottle, lunged towards Plaintiff, and squirted ketchup onto his clothes.  *See id.* at ¶ 17.  Plaintiff was "shocked and humiliated" and "splashed a cup of water at Jane Roe and walked away."  *See id.*

On March 4, 2019, Jane Roe approached and confronted Plaintiff while he was eating lunch with friends.  *See id.* at ¶ 18.  Jane Roe saw Plaintiff through a glass window and began recording him and yelling at him.  *See id.*  About two days later, Jane Roe filed a complaint against Plaintiff with DPS "that contained false allegations that Plaintiff had harassed and assaulted her."  *See id.* at ¶ 19.  "As a result of Jane Roe's complaint, Defendant SU immediately issued a no-contact order (NCO) to Plaintiff.  The NCO prohibited Plaintiff from initiating face-

---

[1] The Court accepts as true all non-conclusory factual allegations and draws all reasonable inferences in Plaintiff's favor.  The Court does not credit legal conclusions presented as factual contentions.

to-face or indirect (including phone, text, and social media) contact with Jane Roe."  *See id.* at ¶ 20.  Plaintiff understood that the NCO was reciprocal such that Jane Roe was prohibited from initiating face-to-face or indirect contact with him.  *See id.* at ¶ 21.

On July 18, 2019, a Student Conduct Board assembled pursuant to Defendant SU's Student Conduct Handbook (the "Conduct Board") and held a hearing related to Jane Roe's complaint about Plaintiff.  *See id.* at ¶ 22.  Plaintiff told the Conduct Board that there was camera footage from the incident, but Plaintiff believes "the committee did not review the camera footage."  *See id.* at ¶ 23.  On August 9, 2019, "the Conduct Board issued a decision regarding the complaint filed by Jane Roe.  It entered a factual finding that Jane Roe was not credible, and that she 'downplayed' her own role in the February 12th and March 4th incidents."  *See id.* at 24.  However, the Conduct Board nonetheless issued a one-year disciplinary probation against Plaintiff, yet, Plaintiff believes, did not issue sanctions against Jane Roe.  *See id.* at ¶ 25.

In addition, Plaintiff alleges that (1) "[d]uring the months that followed the disciplinary hearing, Jane Roe continued to harass [him] while telling mutual acquaintances that she intended to get him arrested and destroy his academic career"; (2) "[o]n one occasion, Jane Roe falsely reported that [he] violated the NCO by viewing one of her stories on Snapchat"; (3) "it was Jane Roe, not [he] who repeatedly violated the NCO . . . [for example] [i]n September 2021, [she] attempted to physically attack [him] . . . [by] charg[ing] at him while screaming, "Don't acknowledge someone while I'm here!" [and his] friend held her back from hitting [him], as she . . . lunged towards [him] and swung her arms in rage"; (4) "[i]n December 2021, . . . Jane Roe approached [him] aggressively and shouted, "I heard you were talking about me.  Just know that I can get you arrested"; (5) "Jane Roe . . . encouraged other students, mostly female students, to spread false and incendiary rumors about [him] . . . [and] [i]n one instance, Jane Roe and a group

of her female friends called [him] a 'rapist' on YikYak (a social media platform) . . . [and] [a]s a result . . . numerous students threatened to physically harm [him]"; (6) "[o]n several occasions, Plaintiff and his family reported this conduct to SU [but] upon information and belief, SU did not take disciplinary action against Jane Roe and the other female students who threatened and harassed [him]"; and (7) "[t]he threatening and harassing conduct of Jane Roe and other female students continued until the Spring 2022 semester, which was [his] and Jane Roe's final semester at SU." *See id.* at ¶¶ 26-33.

On February 8, 2022, Plaintiff was walking to class at SU. *See id.* at ¶ 34. He had just finished eating his lunch and was holding a fountain drink in his right hand. *See id.* As he was approaching the Whitman School, he passed Jane Roe, who was wearing a mask. *See id.* at ¶ 35. Plaintiff mistook Jane Roe for another student and greeted her by saying "hi." *See id.* Jane Roe then turned around towards Plaintiff, lowered her mask, and shouted: "Do you know who I am? I can get you arrested!" *See id.* at ¶ 36. As soon as he learned of Jane Roe's identity, Plaintiff proceeded to walk away from her and towards his class. *See id.* at ¶ 37. "Jane Roe then pursued Plaintiff. She aggressively put her cell phone camera in his face and shouted, 'This is Brandon Williams!'" *See id.* at ¶ 38.

> Plaintiff became very uncomfortable and anxious because Jane Roe had threatened on numerous occasions that she would have him arrested. His immediate reaction was to push Jane Roe's camera out of his face with an open left hand and say, "Get that camera out of my face." Plaintiff did not punch or otherwise strike Jane Roe.

*See id.* at ¶ 39.

Plaintiff then ran inside the Whitman School, called his mother to tell her about the incident, and then walked to class where he was scheduled to give a presentation. *See id.* at ¶¶ 40-41.

Defendants Zarnowski and Fuentes received a complaint from Jane Roe about the incident and then proceeded to Plaintiff's classroom, where they stood outside the hallway for several minutes waiting for Defendant Romano. *See id.* at ¶ 42. "Bodycam footage taken from the incident shows Defendant Zarnowski stating that she is looking for a 'black male' and then standing in the hallway outside of the front door of Plaintiff's classroom, appearing very anxious to enter the classroom." *See id.*[2] The footage also shows Plaintiff's professor stepping outside the classroom to speak with Defendants Zarnowski and Fuentes. *See id.* at ¶ 43. Defendant Zarnowski asked the professor if Plaintiff was in the classroom. *See id.* The professor responded that Plaintiff was presenting in the front of the classroom, and he requested that Defendant Zarnowski "let him finish his presentation." *See id.* at ¶ 44. Defendant Zarnowski declined to wait in the hallway and stated, "we're waiting for the other officer and then we're going to jump in." *See id.* She did not inform the professor that she and the other DPS officers intended to arrest Plaintiff. *See id.*

About five minutes into Plaintiff's presentation, while he was standing and speaking in front of a classroom of about 40 students, Defendants Zarnowski, Romano, and Fuentes, who were on-duty SU DPS officers, entered the classroom, approached Plaintiff, and said, "you gotta come with us." *See id.* at ¶ 45. Defendants Zarnowski, Romano, and Fuentes did not identify

---

[2]This Court does not credit Plaintiff's subjective, conclusory allegation that Defendant Zarnowski appeared "very anxious to enter the classroom."

themselves.  *See id.* at ¶ 46.  They did not inform Plaintiff that he was under arrest and did not read him his *Miranda* rights.  *See id.*

Plaintiff was confused as to why the officers were demanding that he come with them. *See id.* at ¶ 47.  He responded, "why?" and told the officers that he needed to know where he was being taken.  *See id.*  Plaintiff took one step back, but he did not attempt to flee from Defendants Zarnowski, Romano, and Fuentes.  *See id.*  "Then, without any provocation, Defendants Zarnowski, Romano, and Fuentes forcibly knocked Plaintiff to the ground from behind and restrained his arms and hands behind his back."  *See id.* at ¶ 48.  "The three officers held him face down for several minutes."  *See id.*

Plaintiff suffers from asthma and anxiety and began to lose his breath.  *See id.* at ¶ 49. He stated several times: "Stop!" and "I can't breathe!"  *See id.*  Several students in the classroom looked on and pleaded with Defendants Zarnowski, Romano, and Fuentes to stop assaulting Plaintiff.  *See id.* at ¶ 50.  One student told the officers that Plaintiff had a medical condition.  *See id.*  The officers nonetheless continued to hold Plaintiff on the ground and handcuff him without providing him with an explanation of why he was being restrained.  *See id.* at ¶ 51.  In video footage taken of the incident, one of the officers can be heard stating to Plaintiff, "Stop. You're making a scene in class."  *See id.*  Officer Zarnowski was heard stating, "work with us and we will tell you after, all you have to do is cooperate."  *See id.*  Another officer falsely stated that Plaintiff had a "knife," when, in fact, he had a plastic butter knife wrapped in a napkin in his pocket, which he had saved from his lunch.  *See id.*  Officer Romano stated, "stop resisting" which, Plaintiff asserts, was "an apparent attempt to justify his use of unnecessary and excessive force."  *See id.*

Plaintiff contends that, as he was pinned to the ground, he was "dehumanized and humiliated in front of his peers." *See id.* at ¶ 52. He further contends that the fact that Defendants did not inform him as to why he was being restrained and taken away added to his anxiety and made it even more difficult for him to breathe. *See id.* Defendants Zarnowski, Romano, and Fuentes did not call for an ambulance or other medical support even though Plaintiff was clearly stating that he was unable to breathe. *See id.* at ¶ 53. Defendants Zarnowski, Romano, and Fuentes then dragged Plaintiff out of the classroom. *See id.* at ¶ 54. Bodycam footage taken from the hallway outside the classroom purportedly shows that Plaintiff "was in shock, sweating, and desperately trying to catch his breath even after he was able to get to his feet." *See id.*

After Defendants Zarnowski, Romano, and Fuentes handcuffed Plaintiff and dragged him out of the classroom, Defendants Zarnowski and Fuentes proceeded to escort him through the building in handcuffs as other students watched from the hallway. *See id.* at ¶ 55. Plaintiff was then taken to the DPS office, where he was detained for hours without being permitted to use the bathroom or make a phone call. *See id.* at ¶ 56. Plaintiff was released only after his parents located him and demanded his release. *See id.*

Plaintiff contends that Defendants Zarnowski, Fuentes, and Romano's conduct in entering Plaintiff's classroom and approaching him while he was giving a presentation, and then aggressively pinning him to the ground, restraining him face down, forcefully handcuffing him, and taking him into custody "was unjustified and unreasonable." *See id.* at ¶ 57. Plaintiff also contends, upon information and belief, that Defendants Zarnowski, Fuentes, and Romano took such action against Plaintiff because he is a Black man. *See id.* at ¶ 58.

Following Plaintiff's arrest, Defendant SU filed two criminal charges for Assault in the 3rd Degree, and one charge of Resisting Arrest, against Plaintiff. *See id.* at ¶ 59. In support of its first charge of Assault in the 3rd Degree, Defendant SU falsely alleged that Plaintiff "did intentionally cause physical injury to another." *See id.* at ¶ 60. Defendant SU further alleged that Jane Roe "required medical attention and was transported by ambulance to St. Joseph's Hospital where she was treated for head and face pain along with swelling, bruising and blurred vision to her left eye," *see id.*, and that Jane Roe was "diagnosed with a concussions [sic]." *See id.*

Plaintiff asserts the following:

> (1) The first charge, which was signed by Lt. Richard Smith of DPS, contains one or more false statements. Medical records provided in connection with Plaintiff's criminal proceeding proved that Jane Roe did not sustain any injuries. In fact, the emergency staff at St. Joseph's Hospital expressly ruled out a concussion and found "unremarkable" findings upon examining Jane Roe for self-reported "face pain."

> (2) In support of its second charge of Assault in the 3rd Degree, SU alleged that "During his struggle with uniformed officers of the Department of Public Safety [redacted] actively resisting, forcing the arresting offers to struggle to safely bring [Plaintiff] to the ground where he continued to resist until he was finally placed in handcuffs. During the struggle, an arresting officer, PSO John Romano suffered an injury to his left wrist. Officer Romano was in extreme pain and was treated at Crouse Hospital where he was diagnosed with a sprained left wrist."

> (3) The second charge, which was signed by Commander M. J. Hartnett, contains one or more false statements. Bodycam footage taken from the incident shows that Plaintiff was never informed that he was being arrested and, therefore, did not resist arrest. The charge also contradicts an incident statement prepared and signed by Defendant Zarnowski, in which she alleged that Defendant Romano "sustained a severe sprain to his right wrist." Upon information and belief, there is no record of Defendant Romano going to Crouse Hospital and receiving a diagnosis of a sprained left wrist.

(4) In support of its charge of Resisting Arrest, SU alleged that Plaintiff "intentionally prevent[ed] the Department of Public Safety Officers from effecting an authorized lawful arrest for Assault in the 3rd when he failed to comply with repeated verbal commands advising him to place his hands behind his back.  Furthermore, [Plaintiff] pull[ed] and struggle[d] against uniformed officers.  As a result of [Plaintiff's] actions, he was safely taken down to the ground and placed in handcuffs."

(5) The charge, which was signed by Defendant Zarnowski, contains false statements.  It is clear from multiple versions of video footage, and witness accounts, that Defendants Zarnowski, Romano, and Fuentes never informed Plaintiff that he was being placed under arrest.  Therefore, he did not resist arrest.  The footage also shows that Defendants never asked Plaintiff to place his hands behind his back and that Plaintiff did not "pull or struggle" prior to being taken to the ground.  Finally, Defendants' use of excessive force during the arrest was not "safe."

(6) As a result of the false statements made by officers of DPS, including Defendant Zarnowski, Plaintiff was criminally charged with two misdemeanor counts of Assault in the 3rd Degree and one misdemeanor count of Resisting Arrest.  Plaintiff was forced to retain a criminal defense attorney, at this own expense, to defend himself against the charges.

*See id.* at ¶¶ 61-66.

In addition to filing criminal charges against Plaintiff, Defendant SU pursued disciplinary charges against him.  *See id.* at ¶ 67.  On February 8, 2022, Defendant Hradsky issued a letter placing Plaintiff on an interim suspension.  *See id.* at ¶ 68.  As his purported basis for that action, Defendant Hradsky claimed that Plaintiff "engaged in a physical altercation with another student with whom you have a No Contact Order, where you allegedly struck them in the face causing injury."  *See id.*  Defendant Hradsky also stated, "It is further alleged that when interacting with Department of Public Safety Officers, you resisted arrest, and caused injury to the officer."  *See id.*  Under the terms of the interim suspension, Plaintiff was prohibited from any presence on SU owned property and from enrollment in any course or program offered by Defendant SU.  *See id.*

at ¶ 69.  He was forced to immediately disenroll from his classes only three months prior to his scheduled graduation date.  *See id.*

On April 12, 2022, Defendant SU's Office of Community Standards issued a notice to Plaintiff stating that he was being charged with violating four sections of Defendant SU's Code of Student Conduct:

> Section 1) Physical harm or threat of physical harm to any person or persons, including but not limited to: assault, sexual assault, or other forms of physical abuse; Section 3) Assistance, participation in, promotion of, or perpetuation of conduct, whether physical, electronic, oral, written or video, which threatens the mental health, physical health, or safety of anyone; Section 12) violation of any international, federal, state, or local law; and Section 18) failure to comply with the lawful directives of University officials who are performing the duties of their office, especially as they are related to the maintenance of safety or security.

*See id.* at ¶ 70.

On April 22, 2022, a Student Conduct Board assembled pursuant to Defendant SU's Student Conduct System Handbook and conducted a hearing on the above charges.  *See id.* at ¶ 71.  "During the hearing, Plaintiff presented credible evidence that he did not physically assault Jane Roe, and that he did not resist arrest.  Plaintiff played video footage of his interaction with Jane Roe and pointed out that he was holding a drink in his right, dominant hand, and used his left hand to push her phone away in self-defense."  *See id.* at ¶ 72.  Plaintiff also played video footage of his interaction with Defendants Zarnowski, Romano, and Fuentes to show the Conduct Board that he was not told that he was being arrested and that he did not resist arrest. *See id.* at ¶ 73.

Furthermore, Plaintiff asserts the following:

(1) On May 23, 2022, the Conduct Board issued a decision finding Plaintiff "responsible" for violations of three sections of the Code of Student Conduct: Section 1 of the Code - Physical harm or threat of physical harm to any person or

persons, including but not limited to: assault, sexual assault, or other forms of physical abuse; Section 3 of the Code - Assistance, participation in, promotion of, or perpetuation of conduct, whether physical, electronic, oral, written or video, which threatens the mental health, physical health, or safety of anyone; and Section 12 of the Code - violation of any international, federal, state, or local law.

(2) The Conduct Board found Plaintiff "not responsible" for a violation of Section 18 of the Code: "failure to comply with the lawful directives of University officials who are performing the duties of their office, especially as they are related to the maintenance of safety or security."

(3) The Conduct Board provided the following basis for its decision of "responsible": "The Board found that on or about February 8, 2022, the Impacted Party put her phone in your face to record you.  Your action of reaching out to push the phone away from you was excessive and more likely than not caused mental and physical injury to the impacted party."

(4) The Conduct Board provided the following basis for its decision of "not responsible": "You did not violate your no contact order as there is no evidence to say you approached the Impacted Party first or had any communication with them. Additionally, you did not resist arrest as you were never instructed you were being arrested nor instructed why you had to leave with Department of Public Safety officers."

*See id.* at ¶¶ 74-77.

Despite the Conduct Board's finding that Plaintiff did not violate the NCO and did

not resist arrest, it nonetheless recommended that Plaintiff be given a one semester suspension.

*See id.* at ¶ 78.  Defendant SU accepted the Conduct Board's recommendation and imposed a

one-semester suspension upon Plaintiff for the Spring 2023 academic term.  *See id.*  Plaintiff

contends that Defendant SU's decision to impose a suspension as discipline was based on an

unsupported allegation that Jane Roe suffered a physical injury from her encounter with Plaintiff.

*See id.* at ¶ 79.  He points out that the Conduct Board stated specifically: "The Board has

assigned the Respondent a one-semester suspension in light of the injury caused to Impacted

Party . . . she did have two contusions, a red-eye, and a concussion."  *See id.*

After receiving the Conduct Board's decision, Plaintiff obtained, through his

criminal proceeding, records from Jane Roe's visit to the emergency department of St. Joseph's Hospital.  *See id.* at ¶ 80.  Plaintiff contends that those records showed that Jane Roe did not sustain "two contusions, a red-eye, and a concussion," as both she and Defendant SU claimed. *See id.*  Rather, he contends, after conducting a physical examination and CT scan, the emergency department expressly ruled out a concussion and concluded that there were "unremarkable" findings with "no focal neuro deficits."  *See id.*  He also points out that Jane Roe's eyes presented as "negative for pain and redness."  *See id.*  He asserts that the only diagnosis given to Jane Roe was a "headache" and "left-sided face pain" – both of which were self-reported.  *See id.*

Plaintiff asserts that, with new evidence in hand, he submitted an appeal of the Board's decision to Defendant SU's Appeal Board.  *See id.* at ¶ 81.  Within the appeal, he provided a copy of Jane Roe's medical report purportedly proving that she did not sustain the injuries that she claimed.  *See id.*  Within the appeal, Plaintiff also reiterated that it was Jane Roe – not he – who violated the NCO.  *See id.* at ¶ 82.

Plaintiff asserts the following:

> (1) Despite the compelling and conclusive evidence provided by Plaintiff in his appeal, which established that Jane Roe provided false information to SU, the Appeals Board nonetheless sustained the Conduct Board's decision of a one semester suspension.  As its rationale for the decision, the Appeals Board stated that Plaintiff's conduct in pushing Jane Roe's phone away from his face was "excessive."

> (2) At the time that SU suspended Plaintiff, he had only 13 credits left to graduate.

> (3) Upon information and belief, SU did not pursue disciplinary charges against Jane Roe, even though it is undisputed that she violated the NCO and falsely stated that she was injured.

14

(4) In addition, bodycam footage taken from February 8, 2022 shows Jane Roe violently and disrespectfully confronting Defendant Zarnowski.  Upon information and belief, no disciplinary action was taken against Jane Roe for her conduct towards the officer.

(5) Upon information and belief, SU also did not pursue disciplinary charges against numerous other female students who also physically threatened and bullied Plaintiff, including the female students who labeled Plaintiff a "rapist" and placed him in immediate physical harm.

(6) As a result of the actions taken by Defendants, Plaintiff has suffered severe emotional distress, mental trauma, and physical harm, including pain and swelling to his wrists.

(7) Plaintiff has also incurred significant monetary damages resulting from Syracuse University's decision to suspend him and delay his entry into the workforce and its decision to bring criminal charges against him.

*See* Dkt. No. 7, Am. Compl., at ¶¶ 83-89.


### III. MOTION TO SEAL DEFENDANTS' EXHIBITS G AND H

Plaintiff moves for an order of protection pursuant to Federal Rules of Civil Procedure

26(c)[3] and 5.2(e)[4] "to seal and restrict access to" Defendants' Exhibits G, *see* Dkt. No. 21-10, and

H, *see* Dkt. No. 21-11, and to seal or redact "all filings that reference these documents."  *See* Dkt.

---

[3] Federal Rule of Civil Procedure 26(c) authorizes a federal court, for good cause, to issue to "[a] party or any person from whom discovery is sought," "an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense[.] . . ."  Fed. R. Civ. P. 26(c).

[4] Federal Rule of Civil Procedure 5.2 addresses privacy protections for filings made with the Court that include, among other things, an individual's social security number, taxpayer identification number, or the name of an individual known to be a minor, and, at subsection (e), allows a court, for good cause, to provide a protective order to "(1) require redaction of additional information; or (2) limit or prohibit a nonparty's remote electronic access to a document filed with the court."  Fed. R. Civ. P. 5.2.

No. 30-1 at 1, 3.  Exhibits G and H are copies of Plaintiff's plea colloquy and Certificate of

Disposition, respectively, in *People v. Brandon Williams* in Syracuse City Court.  *See* Dkt. No.

21-1, Powers Decl., at ¶¶ 10-11.[5]  Plaintiff contends that the Court should seal these documents

because he is concerned about "serious and permanent harm to his reputation" and "retaliatory

emotional or physical harm," which "may arise if these documents are publicly available."  *See*

Dkt. No. 30-1 at 1.  He also maintains that "[t]hese documents constitute criminal records subject

to the sealing protections of Section 160.55 of the New York Criminal Procedure Law, and

regardless of their use as evidence in this case as between the parties, they should be protected

from public disclosure due to the potential for harm they could engender."  *See id.* at 1-2.

Defendants argue that neither the sealing protections of New York Criminal Procedure

Law ("CPL") § 160.50 (which seals court records in criminal actions that terminate favorably to

the accused), nor CPL § 160.55 (which seals law enforcement and prosecutorial records in

criminal actions that result in conviction of a non-criminal offense), should apply in this case.  In

this regard, Defendants contend that, "because Plaintiff pled guilty to two violations, *only* CPL

§ 160.55 applies to the convictions that are at issue in this lawsuit.  CPL § 160.50, which only

applies to criminal actions terminating in favor of the accused, does not apply to the two

convictions, which are fatal to his federal and state false arrest claims."  *See* Dkt. No. 27,

Defendants' Second Letter Motion, at 1.

Defendants further argue that, "by bringing this action, Plaintiff has affirmatively placed

his conduct at issue, thereby waiving any statutory protections conferred by CPL §§ 160.50,

---

[5] The Court notes that, in Plaintiff's redacted brief opposing Defendants' motion to dismiss and supporting amendment (filed after Plaintiff moved for a protective order), he references these documents and explains that they are "[r]ecords relating to Plaintiff's guilty plea for non-criminal violations of harassment and disorderly conduct."  *See* Dkt. No. 43, Plaintiff's Memorandum of Law, at 11.

160.55." *See id.* at 1 (citing *Green v. Montgomery*, 95 N.Y.2d 693 (2001) ("Where, however, an individual affirmatively places the underlying conduct at issue by bringing a civil suit, the courts have consistently held that the statutory protection [of CPL § 160.50] is waived.")) (other citations omitted).  Defendants maintain that "there is no basis to seal the referenced exhibits and keep them from the public docket pursuant to Local Rule 5.2 or *Lugosch v. Pyramid Co. of Onondaga County*, 435 F.3d 110, 119-27 (2d Cir. 2006)." *See id.* at 2.

A.      **Legal Standard – Sealing and Redacting of Court Documents**[6]

        "The notion that the public should have access to the proceedings and documents of courts is integral to our system of government." *United States v. Erie Cnty.*, 763 F.3d 235, 238-39 (2d Cir. 2014); *see Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 119 (2d Cir. 2006). "Indeed, the common law right of public access to judicial documents is said to predate even the Constitution itself." *Erie Cnty.*, 763 F.3d at 239 (citation omitted).  The First Amendment to the U.S. Constitution "also protects the public's right to have access to judicial documents." *Id.* (citation omitted).  A party seeking to seal documents submitted to a court bears the burden of showing that sealing is proper. *See DiRussa v. Dean Witter Reynolds Inc.*, 121 F.3d 818, 826 (2d Cir. 1997) (citations omitted).

        "A 'judicial document' or 'judicial record' is a filed item that is 'relevant to the performance of the judicial function and useful in the judicial process.'" *Bernstein v. Bernstein Litowitz Berger & Grossmann LLP*, 814 F.3d 132, 139 (2d Cir. 2016) (quoting *Lugosch v.*

---

[6] The Court reviews the pending motions to seal the referenced documents under the well-settled Second Circuit standard for sealing documents in federal court, *see Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 119-27 (2d Cir. 2006), and not strictly under the good cause standard Federal Rules of Civil Procedure 26(c) and 5.2(e) employ.  The Court does, however, consider Plaintiff's good faith arguments in the context of the sealing analysis.

*Pyramid Co. of Onondaga,* 435 F.3d 110, 119 (2d Cir. 2006) (internal quotation marks omitted)). "A '[f]inding that a document is a "judicial document" triggers a presumption of public access, and requires a court to make specific, rigorous findings before sealing the document or otherwise denying public access.'" *Id.* at 141 (quoting *Newsday [LLC v. City of Nassau]*, 730 F.3d [156,] 167 n.15 [(2d Cir. 2013)]). "The 'presumption of access' to judicial records is secured by two independent sources: the First Amendment and the common law." *Id.* (quoting *Lugosch,* 435 F.3d at 121). "The analysis with respect to each is somewhat different." *Id.*

Under the common law analysis, once the court finds "that the documents are judicial documents and that therefore a common law presumption of access attaches, it must determine the weight of that presumption." *Lugosch*, 435 F.3d at 119.

> "[T]he weight to be given the presumption of access must be governed by the role of the material at issue in the exercise of Article III judicial power and the resultant value of such information to those monitoring the federal courts. Generally, the information will fall somewhere on a continuum from matters that directly affect an adjudication to matters that come within a court's purview solely to insure their irrelevance."

*Id.* (quoting *Amodeo II*, 71 F.3d [1044,] 1049 [(2d Cir. 1995)]). "When a document plays a role in a court's adjudication of litigants' substantive rights -- a function that is 'at the heart of Article III' -- the presumption is strong, but '[a]s one moves along the continuum, the weight of the presumption declines.'" *Doe v. Rensselaer Polytechnic Inst.*, No. 1:20-cv-01359 (BKS/CFH), 2020 WL 6586290, *1 (N.D.N.Y. Nov. 10, 2020) (quoting [*Amodeo II*, 71 F.3d] at 1049). "When 'documents are usually filed with the court and are generally available, the weight of the presumption is stronger than where filing with the court is unusual or is generally under seal.'" *Id.* (quoting [*Amodeo II*, 71 F.3d] at 1050).

Next, the court must balance any "countervailing factors" weighing against the presumption of access. *Lugosch,* 435 F. 3d at 120. "[T]he crux of the weight-of-the-presumption analysis" requires "balancing the value of public disclosure and 'countervailing factors' such as '(i) the danger of impairing law enforcement or judicial efficiency and (ii) the privacy interests of those resisting disclosure.'" *Bernstein*, 814 F.3d at 143 (quotation and other citation omitted). "[T]he privacy interests of third parties [also] carry great weight in the balancing of interests." *Dorsett v. Cty. of Nassau*, 762 F. Supp. 500, 521 (E.D.N.Y.), *aff'd*, 800 F. Supp. 2d 453 (E.D.N.Y. 2011), *aff'd sub nom. Newsday LLC v. Cty. of Nassau*, 730 F.3d 156 (2d Cir. 2013).

"When weighing privacy interests, courts should consider 'the degree to which the subject matter is traditionally considered private rather than public.'" *Rensselaer Polytechnic Inst.*, 2020 WL 6586290, at *2 (quoting *Amodeo II*, 71 F.3d at 1051). "Courts should also assess the 'nature and degree of injury,' paying heed to 'the sensitivity of the information and the subject' but also to 'how the person seeking access intends to use the information.'" *Id.* (quoting [*Amodeo II*, 71 F.3d] at 1051 (explaining that "[c]ommercial competitors seeking an advantage over rivals need not be indulged in the name of monitoring the courts")). "Only when competing interests outweigh the presumption [of access] may access be denied." *Erie Cnty.*, 763 F.3d at 239 (citing [*Lugosch*, 435 F.3d] at 119-20).

The First Amendment right of access stems from the qualified right of the public and the press "'to attend judicial proceedings and to access certain judicial documents.'" *Lugosch*, 435 F.3d 120 (quoting *Hartford Courant Co. v. Pellegrino*, 380 F.3d 83, 91 (2d Cir. 2004)). The Second Circuit has described the "First Amendment framework" for sealing a judicial document as "more stringent." *Id.* at 124. Once a court concludes that there is a qualified First

Amendment right of access to the judicial documents at issue, it may only seal the documents "'if specific, on the record findings are made demonstrating that closure is essential to preserve higher values and is narrowly tailored to serve that interest.'"  *Id.* at 120 (quoting *In re N.Y. Times Co.*, 828 F.2d [110,] 116 [(2d Cir. 1987)] (internal quotation marks omitted)).  "'Broad and general findings by the trial court . . . are not sufficient to justify closure.'"  *Id.* (quoting [*In re N.Y. Times Co.*, 828 F.2d at 116]).  Examples of "higher values" may include law enforcement interests and the privacy of innocent third parties.  *United States v. Amodeo (Amodeo II)*, 71 F.3d 1044, 1050 (2d Cir. 1995).  The party seeking to place or maintain judicial documents under seal bears the burden of showing that higher values overcome the presumption of public access.  *DiRussa*, 121 F.3d at 826.

## B.   Analysis

### 1. Whether the Pertinent Filings are Judicial Documents

Judicial documents are materials that are "'relevant to the performance of the judicial function and useful in the judicial process.'"  *Lugosch*, 435 F.3d at 119 (quoting [*United States v. Amodeo ("Amodeo I")*], 44 F.3d [141,] 145 [(2d Cir. 1995)]).  For purposes of this analysis, a document submitted in support of a motion is "relevant" so long as it has the tendency to influence the court's ruling, irrespective of whether the court considering the document is actually persuaded by it or ultimately deems the document immaterial to its decision.  *See Brown v. Maxwell*, 929 F.3d 41, 49 (2d Cir. 2019) (stating that "[a] document is thus 'relevant to the performance of the judicial function' if it would reasonably have the *tendency* to influence a district court's ruling on a motion . . . without regard to which way the court ultimately rules or whether the document ultimately in fact influences the court's decision" (footnote omitted)); *see*

*also Olson v. Major League Baseball*, 29 F.4th 59, 89 (2d Cir. 2022) (stating that "[t]he fact that the district court ultimately found the content of the [document] immaterial under the law does not undermine its classification as a judicial document"); *Bernstein*, 814 F.3d at 140 n.3 (stating that "a document is judicial not only if the judge actually relied upon it, but also if 'the judge *should*, have considered or relied upon [it], but did not'" (quotation omitted)).

In this respect, legal memoranda and accompanying exhibits submitted in support of a motion to dismiss are generally considered judicial documents.  *See Sec. & Exch. Comm'n v. Ripple Labs, Inc.*, 20 Civ. 10832 (AT), 2022 WL 329211, *2 (S.D.N.Y. Feb. 3, 2022) (ruling that a memorandum of law and exhibits submitted in support of a motion to dismiss were "'unquestionably judicial documents'" based on their relevance to the determination of a dispositive motion (citation omitted)); *Albino v. Global Equip. USA, LTD*, No. 6:14-cv-06519 (MAT), 2018 WL 1805553, *2 (W.D.N.Y. Apr. 17, 2018) (noting that "[c]ourts in this Circuit have held that documents submitted in support of or in opposition to a motion to dismiss . . . are entitled to the presumption of access [under common law and the First Amendment] and therefore are 'judicial documents'"); *see also Montgomery v. Cuomo*, No. 14-CV-6709 CJS, 2018 WL 1156842, *6 (W.D.N.Y. Mar. 5, 2018) (stating that "[t]he Court is entitled to consider the documents in connection with Defendants['] motions under Rules 12(b)(1) and 12(b)(3), and, in some cases, in connection with the 12(b)(6) motion insofar as they meet the standard for such motions").  Thus, because documents submitted in connection with a motion to dismiss are generally deemed judicial documents, they are generally deemed presumptively accessible to the public.  *See Albino*, 2018 WL 1805553, at *2 (citation omitted).

The fact that Plaintiff voluntarily dismissed his false arrest and false imprisonment claims -- the basis for which Exhibits G and H were apparently submitted, *see* Dkt. No. 35, Defendants'

Memorandum of Law, at 9-10, -- does not change the analysis in determining whether Exhibits

G and H are judicial documents.  "After *Lugosch,* it appears that the test focuses not on whether

the document was actually used by the court but, rather, on the role the document was intended

to play in the exercise of the court's Article III duties.  If a party submitted the document as part

of the process of adjudication, the presumption of public access accorded the document is

entitled to great weight." *United States v. Sattar*, 471 F. Supp. 2d 380, 386 (S.D.N.Y. 2006).

"The presumption of access remains even when the motion relying on the sealed documents is

rendered moot before it has been decided." *Pascal Abidor, Nat'l Ass'n of Crim. Def. Laws. v.

Johnson*, No. 10-CV-4059 (ERK), 2016 WL 3102017, *4 (E.D.N.Y. June 2, 2016) (citing

*Gambale [v. Deutsche Bank AG,]* 377 F.3d [133,] 141-42 [(2d Cir. 2004)]; *Eagle Star Ins. Co.

Ltd. v. Arrowood Indem. Co.*, No 13 CV 3410 (HB), 2013 WL 5322573, at *1-2 (S.D.N.Y. Sept.

23, 2013)).  Indeed, even if Exhibits G and H are now irrelevant, that "does not mean that they

are not judicial documents. The public has a presumptive right to access documents that were

submitted as part of an Article III adjudication."  *Shetty v. SG Blocks, Inc.*, No. 20-cv-00550-

ARR-SMG, 2020 WL 3183779, *11 (E.D.N.Y. June 15, 2020).  Further, as discussed below,

these documents may be relevant to other claims Plaintiff has made in this action.

Plaintiff maintains, however, that "Exhibits G and H to Defendants' 12(b)(6) motion

cannot be considered 'judicial documents' because they are neither incorporated by reference nor

integral to the Amended Complaint[.]"  *See* Dkt. No. 30-1 at 5 (citing *Standard Inv. Chartered,

Inc. [v. Nat'l Ass'n of Sec. Dealers, Inc.]*, 621 F. Supp. 2d [55,] 66 [(S.D.N.Y. 2007)] ("[B]ecause

documents [outside of the pleadings] submitted with a Rule 12(b)(6) motion can play no role in

the court's deliberations absent conversion [to a motion for summary judgment], the documents

cannot qualify as judicial for presumption-of-access purposes.")).  Plaintiff further maintains that

> [t]he Amended Complaint makes no reference whatsoever to these
> records, and it does not even mention Plaintiff's agreement to plead
> guilty to non-criminal offenses. . . . The documents are not
> "integral," as Plaintiff's counsel did not have knowledge of the
> documents and did not rely upon them in drafting the Amended
> Complaint. . . .  Thus, within the context of Defendants' pending
> 12(b)(6) motion, Exhibits G and H are not "judicial documents"
> worthy of a presumption of public access, and sealing should be
> permitted upon a showing of good cause.

*See id.* (internal citations and footnote omitted).

The Court is not persuaded by Plaintiff's arguments in this regard or his reliance on

*Standard Inv. Chartered, Inc. v. Nat'l Ass'n of Sec. Dealers, Inc.*, 621 F. Supp. 2d 55, 64

(S.D.N.Y. 2007)).  *Cf. Shetty v. SG Blocks, Inc.*, No. 20-cv-00550-ARR-SMG, 2020 WL

3183779, *10 (E.D.N.Y. June 15, 2020) (finding the decision in *Std. Inv. Chartered, Inc.*, which

is 13 years old "to be less persuasive than the more recent cases" in which the district courts have

extended the Second Circuit's reasoning in *Lugosch* that "'documents submitted to a court in

support of or in opposition to a motion for summary judgment are judicial documents to which a

presumption of immediate public access attaches under both the common law and the First

Amendment'" to "documents filed in support of a motion to dismiss" (quotation and other

citations omitted)).

It is well-settled that "courts must consider the complaint in its entirety, as well as other

sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular,

documents incorporated into the complaint by reference, and matters of which a court may take

judicial notice."  *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007) (citing 5B

Wright & Miller § 1357 (3d ed. 2004 and Supp. 2007)); *see Kaplan v. Lebanese Canadian Bank,*

*SAL*, 999 F.3d 842, 854 (2d Cir. 2021) (same); *see also Vasquez v. City of New York*, No. 10 Civ.

6277 (LBS), 2012 WL 4377774, *1 (S.D.N.Y. Sept. 24, 2012) (noting that "there are exceptions

to the rule [articulated in *Standard Inv. Chartered, Inc.*] that documents outside the pleadings

cannot be considered in a 12(b)(6) motion.  '[A] court may consider "documents attached to the

complaint as an exhibit or incorporated in it by reference, . . . matters of which judicial notice

may be taken, or . . . documents either in plaintiffs' possession or of which plaintiffs had

knowledge and relied on in bringing suit."'" (quoting *Chambers v. Time Warner, Inc.,* 282 F.3d

147, 153 (2d Cir. 2002) (quoting *Brass v. Am. Film Techs., Inc.,* 987 F.2d 142, 150 (2d

Cir.1993)))).  "[C]ourts routinely take judicial notice of guilty pleas in section 1983 cases at the

motion to dismiss stage."  *Smith v. Rossini*, No. 19-CV-323 (MKB), 2020 WL 9816016, *2, n.4

(E.D.N.Y. Nov. 30, 2020) (citing *Livingston v. Henderson*, No. 15-CV-631, 2019 WL 1427689,

at *5 & n.8 (N.D.N.Y. Mar. 29, 2019) (taking judicial notice of "Certificate of

Conviction/Disposition" on grounds that "[t]he state prosecution of an individual is a matter of

public record"); *Johnson v. Pugh*, No. 11-CV-385, 2013 WL 3013661, at *2 (E.D.N.Y. June 18,

2013) (finding it "proper to take judicial notice of plaintiff's guilty plea, conviction, and

sentencing as a matter of public record without converting defendant's motion to one for

summary judgment"); *Rios v. Third Precinct Bay Shore*, No. 08-CV-4641, 2009 WL 2601303, at

*1 & n.2 (E.D.N.Y. Aug. 20, 2009) (taking judicial notice of conviction by guilty plea in section

1983 case); *Simmons v. Kelly*, No. 06-CV-6183, 2009 WL 857410, at *2 n.4, 4 (S.D.N.Y. Mar.

31, 2009) (same); *Wingate v. Gives*, No. 05-CV-1872, 2008 WL 5649089, at *3 n.7 (S.D.N.Y.

Apr. 13, 2008) (same)).

     The Court agrees with Defendants that, because Exhibits G and H are public records that

were submitted in support of their motion to dismiss, the documents are relevant to this Court's

Article III determination of a dispositive motion and therefore constitute judicial documents.  *See*

*Sec. & Exch. Comm'n*, 2022 WL 329211, at *2; *see also Vasquez*, 2012 WL 4377774, *2

(deeming a transcript submitted in conjunction with defendant's 12(b)(6) motion to dismiss a judicial document because it was properly within the court's purview as the court had taken judicial notice of it, and thus relevant to adjudication of the motion).  Furthermore, documents of this type are generally filed with the court and generally available to the public albeit with limited redactions removing certain protected personal information, but without wholesale sealing.

The Court also agrees with Defendants' alternative argument that, "even assuming *arguendo* that this Court ultimately concludes that it will not consider the public records submitted by Defendants, the courts in this circuit have resisted *Standard Investment Chartered, Inc*.'s suggestion that a finding of irrelevancy would deprive the documents of their status as 'judicial documents.'"  *See* Dkt. No. 35 at 7 (citing *Olsen*, 29 F. 4th at 89-90 ("The fact that the district court ultimately found the contents of the [document] immaterial under the law *does not* undermine its classification as a judicial document." (emphasis added)); *In re New York City Policing During Summer 2020 Demonstrations*, 20-CV-8924, 2022 WL7886182, at *5 (S.D.N.Y. Oct. 14, 2022) (recognizing that "even a decision [on a motion] that determines that the documents are not relevant" does not weaken a presumption of public access))).

Thus, the Court determines that Exhibits G and H and the legal briefs addressed to or that reference these exhibits are judicial documents to which both a common law presumption of access and a "qualified First Amendment right of access" apply.  *Lugosch*, 435 F.3d at 123-24.

### 2. Weight of the Presumption of Access Afforded to Judicial Documents

Once the Court determines that a document is a judicial document, "it determines the weight of the presumption of access afforded to the document."  *Monahan v. City of N.Y.*, No.

20-cv-2610 (PKC), 2022 WL 993571, *1 (S.D.N.Y. Mar. 30, 2022) (citation omitted).  In that

respect, the presumption of public access -- whether it be common law or the First Amendment

right of access -- exists on a continuum.  *See Brown*, 929 F.3d at 49; *Lugosch,* 435 F.3d at 119.

The more directly pertinent to the Court's Article III functions the particular judicial documents

are, the greater the weight that is given to the public's presumptive right of access.  *See Lugosch*,

435 F.3d at 121.  At the lower end of the continuum is material that "'lie[s] entirely beyond the

presumption's reach,'" including documents that are not filed on the docket.  *Brown*, 929 F.3d at

49 (footnotes omitted).  On the higher end of this continuum are "judicial documents," which

enjoy a strong presumption of public access.  *See id.*

Relevant to the strength of the presumption of public access is the centrality of the

documents sought to be sealed to the dispositive motion pending before the court.  *See Vasquez*,

2012 WL 4377774, at *2.  Where documents are material to the adjudication in question, the

presumption of public access attached to them carries a "great weight."  *See Montgomery*, 2018

WL 1156842, at *7 (citation omitted).  "When documents directly affect an adjudication or are

used to determine the litigants' substantive legal rights, 'the presumption of access is at its zenith'

and can only be overcome by 'extraordinary circumstances.'"  *Monahan*, 2022 WL 993571, at *1

(quoting *Bernstein*, 814 F.3d at 142).

"'When determining whether documents will be material to a court's yet-unmade-

decision, a court should assume that each validly presented, alternative ground has the potential

to be dispositive[.]'"  *Montgomery*, 2018 WL 1156842, at *7 (quoting *Vasquez v. City of New

York*, No. 10 CIV. 6277 LBS, 2012 WL 4377774, at *2 (S.D.N.Y. Sept. 24, 2012)).  Thus,

documents submitted in support of any valid argument contained within a Rule 12(b)(6) motion

to dismiss should be considered potentially dispositive in nature.  *See, e.g., Vasquez*, 2012 WL

4377774, at *2 (finding a transcript submitted in support of a 12(b)(6) motion properly before the court because it was entitled to judicial notice and also potentially dispositive because it was submitted in support of a valid argument contained within the motion to dismiss).  Accordingly, documents of this nature should be ascribed a "relatively heavy weight."  *Id.*

The Court agrees with Defendants that, because Exhibits G and H were submitted in support of a valid argument to dismiss Plaintiff's First and Eighth Causes of Action, the Court should assume their potential to be dispositive and afford the presumption associated with them great weight.  *See Vasquez*, 2012 WL 4377774, at *2; *Montgomery*, 2018 WL 1156842, at *7. The fact that Plaintiff voluntarily dismissed his false arrest and false imprisonment claims in the face of Defendants' dismissal motion does not change this conclusion.  *See United States v. Sattar*, 471 F. Supp. 2d 380, 386 (S.D.N.Y. 2006) (stating that, "[i]f a party submitted the document as part of the process of adjudication, the presumption of public access accorded the document is entitled to great weight")); *see also Pascal Abidor,* 2016 WL 3102017, at *4 (stating that "[t]he presumption of access remains even when the motion relying on the sealed documents is rendered moot before it has been decided" (citations omitted)).  Moreover, it is possible that Exhibits G and H might be relevant to questions arising in the context of Plaintiff's other claims. *Cf. Roe v. St. John's Univ.*, 91 F.4th 643, 652 (2d Cir. 2024) (noting that "[t]o successfully plead [a Title IX erroneous outcome] claim the plaintiff must allege (1) 'facts sufficient to cast some articulable doubt on the accuracy of the outcome of the disciplinary proceeding' and (2) 'circumstances suggesting that gender bias was a motivating factor behind the erroneous finding'" (quotation and other citation omitted)).  Thus, these documents might be relevant to the Court's determination of Plaintiff's claims -- either at the 12(b)(6) stage or later in this case -- and they do not lose their status as judicial documents and the weight accorded them because Plaintiff

dismissed his false arrest and false imprisonment claims. *See Sattar*, 471 F. Supp. 2d at 386; *Pascal Abidor,* 2016 WL 3102017, at *4; *cf. Brown*, 929 F.3d at 49 (stating that "[a] document is thus 'relevant to the performance of the judicial function' if it would reasonably have the *tendency* to influence a district court's ruling on a motion . . . without regard to which way the court ultimately rules or whether the document ultimately in fact influences the court's decision" (footnote omitted)).

### 3. Countervailing Factors

The Court must next consider whether countervailing factors outweigh the presumption of access and whether sealing of the objected-to information is "essential" to serve a "higher value." *Lugosch*, 435 F.3d at 120.

As indicated above, Plaintiff contends that Exhibits G and H, and any documents that reference these exhibits, should be sealed or redacted because he is concerned about "serious and permanent harm to his reputation" and "retaliatory emotional or physical harm," which "may arise if these documents are publicly available." *See* Dkt. No. 30-1, Plaintiff's Memorandum of Law, at 1. He also asserts that "[t]hese documents constitute criminal records subject to the sealing protections" of CPL 160.55. *See id.* Plaintiff maintains that he "agreed to enter a guilty plea for two non-criminal violations in part so that he could receive the protections of 160.55, and thereby pursue his professional and educational goals without the stigma of a criminal record." *See id.* at 7 (citation omitted).

CPL § 160.55(1)(c) provides for sealing of "all official records and papers relating to the arrest or prosecution, including all duplicates and copies thereof, *on file with the division of criminal justice services, police agency, or prosecutor's office . . . .*" CPL § 160.55(1)(c)

(emphasis added).  "Unlike CPL160.50(1)(c), CPL 160.55(1)(c) does not provide for sealing of judgments and orders of the court, 'reflecting a vital distinction between the rights granted [upon conviction of a violation or traffic offense] and those where defendant is acquitted.'"  *Johnson v Ass'n for Advancement of Blind & Retarded*, 21 Misc. 3d 268, 273 n.2 (N.Y. Sup. Ct., New York Cty., 2008) (quoting Preiser, *Practice Commentaries*, McKinney's Cons. Laws of N.Y., Book 11A, CPL 160.55, at 645).  Exhibits G and H are not law enforcement or prosecutor's office official records and papers relating to Plaintiff's arrest or prosecution but, rather, court records.  Thus, CPLR § 160.55(1)(c) does not necessarily provide Plaintiff with privacy protection governing Exhibits G and H.[7]

Further, any privacy protection Plaintiff might have under CPL § 160.55(1)(c), or under CPL § 160.50(1)(c),[8] was waived when Plaintiff commenced this action and asserted claims for false arrest and false imprisonment, which affirmatively placed the conduct underlying his state court convictions in issue.

> CPL 160.50 "creates a statutory privilege intended to ensure confidentiality and protect an individual from the potential stigma resulting from a criminal matter." *Wright v. Snow,* 175 A.D.2d 451, 452, 572 N.Y.S.2d 503 (3d Dept.1991).  "Where, however, an individual affirmatively places the underlying conduct at issue by bringing a civil suit, the courts have consistently held that the statutory protection is waived." *Green v. Montgomery,* 95 N.Y.2d 693, 701, 723 N.Y.S.2d 744, 746 N.E.2d 1036 (2001); *Rodriguez v. Ford Motor Co.,* 301 A.D.2d 372, 753 N.Y.S.2d 63 (1st Dept.2003).  This also applies to CPL 160.55, which similarly provides for sealing of criminal records.

---

[7] The Court recognizes that Exhibit H (the Certificate of Disposition) indicates, relative to the "Conviction Charge" for one count of Harassment 2nd and for the Disorderly Conduct count, that these charges are "SEALED 160.55." *See* Dkt. No. 30-5, Defendants' Ex. H.

[8] The Certificate of Disposition indicates that one of the harassment charges to which Plaintiff pled guilty was "Dismissed (Statutory Motion to Dismiss in Furtherance of Justice (CPL 170.40), Sealed 160.50." *See* Dkt. No. 30-5, Defendants' Ex. H.

*Johnson*, 21 Misc. 3d at 273 (footnote omitted); *see also Noel v. Clouston*, No. 21-CV-6559CJS, 2023 WL 7101324, *2 (W.D.N.Y. Oct. 27, 2023) (noting that, "[a]s the Second Circuit has acknowledged, 'a party who voluntarily initiates a civil action that [raises] issues covered by § 160.50 can therefore be viewed as having waived the protective veil of privacy that the law affords" (quoting *Green v. Montgomery*, 219 F.3d [52,] 57 [(2d Cir. 2000)]) (other citations omitted).

Because the statutory protections ordinarily conferred by CPL §§160.50 and 160.55 have been waived, the privacy interests arising from these statutes do not constitute a "competing consideration" that would justify sealing.  *See Cornwell v. Hancock Cent. Sch. Dist.*, 3:15-CV-00856-BKS-DEP, Dkt. No. 130, Memorandum-Decision and Order, at 8 (N.D.N.Y. Sept. 18, 2018) (Sannes, J.) (concluding that, "[s]ince the privilege [arising from CPL §160.50] has been waived, it does not constitute a 'competing consideration' that would justify sealing" (quoting *Amodeo*, 71 F.3d at 1050)).[9]

Moreover, Plaintiff indicates in the Amended Complaint that he was arrested on three misdemeanor counts and suspended from SU for his conduct on February 8, 2022.  Thus, he has already put into the public realm facts that might impact his employment prospects or subject him to harassment -- reasons he contends weigh in favor of sealing.  Plaintiff's privacy interests appear only slightly more impacted by his decision to plead guilty to violation offenses in satisfaction of the misdemeanor charges -- even assuming he believed that his conviction would be sealed -- than they do by his decision to put into controversy the facts underlying his criminal

---

[9]Judge Sannes' Memorandum-Decision and Order in *Cornwell* is annexed to the Declaration of Mary L. D'Agostino as Exhibit A.  *See* Dkt. No. 35-2.

charges, the criminal charges themselves, and the nature and results of the disciplinary proceedings.

Still further, Plaintiff indicates that he is not *per se* against use of these documents later in this case, *see* Dkt. No. 30-1, Plaintiff's Memorandum of Law, at 9, indicating a diminished concern about a negative impact on his privacy interests arising from public disclosure of these documents.

Finally, the Court has reviewed Exhibits G and H and documents that reference them and finds nothing that implicates a countervailing factor or higher value, such as law enforcement or third-party privacy interests.[10]  *See Amodeo*, 71 F.3d at 1050.

### 4. Conclusion – Sealing/Redaction

For the above-stated reasons, the Court concludes that Plaintiff has failed to identify a "countervailing interest" or "higher value" that would outweigh the common law or First Amendment right of access to Defendants' Exhibits G and H.  Therefore, the Court denies Plaintiff's motion for a protective order sealing Exhibits G and H and redacting related documents, *see* Dkt. No. 30, and grants Defendants' letter-motion arguing that Exhibits G and H should not be sealed, *see* Dkt. No. 27.

---

[10] The Court notes that, in Defendants' Exhibit H, the purported victim's identity is obscured.  *See* Dkt. No. 30-5, Defendants' Ex. H.

## IV. MOTION TO DISMISS

### A.  Standard of review

When legal sufficiency is challenged under Rule 12(b)(6), a court must accept as true all well-pleaded facts and draw all reasonable inferences in the favor of the pleader.  *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).  A complaint must contain sufficient factual allegations to "raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citation omitted).  Thus, "a complaint 'must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" *Kim v. Kimm*, 884 F.3d 98, 103 (2d Cir. 2018) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007) (internal quotation marks omitted))).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Aschcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted).  Claims should be dismissed where the plaintiff fails to advance "their claims across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570.

The presumption of truth does not extend to legal conclusions. *Lynch v. City of New York*, 952 F.3d 67, 75 (2d Cir. 2020).  In addition, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678 (citation omitted).  Nor do "labels," "conclusions" or "formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555.

> On a motion to dismiss pursuant to Rule 12(b)(6), the district court's task is to assess the pleadings to determine whether they

> contain sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face. *See Int'l Code Council, Inc. v. UpCodes Inc.*, 43 F.4th 46, 53 (2d Cir. 2022). In performing this exercise, district courts "may review only a narrow universe of materials," which includes "facts stated on the face of the complaint, documents appended to the complaint or incorporated in the complaint by reference, . . . matters of which judicial notice may be taken," as well as "document[s] not expressly incorporated by reference in the complaint [that are] nevertheless 'integral' to the complaint." *Goel v. Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016) (internal quotation marks, alterations, and citations omitted).

*Clark v. Hanley*, 89 F.4th 78, 93 (2d Cir. 2023) (footnote omitted).

## B.   Documents and Materials the Court May Consider

### 1. Defendants' Exhibits

Defendants have submitted several documents and other materials with their Rule 12(b)(6) motion. These materials include the following:

> 1. The Body Worn Camera ("BWC") footage from cameras worn by Defendants Zarnowski, Romano, and Fuentes on February 8, 2022, *see* Dkt. No. 21-1, Declaration of John Powers (hereinafter "Powers Decl."), Def. Exs. A, B, and C) ("the BWC footage");

> 2. A video taken from Jane Roe's cell phone on February 8, 2022, *see* Powers Decl., Def. Ex. D) ("Roe's cell phone video");

> 3. The decision of Defendant SU's Conduct Board in connection with disciplinary proceedings initiated against Plaintiff (the "Conduct Board Decision"), *see* Powers Decl., Ex. E; Plaintiff's written appeal of the Conduct Board Decision ("Plaintiff's Appeal"), *see* Powers Decl., Def. Ex. F; and Defendant SU's decision on the appeal (the "Appeal Decision"), *see* Powers Decl., Def. Ex. I (collectively "the Disciplinary Records");

> 4. A photograph of Roe which Defendants allege was taken by campus security officers, *see* Powers Decl., Def. Ex. E-1 (the "Photograph");

> 5. Jane Roe's emergency room medical records, *see* Powers Decl., Def. Ex. F-1 ("Jane Roe's Medical Records"); and

6. Records relating to Plaintiff's guilty plea for non-criminal violations in satisfaction of the criminal charges against him for his conduct on February 8, 2022, *see* Powers Decl., Def. Exs. G and H (the "Violation Records").

Plaintiff contends that three of the above exhibits – Roe's cell phone video, the Photograph, and the Violation Records – are outside the scope of the Amended Complaint and cannot be considered on a 12(b)(6) motion. *See* Dkt. No. 43, Plaintiff's Memorandum of Law, at 11. The Court addresses Plaintiff's challenges to these three items below.

### *(a). BWC footage*

Regarding the BWC footage, the Amended Complaint specifically references the officers' "bodycam footage," *see* Am. Compl. at ¶¶ 42, 54, 63, and 86, and so the BWC footage is necessarily incorporated into the pleading "by reference."

Further, the BWC footage can also be considered integral to the pleaded claims. To this end, where a complaint "relies heavily upon [a document's] terms and effect," the document is "'integral' to the complaint and, accordingly, a fair object of consideration on a motion to dismiss." *Goel v. Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016) (quoting *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) (internal quotation marks omitted)); *see also Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995) (noting that "'when a plaintiff chooses not to attach to the complaint or incorporate by reference a [document] upon which it solely relies and which is integral to the complaint,' the court may nevertheless take the document into consideration in deciding the defendant's motion to dismiss, without converting the proceeding to one for summary judgment" (quoting [*Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42,] 47-48 [(2d Cir. 1991)])). "A document is integral to the complaint where the plaintiff (1) has 'actual notice'

of the document and its information and (2) has 'relied upon the[] document in framing the

complaint.'" *McLennon v. City of New York*, 171 F. Supp. 3d 69, 89 (E.D.N.Y. 2016)

(quoting *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) (quoting *Cortec

Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991))).  "Merely mentioning a

document in the complaint will not satisfy this standard; indeed, even offering 'limited

quotation[s]' from the document is not enough." *Goel*, 820 F.3d at 559 (quoting *Global

Network Commc'ns*, 458 F.3d at 156) (other citation omitted).  "'In most instances where this

exception is recognized, the incorporated material is a contract or other legal document

containing obligations upon which the plaintiff's complaint stands or falls, but which for

some reason -- usually because the document, read in its entirety, would undermine the

legitimacy of the plaintiff's claim -- was not attached to the complaint.'" *Id.*  (quoting

*Global Network Commc'ns*, 458 F.3d at 157).

      The courts in this Circuit have applied this standard to allow videotaped material to be

considered as part of a court's Rule 12 analysis of pleading sufficiency.  *See, e.g., Santiago v.

City of Rochester Police Dep't*, No. 19-CV-6859-FPG, 2021 WL 3270511, *3 (W.D.N.Y. July 30,

2021) (concluding that "it is readily apparent that Plaintiffs relied upon the BWC video recording

in drafting their Amended Complaint as the video footage, and observations from the interactions

depicted, are explicitly referenced at various points throughout the Amended Complaint. . . .

Consideration of video footage in such circumstances is supported by the relevant caselaw . . ."

(citations omitted); *Torain v. Casey*, No. 16 Civ. 2682 (VEC) (JCF), 2016 WL 6780078, *2 n.1

(S.D.N.Y. Sept. 16, 2016) (holding that, "[b]ecause the [videotaped] interview is integral to the

Complaint, [the court] may consider the video without converting the motions into motions for

summary judgment" (citation omitted)); *cf. Norales v. Acevedo*, No. 21-549, 2022 WL 17958450,

*2 (2d Cir. 2022) (Summary Order) (concluding that "[t]he district court properly stated the 'integral to the complaint' standard and determined that the surveillance video . . . fell into that category" because "[k]ey allegations in the complaint rested on the content of the surveillance video . . .).

In this case, Plaintiff clearly reviewed and relied upon the BWC footage when drafting the operative pleading.  *See* Am. Compl. at ¶¶ 42, 54, 63, 86.  Most notably, various allegations identify direct quotes from the BWC footage.  *See id.* at ¶¶ 42-55.  Therefore, the Court finds that the BWC may be considered integral to the Amended Complaint because (1) Plaintiff had the BWC footage in his possession prior to drafting the Amended Complaint; (2) Plaintiff relied on the BWC footage in drafting the Amended Complaint; and (3) key allegations in the Amended Complaint rest on the content of the BWC footage.[11]

### (b). Disciplinary Records

Plaintiff references the Disciplinary Records in the Amended Complaint, pointing to disciplinary determinations that he alleges were unsupported or improperly made.  *See* Am. Compl. at ¶¶ 67-83.  This includes quotations from portions of the Disciplinary Records.  *See, e.g., id.* at ¶ 77.  Further, Plaintiff references parts of the Disciplinary Records in his opposition to Defendants' motion.  *See* Dkt. No. 43, Plaintiff's Memorandum of Law, at 28.  Therefore, the Court will consider the Disciplinary Records integral to the Amended Complaint because (1) Plaintiff had the Disciplinary Records in his possession prior to drafting the Amended Complaint; (2) Plaintiff relied on the Disciplinary Records in drafting the Amended Complaint;

---

[11] The Court notes that Plaintiff does not specifically object to the Court considering the BWC footage and references parts of the BWC footage in his opposition to Defendants' motion. *See* Dkt. No. 43, Plaintiff's Memorandum of Law, *passim*.

and (3) key allegations in the Amended Complaint rest on the content of the Disciplinary Records.

Therefore the Court grants Defendants' motion to file the Disciplinary Records in redacted form to shield from public view personal identifying information protected under 20 U.S.C. § 1232g(a)(4).  *See* Dkt. No. 32.

### (c). Jane Roe's Medical Records

Plaintiff cites to and references the contents of Jane Roe's Medical Records in the Amended Complaint to demonstrate that she provided false information to the Conduct Board, to demonstrate that the Conduct Board and Appeals Board arrived at erroneous determinations, and to demonstrate that Defendant SU engaged in selective enforcement of its Code of Conduct.  *See* Am. Compl. at ¶¶ 79-83, 85.  Thus, the Court will consider Jane Roe's Medical Records integral to the Amended Complaint because (1) Plaintiff had Jane Roe's Medical Records in his possession prior to drafting the Amended Complaint; (2) Plaintiff relied on Jane Roe's Medical Records in drafting the Amended Complaint; and (3) key allegations in the Amended Complaint rest on the content of Jane Roe's Medical Records.  Further, Plaintiff does not object to the Court considering Jane Roe's Medical Records and references parts of Jane Roe's Medical Records in his opposition to Defendants' motion.

### (d). Jane Roe's Cell Phone Video

Plaintiff argues that the Court should disregard Jane Roe's cell phone video "because it was not 'incorporated by reference' into the Amended Complaint.  The video was referenced in passing within a single paragraph of the Amended Complaint for the sole purpose of alleging that

Plaintiff presented evidence of his right dominant hand holding a drink during his encounter with

Jane Roe -- an undisputable fact which challenges any notion that he punched or otherwise

struck her.  Due to this limited reference, the cell phone video cannot be deemed to be

'incorporated by reference' to the Amended Complaint."  *See* Dkt. No. 43, Plaintiff's

Memorandum of Law, at 12 (citing *Goldman v. Belden*, 754 F.2d 1059, 1066 (2d Cir. 1985)

(passing references, and even limited quotations of extrinsic documents, are insufficient to deem

them incorporated into the pleading); *Thomas v. Westchester Cnty. Health Care Corp.*, 232 F.

Supp. 2d 273, 276 (S.D.N.Y. 2002) ("refer[ring] briefly in one paragraph" of a complaint does

not incorporate a document by reference for consideration of a Rule 12(b)(6) motion)).

 Plaintiff also argues that the cell phone video may not be considered under a theory that it

is integral to the Amended Complaint because that pleading does not rely heavily upon the

video's terms and effect, *see* Dkt. No. 43, Plaintiff's Memorandum of Law, at 12, and that "[e]ven

if a document meets the twin requirements of integrality -- reliance and notice -- a court still may

not consider it on a motion to dismiss if there is a dispute regarding 'the authenticity or accuracy

of the document' or the relevance of the document."  *See id.* at 12-13 (quoting [*DeLuca v.

AccessIT Group, Inc.*, 695 F. Supp. 2d 54,] 60 [(S.D.N.Y. 2010)] (quoting *Faulkner v. Beer*, 463

F.3d 130, 134 (2d Cir. 2006)).

 Plaintiff also contends that the cell phone video is of limited and marginal probative

value, *see id.* at 13, and that, "[a]side from its limited relevance, the video's authenticity is

questionable.  *See id.* at 13 n.3.  In this regard, Plaintiff notes that "[t]he video was taken from

Roe's cell phone and held in the custody of Defendants before an edited version was provided to

Plaintiff in connection with the Conduct Board hearing."  *See id.* at 13, n.3 (citing Powers Decl.,

Ex. A-1 at 51:00 – 51:15 (depicting Roe sending the video via text to Defendant Zarnowski)).

Plaintiff asserts that he "has not yet had an opportunity to investigate the video's authenticity. Thus, allowing Defendants to use the video at this early stage, for the stated purpose of proving that Plaintiff committed the act of 'striking out at' Roe, would be prejudicial."  *See id.*

Defendants point out that Plaintiff specifically relies on the cell phone footage in his Amended Complaint to demonstrate the strength of the evidence he submitted at his challenged disciplinary hearing, *see* Am. Compl. at ¶ 72, and refers to his and Jane Roe's actions and statements during this incident.  *See id.* at ¶¶ 38-39.  Defendants argue that "[t]he video is central to the incident and was not just referenced in the [Amended] Complaint, its content was pleaded as a reason to grant Plaintiff relief.  The video easily meets the standard for inclusion as either being incorporated by reference or integral."  *See* Dkt. No. 47, Defendants' Reply Memorandum, at 1-2 (citing *Norales v. Acevedo,* No. 21-549, 2022 WL 17958450, at *1-2 (2d Cir. Dec. 27, 2022) (trial court properly considered video on Rule 12 motion as integral to the pleading because "[k]ey allegations in the complaint rested on the content of the . . . video")).  Defendants further argue that "Plaintiff cannot *have it both ways*, relying on the content of cell phone video in his pleadings to support his claims while, in the same breath, objecting to the Court viewing that video to test the viability of these pleadings.  Courts in the Second Circuit have rejected this tactic."  *See id.* at 2 (citing *Berman v. Sugo LLC*, 580 F. Supp. 2d 191, 201 (S.D.N.Y. 2008) ("Where, as here, the pleader has notice of documents that are integral to its claims, the pleader may not avoid the Court's consideration of such documents simply because they contain material adverse to their claims."); *Leroy v. Delta Air Lines*, No. 21-267-CV, 2022 WL 12144507, *1, n. 2 & 3 (2d Cir. Oct. 27, 2022) ("to the extent there are inconsistencies between [the] complaint and the FACTS report, we credit [the] more detailed account in the FACTS report"); *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 422 (2d Cir. 2011) (observing that when reviewing a

judgment on the pleadings, courts assume facts alleged are true "unless contradicted by more specific allegations or documentary evidence")).

The Court agrees with Defendants to an extent.  Plaintiff's allegations regarding the contents of Jane Roe's cell phone video cannot be quantified as a passing reference or mere limited quotation.  As is evident from the Amended Complaint, and the reference to Jane Roe's cell phone video in ¶ 72, the contents of the video she was recording when she "aggressively put her cell phone camera in [Plaintiff's] face," *see* Am. Compl. at ¶ 38, is part of Plaintiff's effort to demonstrate why Defendant SU should not have been arrested or disciplined him.  *See, generally*, Am. Compl.  Further, Jane Roe's conduct on the date in question, which is evident from Jane Roe's cell phone video, is probative of Plaintiff's claim that he was subject to selective enforcement by Defendant SU in the disciplinary context and/or that Defendant SU reached an erroneous determination in these proceedings.  *See id.*

It is clear that Plaintiff had actual notice of Jane Roe's cell phone video, relied upon that video in framing the Amended Complaint, and relied on the video to support some of his claims.  Thus, the cell phone video may be deemed integral to some of the claims in the Amended Complaint.  Be that as it is may, however, Jane Roe's cell phone video depicts only a portion of the incident where Plaintiff reached out and pushed the cell phone away from his face while Roe was filming.  *See* Dkt. No. 21-5, Def. Ex. D, Cell Phone Recording (conventionally filed).  The allegations in the Amended Complaint describe what Plaintiff and Roe stated during this encounter, *see* Am. Compl. at ¶¶ 38-39, but the video does not clearly contain these statements.  Thus, in this regard, the video has limited relevance beyond demonstrating Jane Roe's action of approaching Plaintiff and filming him at close range and Plaintiff's actions when Roe placed her cell phone in his face and began recording.  Further, in light of the fact that Plaintiff raises an

authenticity argument, the Court will review Jane Roe's cell phone video only for what Plaintiff claims it represents -- that is, that, when Jane Roe approached him and placed her cell phone near his face, he reached out with his left hand and pushed the cell phone away.

### (e). The Photograph

Plaintiff argues that, although Defendants' numbering of the Photograph seeks to suggest that it was attached to the Conduct Board Decision, this was not the case as the Conduct Board Decision did not include any attachments.  Plaintiff also argues that the Photograph's authenticity and relevance "are highly suspect."  *See* Dkt. No. 43, Plaintiff's Memorandum of Law, at 14-15.

In response, Defendants argue that "the Conduct Board considered the photographs taken of the victim toward the issue of whether she was injured and referenced the photos in the written decision."  *See* Dkt. No. 47, Defendants' Reply Memorandum of Law, at 2 (citing Def. Ex. E at 9).  "Even if that photo is not properly considered by the Court, the information is also available to the Court in the [BWC footage], where Officer Zarnowski reports that the victim's eye is red," *see id.* (citing Def. Ex. A at 20:26:45-54), "and in Plaintiff's own admissions in his written administrative appeal."  *See id*. at 2-3 (citing Def. Ex. F at 90-91 ('within the photographs [submitted as part of the case file], Student X's eye appeared slightly red ….')).

Given that Plaintiff challenges the authenticity of this specific piece of evidence, the Court will not consider it at this stage of the proceedings and, instead, will rely on evidence to which Plaintiff does not object the Court considering.

### (f). The Violation Records

Plaintiff contends that "the Violation Records, which are the subject of Plaintiff's Motion

for a Protective Order, cannot be used for the purpose of proving that Plaintiff was guilty of

harassment in the second degree and disorderly conduct." *See* Dkt. No. 43, Plaintiff's

Memorandum of Law, at 22. In making this argument, Plaintiff relies on *Hesse v. Godiva*

*Chocolatier, Inc.,* 463 F. Supp. 3d 453 (2020), for the proposition that "'[a] party cannot rely on

material subject to judicial notice to "prove the truth of their contents."'" *See* Dkt. No. 43,

Plaintiff's Memorandum of Law, at 22 (quoting *Hesse v. Godiva Chocolatier, Inc.*, 463 F. Supp.

3d 463 (2020), citing *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007)). In *Hesse*, the court

took judicial notice of a trademark registration "because the trademark registration is a matter of

public record" and took judicial notice of information publicly announced on a party's website

because the plaintiffs did "not challenge the authenticity of these documents." *Hesse v. Godiva*

*Chocolatier, Inc.*, 463 F. Supp. 3d 453, 462-63 (S.D.N.Y. 2020). That court held, however, that,

"[e]ven though the Court takes judicial notice of these documents, their purposes at the motion-

to-dismiss stage are limited. They may be used only for 'determining what the documents state,'

and [the defendant] cannot rely on them to 'prove the truth of their contents.'" *Id.* at 463 (quoting

*Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007)).

*Hesse* does not directly support Plaintiff's argument that "Defendants cannot use Exhibits

G and H to prove that Plaintiff was guilty of the non-criminal violations set forth in his guilty

plea, as they seek to do." *See* Dkt. No. 43, Plaintiff's Memorandum of Law, at 15. What these

documents state is, essentially, that Plaintiff pled guilty to the non-criminal violations of

harassment and disorderly conduct. Further, Plaintiff acknowledges in his briefing that he pled

guilty to these two violations.  *See* Dkt. No. 43, Plaintiff's Memorandum of Law, at 11 ("Records relating to Plaintiff's guilty plea for non-criminal violations of harassment and disorderly conduct (the "Violation Records") (Powers Decl., Exs. G and H)"); Dkt. No. 30-1 at 2 (stating that "Plaintiff . . . was charged with two (2) misdemeanor counts of assault, and one (1) misdemeanor count of resisting arrest in connection with the incident of February 8, 2022 described in the Amended Complaint.  . . .  To avoid a public trial, Plaintiff agreed to plead guilty to non-criminal charges of harassment in the second degree and disorderly conduct." (internal citations omitted)). Accordingly, the Court will take judicial notice of the Violation Records for purposes of deciding the motion to dismiss and will consider them only for what they state.

### 2.  *Plaintiff's Exhibits*

Plaintiff also submits with his opposition video footage, recorded by two students in the classroom when Plaintiff was arrested, *see* Pl. Exs. A & B, and video footage recorded by a classroom camera at that time, *see* Pl. Ex. C.  As Plaintiff notes, these materials are incorporated by reference in the Amended Complaint.  *See* Am. Compl. at ¶¶ 50, 51, 65.  Accordingly, the Court will consider this video footage in the context of the motion to dismiss.

### C.    42 U.S.C. § 1983 claims against Defendants Zarnowski, Romano, and Fuentes

Plaintiff asserts his First,[12] Second, and Third Causes of Action against all Defendants pursuant to 42 U.S.C. §1983 ("Section 1983").  Section 1983 imposes liability on "[e]very

---

[12] Although Plaintiff voluntarily dismisses his First Cause of Action, the Court considers the allegations surrounding this cause of action in the context of determining whether Defendants acted under color of state law for purposes of the Section 1983 claims.

person" who acts "under color of any [state] statute, ordinance, regulation, custom, or usage" and violates a plaintiff's Constitutional rights.  42 U.S.C. §1983.  "'Because the United States Constitution regulates only the Government, not private parties, a litigant claiming that his constitutional rights have been violated must first establish that the challenged conduct constitutes "state action."'"  *Flagg v. Yonkers Sav. & Loan Ass'n,* 396 F.3d 178, 186 (2d Cir. 2005) (quoting *United States v. Int'l Bhd. of Teamsters*, 941 F.2d 1292, 1295 (2d Cir. 1991)); *see also Fabrikant v. French*, 691 F.3d 193, 206 (2d Cir. 2012); *Tancredi v. Metro. Life Ins. Co.,* 316 F.3d 308, 312 (2d Cir. 2003).

Defendants argue that Plaintiff may not maintain a Section 1983 claim against Defendant SU or Defendant SU Board because these entities are not "persons" whose conduct caused a deprivation of constitutional rights, s*ee* Dkt. No. 22, Defendants' Memorandum of Law, at 13; Dkt. No. 47, Defendants' Reply Memorandum of Law, at 3, and that previous case law establishes that Syracuse University is a private educational institution that cannot be construed as a state actor for purposes of § 1983, *see* Dkt. No. 22, Defendants' Memorandum of Law, at 14. Defendants also argue that Plaintiff may not maintain Section 1983 claims against Defendant SU employees because they are not state actors for purposes of Section 1983.  *See id.* at 13-15.  In this regard, Defendants argue that Defendant SU's campus security officers were not acting under color of state law when they arrested Plaintiff.  *See id.* at 15.

Plaintiff counters that Defendant SU and Defendant SU Board are proper Defendants under Section 1983 because "it is generally accepted that private universities are 'persons' under the law and, if a private university is deemed to be acting under 'color of state law,' both the University and its Board of Trustees may be named as defendants in a Section 1983 claim."  *See* Dkt. No. 38, Plaintiff's Opposition Memorandum of Law, at 23 (citations omitted).  Plaintiff

further argues that "private entities can be deemed 'state actors' and subject to suit under Section 1983," *see id.* at 23, "'when the entity has been delegated a public function by the [s]tate, (the public function test),'" *see id.* (quoting *Sybalski v. Ind. Group Home Living Program, Inc.*, 546 F.3d 255, 257 (2d Cir. 2008) (internal citations omitted)).  "'A person acts under color of state law when he or she acts in his or her official capacity, "clothed with the authority of state law," or acts under "pretense" of law by purporting to act with official power.'"  *Id.* (quoting *Faiaz v Colgate Univ.*, 64 F. Supp. 3d 336, 347-48 (N.D.N.Y. 2014)).  Plaintiff maintains that

> [t]he question of whether Defendants were acting under "color of state law" when they arrested Plaintiff can be answered through an examination of their exercise of law enforcement authority – a "public function" typically performed by the state.  *Sybalski*, 546 F.3d at 257.  Defendants Zarnowski, Romano, and Fuentes are sworn DPS officers, who exercise law enforcement authority within the University's campus pursuant to an MOU between Syracuse University and the City of Syracuse Police Department (SPD).  Am. Compl. 6; Janardhan Decl., Ex. D.  The MOU, which was signed on December 3, 2014, states that "DPS will exercise primary law enforcement jurisdiction for the University Campus" and members of DPS design[at]ed as "campus peace officers may exercise the law enforcement authority as specified by state law and this MOU."  Janardhan Decl., Ex. D at 1.
>
> The MOU was entered pursuant to Section 2.10 of the New York Criminal Procedure Law (referred to in the MOU as the "SU Campus Peace Officer Act"), a statutory provision which explicitly permits the SPD to appoint and remove DPS officers as "peace officers."  N.Y. CPL § 2.10(77); Janardhan Decl., Ex. D at 1.  The law enforcement powers granted to DPS peace officers are enumerated within Section 2.20 of the Criminal Procedure Law.  N.Y. CPL § 2.20.  Those powers include, "(a) The power to make warrantless arrests pursuant to section 140.25 of this chapter, and (b) The power to use physical force and deadly physical force in making an arrest or preventing an escape pursuant to section 35.30 of the penal law."
>
> Considering the above-enumerated powers, which mirror the functions typically performed by the state, Defendants cannot conceivably argue that Syracuse University's campus police do not perform a public function.  Indeed, courts have routinely found that

campus police officers at private universities, who are granted "plenary police powers, such that they are de facto police officers…may qualify as state actors under the public function test." *Fleck v. Trustees of the University of Pennsylvania*, 995 F. Supp. 2d at 399-402 (private university was a state actor when its officers participated in an arrest on campus); *see also McGovern v. George Washington University*, 245 F. Supp. 3d 167, 179-80 (D.D.C. 2017) (campus police employed by private university acted under color of state law when they approached, removed, and arrested an individual at a university-sponsored event); *Dempsey v. Bucknell University*, 834 F.3d 457 (3d Cir. 2016) (official actions of public safety officers employed by a private university, who were sworn police officers under Pennsylvania law (22 Pa. Cons. Stat. Ann. § 501), were taken "under color of state authority" for purposes of § 1983).

*See* Dkt. No. 38, Plaintiff's Opposition Memorandum of Law, at 24-25 (internal footnote omitted).

Plaintiff points out that in *Auricchio v. Giocondo*, the court found that the plaintiff adequately pled that the defendant, a SU DPS peace officer acting under the authority of CPL 2.10(77)(b) and a Memorandum of Understanding between SPD and SU DPS, was acting under color of law for Fourth Amendment purposes when he stopped the plaintiff's vehicle and frisked him. *See Auricchio v. Giocondo,* No. 5:12-CV-751 (NAM/ATB), 2013 WL 718340, *4 (N.D.N.Y. Feb. 27, 2013). Plaintiff also cites to *Faiaz v. Colgate Univ.*, 64 F. Supp. 3d 336 (N.D.N.Y. 2014), for the proposition that that Defendants Zarnowski, Romano, and Fuentes are state actors subject to the Fourth Amendment. Plaintiff points out that, "[i]n *Faiaz*, the court determined that off-duty campus security officers at Colgate University, which, unlike Syracuse University, did not have statutory authority to conduct law enforcement functions, were not "'state actors.'" *See* Dkt. No. 43, Plaintiff's Opposition Memorandum of Law, at 19. Plaintiff stresses that, "[i]n making this determination, the *Faiaz* court drew an important distinction between the campus security officers of Colgate University and the campus police of Cornell University." *See id.* "It found that Cornell University campus police were state actors because

they 'have the power of "peace officers" as set forth in section 2.20 of the New York Criminal

Procedure Law'" which, Plaintiff points out, is "the exact same statutory provision that grants

plenary police powers to Syracuse University DPS officers." *See id.* (citing [*Faiaz*, 641 F. Supp.

3d] at 350-51; *see* N.Y. CPL §§ 2.10 (77), 2.20).  Plaintiff argues that "Syracuse University, like

Cornell University, is 'clothed with the authority of state law,' pursuant to [N.Y. CPL] Section[s]

2.10 and 2.20 and its employees are state actors subject to suit under Section 1983." *See id.*

(citing [*Faiaz*, 641 F. Supp. 3d] at 350; citing *Yuan v. Tops Market*, 2012 WL 4491106, at *3

(N.D.N.Y. Sept. 28, 2012)).

     Plaintiff further argues that, "[i]f the plenary law enforcement authority delegated to SU

by the state is somehow not enough to establish Defendants' role[s] as state actors, their own

words and actions further evidence that they were 'purporting to act with official power' on the

date in question."  *See id.* at 19 (citing *Faiaz*, 64 F. Supp. 3d at 350).  In this regard, Plaintiff

points out that "Defendants Zarnowski, Romano, and Fuentes, while uniformed and on-duty,

conducted an arrest of Plaintiff."  *See id.*  Moreover, "[t]hey physically restrained him,

handcuffed him, wrote a police report, and recommended criminal charges against him.  *See id.*

Finally, Plaintiff contends that, "when confronted by Roe, who sought to file a report with the

'actual police,' Defendant Zarnowski stated, unequivocally, 'we are the police.'"  *See id.* (citing

Powers Decl., Ex. A-1 at 37:10 – 37:28).

     In reply, Defendants argue that DPS campus peace officers do not have plenary

(complete) police powers because the MOU prohibits campus peace officers from investigating

incidents involving violent felony offenses, sex offenses, and domestic violence.  *See* Dkt. No.

47, Defendants' Reply Memorandum, at 5 (citing Dkt. No. 38-7, ¶ 14).  Thus, Defendants

contend, DPS campus peace officers do not fulfill all the functions exclusively reserved for the

State, and therefore cannot satisfy the public function test.  *See id.* (stating that "*some limited* law enforcement authority does not equate to *plenary* (*i.e.*, total) police powers" (citing *Romanski v. Detroit Ent., L.L.C.*, 428 F.3d 629, 637 (6th Cir. 2005) (individual with "*some* police-like powers but not plenary police authority" does not meet the public function test.)).  To meet this element, Defendants contend, "an individual would have to be a 'substitute for the police,'" *see id.* (quoting *Johnson v. LaRabida Children's Hosp.*, 372 F.3d 894, 897 (7th Cir. 2004), which, Defendants maintain, the SU campus peace officers are not.  *See id.*  Accordingly, Defendants argue, Defendants Zarnowski, Romano, and Fuentes did not act under color of state law when they arrested Plaintiff.  *See id.* at 5-6.  Finally, Defendants argue that the "purporting to act with official power" doctrine does not apply here" because it presupposes that the accused is a state actor (albeit off-duty) in the first instance."  *See id.* at 6 (citation omitted).

### 1. Whether Defendants Zarnowski, Romano, and Fuentes are state actors

The Court is not persuaded that the limitations on DPS campus peace officers in investigating incidents involving violent felony offenses, sex offenses, and domestic violence – none of which are involved here -- defeats Plaintiff's claim that Defendants Zarnowski, Romano, and Fuentes acted under color of state law when they arrested him.  As the Supreme Court has indicated:

> Under the Court's cases, a private entity may qualify as a state actor when it exercises "powers traditionally exclusively reserved to the State."  *Jackson,* 419 U.S. at 352, 95 S. Ct. 449.  It is not enough that the federal, state, or local government exercised the function in the past, or still does.  And it is not enough that the function serves the public good or the public interest in some way.  Rather, to qualify as a traditional, exclusive public function within the meaning of our state-action precedents, the government must have traditionally *and* exclusively performed the function.  *See Rendell-Baker v. Kohn*, 457 U.S. 830, 842, 102 S. Ct. 2764, 73 L.

> Ed. 2d 418 (1982); *Jackson*, 419 U.S. at 352-353, 95 S. Ct. 449;
> *Evans v. Newton*, 382 U.S. 296, 300, 86 S. Ct. 486, 15 L. Ed. 2d
> 373 (1966).
>
> The Court has stressed that "very few" functions fall into
> that category. *Flagg Bros., Inc. v. Brooks*, 436 U.S. 149, 158, 98
> S. Ct. 1729, 56 L. Ed. 2d 185 (1978).

*Manhattan Cmty. Access Corp. v. Halleck*, 587 U.S. 802, 809 (2019).

The test speaks to the function that underlies the challenged action and whether the power the actor exercised in performing that function was traditionally and exclusively reserved to the State. *See id.* Further, the Supreme Court and the Second Circuit have looked to the conduct underlying the constitutional claim in determining whether state action exists. *See, e.g., Fabrikant v. French*, 691 F.3d 193, 207 (2d Cir. 2012) (noting that "[t]he fundamental question under each test [of whether actions of a nominally private entity are attributable to the state] is whether the private entity's challenged actions are 'fairly attributable' to the state" (quoting *Rendell-Baker*, 457 U.S. at 838, 102 S. Ct. 2764; *see also Am. Mfrs. Mut. Ins. Co.*, 526 U.S. at 50, 119 S. Ct. 977; *Cooper*, 577 F.3d at 491)); *id.* (explaining that, "[i]n analyzing whether a private entity acts under color of state law for purposes of § 1983, we begin 'by identifying the specific conduct of which the plaintiff complains,' rather than the general characteristics of the entity" (quoting *Sullivan*, 526 U.S. at 51, 119 S. Ct. 977 (internal quotation marks omitted)); *Cranley v. Nat'l Life Ins. Co. of Vt.,* 318 F.3d 105, 111 (2d Cir. 2003) (finding that "there must be 'such a "close nexus between the State and the challenged action" that "the State is *responsible* for the specific conduct of which the plaintiff complains" (quoting *Blum v. Yaretsky*, 457 U.S. 991, 1004, 102 S. Ct. 2777, 73 L. Ed. 2d 534 (1982) (emphasis in original))); *see also Cancel v. Amakwe,* 551 F. App'x 4, 6 (2d Cir. 2013) (Summary Order) (noting that "[w]hile we have recognized that a police officer's self-identification and use of a service pistol can constitute

49

acting under color of state law, . . . the action at issue must be 'made possible only because the wrongdoer is clothed with the authority of state law, . . ." (internal citations omitted)).

In this case, the function and conduct underlying the challenged action is Defendants Zarnowski, Romano, and Fuentes' arrest of Plaintiff.  Defendants' power to effectuate this arrest -- a power that is traditionally and exclusively reserved to the State -- arises from the agreement between SU and the SPD as memorialized in the MOU.  *See* Dkt. No. 38-7.  Defendants' citation to *Romanski* does not support a conclusion that Defendants Zarnowski, Romano, and Fuentes did not act under color or state law when they arrested Plaintiff.

In *Romanski*, the Sixth Circuit explained that, "[w]here private security guards are endowed by law with plenary police powers such that they are *de facto* police officers, they may qualify as state actors under the public function test."  *Romanski v. Ent., L.L.C.*, 428 F.3d 629, 637 (6th Cir. 2005) (citing *Payton*, 184 F.3d at 630; *Henderson v. Fisher*, 631 F.2d 1115 (3d Cir. 1980) (*per curiam*) (university policemen with plenary police authority throughout the university's campus); *Rojas v. Alexander's Dept. Store, Inc.*, 654 F. Supp. 856 (E.D.N.Y. 1986) (New York City special patrolman with plenary police authority patrolling a department store)).  The Sixth Circuit found that the security guard in *Romanski* was a state actor because, "at all times relevant to [that] case, [the security guard] 'ha[d] the authority to arrest a person without a warrant as set forth for public peace officers'" as prescribed by state statute.  *Id.* at 638 (quoting M[ich.] C[omp.] L[aws] § 338.1080).  In reaching this conclusion, the Sixth Circuit contrasted cases finding private police officers authorized to make arrests were state actors under the public function test, *see id.* at 637 (citing *Payton v. Rush-Presbyterian,* 184 F.3d 623, 627-30 (7th Cir.1999) (medical center's security personnel could be deemed to act under color of law because they had plenary arrest power and were subject to the same rules as police officers); *Henderson*

*v. Fisher,* 631 F.2d 1115 (3d Cir. 1980) (*per curiam* ) (university policemen with plenary police authority throughout the university's campus); *Rojas v. Alexander's Dep't Store, Inc.,* 654 F. Supp. 856 (E.D.N.Y.1986) (New York City special patrolman with plenary police authority patrolling a department store)), with cases finding no state action where private security guards had some police-like powers but not plenary police authority.  *See Romanski*, 428 F.3d at 637 (citing *Wade [v. Byles],* 83 F.3d [902,] 906-907 [(7th Cir.1996)] (noting that the defendant in *Wade* was permitted to carry a handgun and to use deadly force in self-defense but could arrest someone only for "trespass pending the arrival of the police" and could exercise these powers only in the lobbies of properties owned by the public housing authority for which he worked); *Johnson v. LaRabida Children's Hosp.,* 372 F.3d 894, 896-97 (7th Cir. 2004) (hospital security guards who had authority to patrol and eject people but not to carry guns and who had to call the police if someone became hostile and belligerent)).

As to the first line of cases, the Sixth Circuit stated that "[t]he rationale of these cases is that when the state delegates a power traditionally reserved to it alone -- the police power -- to private actors in order that they may provide police services to institutions that need it, a 'plaintiff's ability to claim relief under § 1983 [for abuses of that power] should be unaffected.'" *Id*. at 637 (quoting *Payton,* 84 F.3d at 629; *cf. Henderson,* 631 F.2d at 1118).  As to the second line of cases, the Sixth Circuit stated that "[a] subset of these cases are cases in which a private institution's security employees have been dispatched to protect the institution's interests or enforce its policies.  The canonical example here is when a store avails itself of the common law shopkeeper's privilege, the privilege at issue in this Court's *en banc* decision in *Chapman v. Higbee Co.,* [319 F.3d 825 (6th Cir.2003) (*en banc* )]*,* and the Fifth Circuit case upon which

*Chapman* relied." *Id.* at 638 (citing *Chapman,* 319 F.3d at 833-34 (discussing *White v. Scrivner Corp.,* 594 F.2d 140, 142 (5th Cir.1979)).

Defendants Zarnowski, Romano, and Fuentes, like Brown in *Romanski*, have been vetted by the SPD and have been commissioned pursuant to New York state law as campus peace officers "for the purpose of providing those law enforcement services, which are prescribed by law and which are agreeable to the City and the University, for and to all property within Onondaga County under the University's ownership, control, or administration." *See* Dkt. No. 38-7, MOU, at ¶ 1.  This involves, among other things, exercising primary law enforcement jurisdiction for the SU campus and providing law enforcement services as approved by the Chief of SPD and as prescribed by the SU Campus Peace Officer Act, except as specified by the MOU, *see id.* at ¶ 13(e); initially responding "to all requests for law enforcement services, as and to the extent allowed under its legal authority and limits, which originate from the University campus;" *see id.* at ¶ 13(f); and initially handling all crimes in progress on campus, with the requirement that DPS notify SPD's APU and the DA's Office in cases of violations, misdemeanors, and felonies related to sexual abuse/deviance or domestic violence, *see id.* at ¶ 13(g).

Further, the MOU provides that SU campus peace officers shall act as first responders to any reported or detected incident of criminal activity, *see id.* at ¶ 14(c); have the authority to make warrantless custodial arrests and issue appearance tickets, *see id.* at ¶ 14(d); have the authority to respond to the violation of, and enforce any provision of, any law related to domestic/relationship violence, to include the making of arrests for a criminal offense or violation of an order of protection, provided that all such activities, enforcement actions, and investigations are coordinated with SPD's Abused Persons Unit (APU) and DPS officers make additional mandatory notifications to SPD's CID Desk and the DA's Office,

*see id.* at ¶ 14(h); and have the authority to investigate all felonies "aside from violent ones defined in the CPL and aside from sex offenses and domestic/relationship violence offenses normally overseen by SPD's APU," *see id.* at ¶ 14(j).

When Defendants arrested Plaintiff, they were acting in their capacities as on-duty and duly commissioned SU campus peace officers.  *See* Am. Compl. at ¶ 6.  As is apparent from the MOU, when acting in these capacities, Defendants had at their disposal plenary arrest power.  The fact that DPS campus peace officers do not have the authority to investigate certain felony offenses does not diminish the "specific power" at issue here, that is, the plenary arrest power.  In this regard, other than the limitations on their ability to investigate certain crimes, DPS campus peace officers serve as the *de facto* police for situations occurring on the SU campus.  For all these reasons, the Court concludes that, because the plenary arrest power, which was the power exercised here, is "traditionally the exclusive prerogative of the State," *Jackson v. Metro. Edison Co.,* 419 U.S. 345, 353 (1974), Defendants Zarnowski, Romano, and Fuentes were state actors when they arrested Plaintiff.

Furthermore, even assuming that Defendants Zarnowski, Romano, and Fuentes did not actually act under color of state law because the DPS campus peace officers do not have plenary police powers, these defendants acted under pretense of law in effectuating Plaintiff's arrest.  *See Faiaz*, 64 F. Supp. 3d at 347-48 (explaining that "[a] person acts under color of state law when he or she acts in his or her official capacity, 'clothed with the authority of state law,' or acts under 'pretense' of law by purporting to act with official power." (quoting *Pleasure Island, Inc. v. City of New York,* No. 12 Civ. 4699, 2013 WL 2311837, at *5–6 (E.D.N.Y. May 24, 2013) (quoting *West v. Atkins,* 487 U.S. 42, 49, 108 S. Ct. 2250, 101 L. Ed. 2d 40 (1988)))).  In *Screws v. United*

*States,* the Supreme Court, addressing whether an officer was acting under pretense of law, stated as follows:

> We are not dealing here with a case where an officer not authorized to act nevertheless takes action.  Here the state officers were authorized to make an arrest and to take such steps as were necessary to make the arrest effective.  They acted without authority only in the sense that they used excessive force in making the arrest effective.  It is clear that under "color" of law means under "pretense" of law.  Thus acts of officers in the ambit of their personal pursuits are plainly excluded.  Acts of officers who undertake to perform their official duties are included whether they hew to the line of their authority or overstep it.  If, as suggested, the statute was designed to embrace only action which the State in fact authorized, the words "under color of any law" were hardly apt words to express the idea.

*Screws v. United States*, 325 U.S. 91, 111 (1945).

Defendants Zarnowski, Romano, and Fuentes were authorized by state law and the MOU to make arrests for simple assaults occurring on the SU campus.  Pursuant to this authority, these Defendants went to Plaintiff's classroom in their uniforms and effectuated an arrest based upon a student complaint against Plaintiff alleging a simple assault.  If Defendants' analysis is accepted, they were without authority only in the sense that they did not have plenary police powers because the MOU prohibits campus peace officers from investigating incidents involving violent felony offenses, sex offenses, and domestic violence -- none of which apply here.

By all accounts, Defendants Zarnowski, Romano, and Fuentes undertook to perform their official duties as they understood them to be.  Indeed, Defendant Zarnowski stated to Jane Roe that "we are the police."  The Court finds that, under these circumstances, Defendants Zarnowski, Romano, and Fuentes acted under pretense of law in relation to Plaintiff's arrest and criminal prosecution, thereby establishing that they acted under color of law for purposes of Section 1983.

**2. Section 1983 Excessive Force and State Law Assault and Battery Claims**

Defendants Zarnowski, Romano, and Fuentes argue that the Court should dismiss Plaintiff's Section 1983 excessive force and New York state law assault and battery claims on the merits "in light of the BWC, which demonstrates that the use of force was objectively reasonable under the circumstances." *See* Dkt. No. 22, Defendants' Memorandum of Law, at 16-17. Defendants also contend that, based on the BWC footage, they are entitled to qualified immunity on these claims. *See id.* at 17-21.  Plaintiff opposes Defendants' motion in these respects. *See* Dkt. No. 43, Plaintiff's Memorandum of Law, at 20-24.

As indicated above, the BWC footage, the footage from two students' cell phone cameras, and the footage from the classroom camera are either integral to, or incorporated in, the Amended Complaint.  Plaintiff does not object to the Court considering this footage on Defendants' motion and, in fact, relies upon this footage in opposing Defendants' motion. Therefore, the Court will consider this footage in evaluating Defendants' motion to dismiss and their application for qualified immunity.

Excessive force claims brought pursuant to the Fourth and Fourteenth Amendment "'are properly analyzed under the Fourth Amendment's "objective reasonableness" standard.'" *Shamir v. City of New York*, 804 F.3d 553, 556 (2d Cir. 2015) (quoting *Graham v. Connor*, 490 U.S. 386, 388, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989)).[13]  Using "excessive force renders a seizure of the person unreasonable and for that reason violates the Fourth Amendment." *Id.*  To decide whether the force was reasonable, a court should pay "'careful attention to the facts and

---

[13] In addition to invoking the Fourth Amendment, Plaintiff also invokes "deprivation of liberty" under the Fourteenth Amendment. *See, e.g.,* Am. Compl. at ¶ 93.

circumstances of each particular case, including the severity of the crime at issue, whether the subject poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.'" *Soares v. Connecticut*, 8 F.3d 917, 921 (2d Cir. 1993) (quoting [*Graham*], 490 U.S. at 396, 109 S. Ct. at 1872).  This standard focuses on "'a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'" *Brown v. City of New York*, 798 F.3d 94, 100 (2d Cir. 2015) (quoting [*Graham*, 490 U.S. at 397]).  "A court's role in considering excessive force claims is to determine whether a jury, instructed as to the relevant factors, could reasonably find that the force used was excessive." *Id.* at 103.

      "'Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers,' *Johnson v. Glick*, 481 F.2d, at 1033, violates the Fourth Amendment." *Graham v. Connor*, 490 U.S. 386, 396 (1989).  The Supreme Court's "Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Id.* (citation omitted).  For example, as Defendants point out, using force to escort an arrestee away from the scene -- *i.e.*, officers "grabb[ing] [the subject's] arms, half-walking, half-dragging him" away -- and "violent[ly] shoving" him into a police van does not constitute a clearly established violation of the Fourth Amendment. *See Saucier v. Katz*, 533 U.S. 194, 198, 208-09 (2001).  Nor does the fact that a custodial arrest and handcuffing may be "humiliating" or "embarrassing" create a constitutional violation, where one does not otherwise exist. *Atwater v. City of Lago Vista*, 532 U.S. 318, 354-55 (2001).

      Further, as Defendants also point out, courts have held that the ordinary force it takes to handcuff an actively non-compliant subject -- including taking them to the ground and pulling

their arms behind their back -- will not support a Fourth Amendment claim or overcome an

officer's qualified immunity.  *See* Dkt. No. 22, Defendants' Memorandum of Law, at 19 (citing

*Vasicka v. Kerwin*, No. 18-CV-6858, 2022 WL 4641585, at *7 (E.D.N.Y. Sept. 30, 2022) (force

used to hold down and pull arms back of woman who was backing away and pulling her arms

away from being handcuffed did not violate clearly established Fourth Amendment standards);

*Alexander v. Nolan*, No. 6:17-CV-0725-, 2018 WL 6621400, at *7 (N.D.N.Y. Dec. 18, 2018)

(using force to take a fleeing subject to the ground and handcuff him did not violate Fourth

Amendment); *Kalfus v. New York & Presbyterian Hosp.*, 476 F. App'x 877, 879, 881 (2d Cir.

2012) (pushing detainee to the ground on his stomach and pulling his arms behind his back after

he refused to put his arms behind his back did not constitute a Fourth Amendment violation))

(other citations omitted).  "[I]t is of course possible that defendants used somewhat more force

than absolutely necessary.  But the Fourth Amendment does not require officers to use the least

possible degree of force."  *Davis v. City of Rochester*, No. 14-CV-6562L, 2022 WL 6885334,

*10 (W.D.N.Y. Oct. 12, 2022) (citing *Mael v. Howard*, No. 18-CV-378, 2022 WL 263235, at *5

(W.D.N.Y. Jan. 27, 2022) ("Less forceful means may have been available to [defendant], but an

officer is not held to such a standard"); *Brennan v. City of Middletown*, No. 18 Civ. 6148, 2020

WL 3820195, at *7 (S.D.N.Y. July 8, 2020) ("The police are not required to utilize the least

amount of force possible to place someone into custody")).  "What is required, to establish

defendants' liability, is proof that the force they used was objectively unreasonable, in light of the

circumstances known to them."  *Id.* (citing *Lennon v. Miller*, 66 F.3d 416, 425-26 (2d Cir. 1995);

*Baker v. City of New York*, 551 F. Supp. 3d 258, 266 (S.D.N.Y. 2021)).

"'[E]xcept for § 1983's requirement that the tort be committed under color of state law,

the essential elements of [excessive force and state law assault and battery claims are]

substantially identical.'" *Humphrey v. Landers*, 344 F. App'x 686, 688 (2d Cir. 2009) (Summary Order) (quoting *Posr v. Doherty*, 944 F.2d 91, 94-95 (2d Cir. 1991)); *see also Benson v. Yaeger*, No. 05-CV-784S, 2009 WL 1584324, *4 n.6 (W.D.N.Y. June 3, 2009) (stating that "'[t]he test for whether a plaintiff can maintain a New York State law assault and battery cause of action against law enforcement officials is the exact same test as the one used to analyze a Fourth Amendment excessive force claim'" (quoting *Chen v. City of Syracuse*, No. 03-CV-1927, 2009 WL 529553, at *5 (N.D.N.Y. Mar. 2, 2009))).

The Court has carefully reviewed all the video footage.  In many respects, the  footage contradicts allegations made in the Amended Complaint.  In other respects, however, the footage confirms Plaintiff's allegations.

Overall, the footage shows that Defendant Zarnowski received a call from Dispatch reporting that two females, including "Jane Roe," were "hidin" in a first-floor bathroom of the Whitman School from an individual named Brandon Williams who may have hit another individual in the face and who was under an active no contact order ("NCO").  Defendant Zarnowski met with the two females, confirmed that Jane Roe alleged that Plaintiff struck her causing injury to her eye.  Then, Defendants Zarnowski, Romano, and Fuentes went to the classroom where Plaintiff was located to take him into custody.  When the officers arrived, Plaintiff was standing in the front of the classroom giving a presentation to the other students. Defendants entered the classroom and told Plaintiff that he had to go with them, and although Defendants were in their uniforms, they did not tell Plaintiff that he was under arrest.  Plaintiff questioned why he had to leave with the officers, and he was only told that it would be explained once they left the classroom.  The footage indicates that Plaintiff was confused and asked why he needed to leave the classroom.  He pulled away from Defendant Zarnowski when she moved to

place her hand on his arm.  Defendant Romano then twisted Plaintiff's right arm behind his back, and he and Defendant Fuentes attempted to escort Plaintiff toward the classroom door.  Plaintiff can be seen and heard resisting the officers' efforts to bring him out of the classroom, including placing his foot on the door to prevent him from being taken out of the classroom.  The three officers then engaged in a struggle with Plaintiff, including bringing him to the ground and attempting to handcuff him behind his back while he was face down on the ground.

Once Plaintiff was face down on the ground with his hands behind his back albeit before he was handcuffed, he repeatedly yelled, "I can't breathe," and stated that someone was on his back.  The various clips from the video footage appear to indicate that Officers Fuentes and Romano were on their knees on both sides of Plaintiff while Officer Fuentes attempted to apply handcuffs, and Officer Zarnowski was squatting down at the end of Plaintiff's feet – none of whom appear to be on Plaintiff's back.  However, some clips also indicate that Officer Fuentes placed her hands and forearm on Plaintiff's back while she was trying to apply the handcuffs.

Although it appears that Officer Fuentes placed her hands and forearm on Plaintiff's back very briefly, perhaps to curtail Plaintiff from struggling and/or to reposition herself to apply the handcuffs, the Court cannot make this assessment at this stage.  Drawing reasonable inferences in Plaintiff's favor, the Court must conclude that Defendant Fuentes was applying enough pressure to Plaintiff's back to make it difficult for him to breathe.

Moreover, although Defendants argue that the ordinary force it takes to handcuff an actively non-compliant subject -- including taking them to the ground and pulling their arms behind their back -- will not support a Fourth Amendment claim or overcome an officer's qualified immunity, *see* Dkt. No. 22, Defendants' Memorandum of Law, at 19, the Court cannot conclude at this stage that the officers used only reasonable force in bringing Plaintiff to the

ground and in attempting to handcuff him.  Whether it was because of the Defendants' conduct, or some other reason,[14] the video footage shows that Plaintiff was in distress and stating that he could not breathe while the officers attempted to take him into custody.  The video footage also shows that, while Defendants were attempting to handcuff Plaintiff, he continued to gasp and cough as if he were unable to catch his breath.  Moreover, when the officers attempted to get Plaintiff to his feet after securing the handcuffs, Plaintiff appears to collapse to the ground, raising an inference that the officers' conduct impeded Plaintiff's ability to breathe.

While the video footage can certainly be construed as indicating that the arresting officers did not place their weight on Plaintiff's back such to obstruct his breathing, the opposite conclusion could also be reached – at least as to Officer Fuentes.  A conclusion could also be reached that Plaintiff's breathing was negatively impacted when he was brought face-first to the ground with two officers holding his arms.  Although none of the officers used a chokehold on Plaintiff, it is plausible that their conduct had a similar result.  Because Plaintiff repeatedly yelled that he could not breathe while he was lying face down on the floor with the three officers around him, it is a reasonable inference that he posed no danger to the officers, to other students, or of escaping at this point.  The Second Circuit and other courts have found that it is clearly established that a police officer cannot use a chokehold on someone who does not pose a threat of any kind.  *See United States v. Livoti*, 196 F.3d 322, 327 (2d Cir. 1999) (upholding criminal conviction for excessive force when officer put man in a chokehold which lasted for one minute and rendered him unconscious, when the evidence showed that the New York City Police

---

[14] Plaintiff alleges that he has asthma and anxiety that made it difficult for him to breathe while the officers were arresting him, but the video footage indicates that the officers were not advised by a fellow student that Plaintiff "might have a medical condition, like anxiety or something" until after Plaintiff was handcuffed, lying on his side on the ground, and an officer indicated that medical personnel had been called for Plaintiff.

Department prohibited chokeholds under any circumstances); *Jackson v. Tellado*, 236 F. Supp. 3d 636, 664-65 (E.D.N.Y. 2017) (arresting officer not entitled to qualified immunity despite officer's testimony he merely gave arrestee a "bear hug" in light of plaintiff's testimony that he was placed in a chokehold);

The Court finds that, at this point, there is a question of fact as to whether the force Defendants used was reasonable under the circumstances.  Therefore, the Court denies Defendants' motion to dismiss Plaintiff's Section 1983 excessive force and state law assault and battery claims at this time.

### 3. 42 U.S.C. § 1983 Failure to Intervene Claim

"An officer may be liable for the preventable harm caused by his failure to intervene during a constitutional violation where the officer 'observes the [constitutional violation] and has sufficient time to act to prevent it.'"  *Colon v. City of Rochester*, 419 F. Supp. 3d 586, 601 (W.D.N.Y. 2019) (quoting *Figueroa v. Mazza*, 825 F.3d 89, 106 (2d Cir. 2016) (citation omitted)).  In this case, because all three Defendants were present when the alleged excessive force was used, the Court denies Defendants' motion to dismiss Plaintiff's failure to intervene claims at this time.

### 4. Qualified Immunity

Defendants Zarnowski, Romano, and Fuentes seek qualified immunity with regard to Plaintiff's Section 1983 excessive force and failure to intervene claims.  The doctrine of qualified immunity shields officials from civil liability so long as their conduct "'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"

*Pearson v. Callahan,* 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982)).  "Qualified immunity shields an officer from suit when she makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances she confronted." *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (citation omitted).  "[I]f officers of reasonable competence could disagree on [whether the conduct is constitutional], immunity should be recognized." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

A court applies "a two-step analysis to determine whether qualified immunity bars a plaintiff's claim against government officials for civil damages related to actions taken in the course of their official duties." *Sabir v. Williams*, 52 F.4th 51, 58 (2d Cir. 2022) (citing *Francis v. Fiacco*, 942 F.3d 126, 139 (2d Cir. 2019)).  "'Pursuant to that analysis, "[q]ualified immunity shields federal and state officials from money damages unless [the] plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct."'" *Id.* (quotation omitted*)*.  "When qualified immunity shields defendants from liability, courts may 'exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand.'" *Id.* (quoting *Pearson v. Callahan*, 555 U.S. 223, 236, 129 S. Ct. 808, 172 L. Ed. 2d 565 (2009)) (citing *Francis*, 942 F.3d at 140) (footnote omitted).  A court may consider "these questions in either order" and "[i]f [the court answers] either question in the negative, qualified immunity attaches." *Golodner v. Berliner*, 770 F.3d 196, 201 (2d Cir. 2014).

Defendants argue that the BWC footage unequivocally establishes that the arresting officers used reasonable force in light of existing precedent and that Plaintiff has failed to

identify any clearly established constitutional police norms that the campus peace officers violated on the date in question. *See* Dkt. No. 22, Defendants' Memorandum of Law, at 16-20; Dkt. No. 47, Defendants' Reply Memorandum of Law, at 6-10. Defendants also argue that, because there are no viable excessive force claims against them, there can be no failure to intervene claims arising from the circumstances. *See id.* Plaintiff opposes Defendants' motion. *See* Dkt. No. 43, Plaintiff's Memorandum of Law, at 20-24.

In *Mullenix v. Luna*, 577 U.S. 7 (2015), the Supreme Court explained that "[a] clearly established right is one that is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" *Id.* at 11 (quoting *Reichle v. Howards,* 566 U.S. ——, ——, 132 S. Ct. 2088, 2093, 182 L. Ed. 2d 985 (2012) (internal quotation marks and alteration omitted)). Although "'a case directly on point [is not required], . . . existing precedent must have placed the statutory or constitutional question beyond debate.'" *Id.* at 12 (quoting *Ashcroft v. al-Kidd,* 563 U.S. 731, 741, 131 S. Ct. 2074, 179 L. Ed. 2d 1149 (2011)). Simply stated, "qualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Id.* (quoting *Malley v. Briggs,* 475 U.S. 335, 341, 106 S. Ct. 1092, 89 L. Ed. 2d 271 (1986)).

Furthermore, the *Mullenix* Court reminded the lower courts that it had repeatedly "'told [them] . . . not to define clearly established law at a high level of generality.'" *Id.* (quoting *al–Kidd,* [563 U.S.] at 742, 131 S. Ct. 2074). Rather, "[t]he dispositive question is 'whether the violative nature of *particular* conduct is clearly established.'" *Id.* (quotation omitted) (emphasis added). Thus, "[t]his inquiry '"must be undertaken in light of the specific context of the case, not as a broad general proposition."'" *Id.* (quoting *Brosseau v. Haugen,* 543 U.S. 194, 198, 125 S. Ct. 596, 160 L. Ed. 2d 583 (2004) (*per curiam*) (quoting *Saucier v. Katz,* 533 U.S. 194, 201, 121

63

S. Ct. 2151, 150 L. Ed. 2d 272 (2001))).  Furthermore, "[s]uch specificity is especially important

in the Fourth Amendment context, where the Court has recognized that '[i]t is sometimes

difficult for an officer to determine how the relevant legal doctrine, here excessive force, will

apply to the factual situation the officer confronts.'"  *Id.* (quoting [*Saucier*,] 533 U.S., at 205, 121

S. Ct. 2151).  "Thus, an officer is entitled to qualified immunity unless 'existing precedent

"squarely governs" the specific facts at issue.'"  *Walker v. Thibault*, No. 5:22-CV-1088

(MAD/ATB), 2023 WL 7701726, *7 (N.D.N.Y. Nov. 14, 2023) (quoting [*Kisela*, 138 S. Ct.] at

1153 (citing *Mullenix v. Luna*, 577 U.S. 7, 13, 136 S. Ct. 305, 193 L. Ed. 2d 255 (2015))).

Furthermore, where it was not "obvious" that the force used by an officer was excessive,

"to show a violation of clearly established law, [the plaintiff] must identify a case that put [the

officer] on notice that his specific conduct was unlawful."  *Rivas-Villegas v. Cortesluna*, 592

U.S. 1, 6 (2021); *see City of Escondido v. Emmons*, 586 U.S. 38, 43 (2019) (*per curiam*)

(explaining that the Court has "'stressed the need to identify a case where an officer acting under

similar circumstances was held to have violated the Fourth Amendment'" (quoting [*District of

Columbia v.*] *Wesby*, 583 U.S., at ---, 138 S. Ct. at 581 (internal quotation marks omitted))).

Furthermore, "'[o]nly Supreme Court and Second Circuit precedent existing at the time of the

alleged violation is relevant in deciding whether a right is clearly established.'"  *Torcivia v.

Suffolk Cnty., N.Y.*, 17 F.4th 342, 367 (2d Cir. 2021) (quoting *Moore v. Vega*, 371 F.3d 110, 114

(2d Cir. 2004)).

Qualified immunity is an affirmative defense; therefore Defendants bear the burden of

proving that qualified immunity applies.  *See Coolick v. Hughes*, 699 F.3d 211, 219 (2d Cir.

2012).  The defense of qualified immunity may properly be raised at the motion-to-dismiss stage

because "[q]ualified immunity provides government officials 'immunity from suit rather than a

mere defense to liability.'"  *Looney v. Black*, 702 F.3d 701, 705 (2d Cir. 2012) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231, 129 S. Ct. 808, 172 L. Ed. 2d 565 (2009) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526, 105 S. Ct. 2806, 86 L. Ed. 2d 411 (1985))).  Indeed, "'[t]he "driving force" behind creation of the qualified immunity doctrine [is] a desire to ensure that "insubstantial claims" against government officials [will] be resolved prior to discovery.'"  *Id.* at 706 (quotation and other citation omitted).

When a qualified immunity defense is raised on a Rule 12(b)(6) motion, the court must accept the truth of the allegations in the complaint and may grant qualified immunity only "if 'the facts supporting the defense appear on the face of the complaint.'"  *Hyman v. Abrams*, 630 F. App'x 40, 42 (2d Cir. 2015) (Summary Order) (quoting *McKenna v. Wright*, 386 F.3d 432, 435-36 (2d Cir. 2004) (citing *Green v. Maraio*, 722 F.2d 1013, 1018 (2d Cir. 1983) (internal quotation marks and alterations omitted))).  At the motion to dismiss stage, the qualified immunity defense "'faces a formidable hurdle . . . and is usually not successful" because it is the defendant that must plead and prove the defense.  *Chamberlain Estate of Chamberlain v. City of White Plains*, 960 F.3d 100, 111 (2d Cir. 2020) (quoting *Field Day, LLC v. County of Suffolk*, 463 F.3d 167, 191-92 (2d Cir. 2006) (internal quotation marks omitted)) (footnote omitted).  "[W]hen a defendant raises a defense of qualified immunity at the initial pleadings stage, a court must take care not to engage in a premature determination of the facts in a manner at odds with those facts that the plaintiff has pleaded in the complaint."  *Rosa v. Cook*, No. 3:22-cv-703 (JAM), 2024 WL 1050516, *3 (D. Conn. Mar. 11, 2024)  Moreover, "[t]he defendant presenting an immunity defense on a motion to dismiss 'must therefore show not only that the facts supporting the defense appear on the face of the complaint, but also that it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief.'"

*Id.* (quoting *Horn [v. Stephenson]*, 11 F.4th [163,] 170 [(2d Cir. 2021)]).  "'Moreover, the plaintiff is entitled to all reasonable inferences from the facts alleged, including those that defeat the immunity defense.'"  *Id.* (quoting [*Horn,* 11 F.4th at 170]).

In this case, when drawing all reasonable inferences in Plaintiff's favor from the facts alleged in the Amended Complaint and as demonstrated by the video footage, the arresting officers engaged in conduct that made it difficult for Plaintiff to breathe freely.  It could reasonably be inferred that the officers continued to impede Plaintiff's ability to breathe freely even after he was on the ground and surrounded by three officers.  The Second Circuit's decision in *United States v. Livoti* is sufficient to put reasonable officers on notice that continuing to engage in conduct that impedes an arrestee's ability to breathe after the suspect is effectively restrained and poses no threat of harm or escape is unreasonable.  Although the video footage could be construed as indicating that the arresting officers did nothing more than use reasonable force to detain a resistant arrestee, that conclusion cannot be made on the present record at this stage of the proceedings.  Accordingly, the Court finds that the existence of a question of fact as to the actual conduct the Defendant Officers took during the arrest precludes them from obtaining qualified immunity at this time.  Therefore, the Court denies Defendants' motion to dismiss on the grounds of qualified immunity.

**D.    42 U.S.C. § 1983 claims against Defendant SU, Defendant SU Board, and Defendant Hradsky in his Official Capacity**

Although the Supreme Court has held that municipal entities can be held derivatively liable for the unconstitutional acts of individual state actors in limited circumstances, *see Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 687 (1978), the definition of "person" generally has not been extended to private entities such as colleges or universities.  *See, e.g.,*

*Klunder v. Brown Univ.*, 778 F.3d 24, 34 (1st Cir. 2015) (concluding that "Brown University is

not a state actor subject to federal jurisdiction under § 1983"); *Krohn v. Harvard L. Sch.*, 552

F.2d 21, 23 (1st Cir. 1977) (finding that, "[a]s a private entity, Harvard Law School is not subject

to suit . . . under 42 U.S.C. § 1983")

      To hold otherwise would be allowing § 1983 claims to proceed against private entities

under either a theory of *respondeat superior* liability or pursuant to a *Monell* official policy or

custom theory.  The former is plainly impermissible, *see Monell* 436 U.S. at 691 ("conclude[ing]

that a municipality cannot be held liable *solely* because it employs a tortfeasor -- or, in other

words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory"

(emphasis in original)), while the latter was not plausibly alleged, *see Lefevre v. Cnty. of Albany*,

No. 1:14-cv-155 (GLS/RFT), 2015 WL 1626005, *3 (N.D.N.Y. Apr. 13, 2015) (explaining that

"[a] successful claim of municipal liability under section 1983, therefore, requires the plaintiff

"'to plead and prove three elements: (1) an official policy or custom that (2) causes the plaintiff

to be subjected to (3) a denial of a constitutional right.'"" (quotation omitted)).  "To do so, a

plaintiff may allege: '(1) that the [municipality]'s failure to train its employees amounted to

deliberate indifference to constitutional rights; (2) that there was a persistent and widespread

unconstitutional governmental policy or custom; or (3) that a [municipal] policymaker approved

any constitutional violation.'" *Lefevre*, 2015 WL 1626005, at *3 (quoting *Carter v. Inc. Vill. of

Ocean Beach*, 759 F.2d 159, 164 (2d Cir. 2014) (citations omitted)).

      Accordingly, the Court grants Defendants' motion to dismiss Plaintiff's Section 1983

claims against Defendant SU, Defendant SU Board, and Defendant Hradsky in his official

capacity.

**E.      42 U.S.C. § 1983 claims against Defendant Hradsky in his Individual Capacity**

Finally, the Amended Complaint fails to plausibly plead that Defendant Hradsky had any personal involvement in the alleged Fourth Amendment constitutional deprivation.  The Amended Complaint alleges that "Defendants SU, SU Board and Hradsky ratified Defendant Zarnowski, Romano, and Fuentes' conduct, as they knew of and specifically made a deliberate choice to approve of Defendant Zarnowski, Romano, and Fuentes' actions and the basis for them."  *See* Am. Compl. at ¶ 103.  This is a broad, conclusory allegation and does not provide a sufficient factual basis upon which to reasonably conclude or infer that Defendant Hradsky knew of and approved Defendant Zarnowski, Romano, and Fuentes' use of force in arresting Plaintiff before that conduct occurred.  "To show liability, including supervisory liability, the Amended Complaint must allege that [Hradsky] violated the Constitution through his own actions." *Stennett v. New York City Admin. for Children's Servs.*, No. 21-CV-1069 (FB) (JRC), 2023 WL 8258800, *5 (E.D.N.Y. Nov. 29, 2023) (citing *Tangreti v. Bachmann*, 983 F.3d 609, 618 (2d Cir. 2020) (rejecting a "special rule" for supervisory liability)).  However, because "'[Defendant Hradsky] [was not] personally involved in the alleged constitutional deprivation, Plaintiff cannot maintain [Fourth Amendment excessive force or failure to intervene causes of action] against [him].'"  *Id.* (citations omitted); *see also Stoutenger v. City of Fulton*, 605 F. Supp. 3d 432, 457 (N.D.N.Y. 2022) (dismissing claim against supervisor when "[t]his allegation does not, by itself, allege that Mayor Michaels was directly involved in any of the acts which [the plaintiff] contends constitute adverse employment actions").  Accordingly, the Court grants Defendants' motion to dismiss Plaintiff's Fourth Amendment excessive force and failure to intervene causes of action against Defendant Hradsky in his individual capacity.

**F.      42 U.S.C. §§ 1985 and 1986 Claims**

Plaintiff also alleges a conspiracy under 42 U.S.C. §§ 1985 and 1986.  *See* Am. Compl. at ¶¶ 95, 104, 109 (citing 42 U.S.C. §§ 1985-1986).  Defendants argue that, setting aside that a conspiracy is a legal impossibility because the individual defendants are all employees of the same entity, *see Herrmann v. Moore*, 576 F.2d 453, 459 (2d Cir. 1978), Plaintiff's unadorned factual allegations cannot withstand a motion to dismiss.  *See Gallop v. Cheney*, 642 F.3d 364, 369 (2d Cir. 2011) (explaining that "[i]t is well settled that claims of conspiracy 'containing only conclusory, vague, or general allegations of conspiracy to deprive a person of constitutional rights cannot withstand a motion to dismiss'" (quoting *Leon v. Murphy*, 988 F.2d 303, 311 (2d Cir. 1993) (quotation marks omitted))).  Defendants maintain that, beyond citing to the two statutes, Plaintiff does not provide any factual support that would plausibly suggest the existence of a conspiracy.  Accordingly, Defendants contend, to the extent the Amended Complaint attempts to raise a conspiracy claim under 42 U.S.C. §§ 1985-1986, the Court must summarily dismiss those claims.  *See Brito v. Arthur*, 403 F. App'x 620, 621 (2d Cir. 2010) (Summary Order) (dismissing both causes of action when the complaint "failed to provide any factual allegations that [the defendants] engaged in a conspiracy, or that they were motivated by unlawful discriminatory intent or animus").  Plaintiff did not oppose Defendants' argument that his claims under 42 U.S.C. §§ 1985 or 1986 were not legally viable.

"In this District, where a non-movant has willfully failed to respond to a movant's properly filed and facially meritorious memorandum of law, the non-movant is deemed to have 'consented' to the legal arguments contained in that memorandum of law under Local Rule 7.1(a)(3)."  *CF Fresh, LLC, v. Carioto Produce, Inc.*, No. 1:20-CV-0884 (GTS/CFH), 2021 WL 4129161, *8 (N.D.N.Y. Sept. 10, 2021).  "Stated another way, when a non-movant fails to

oppose a legal argument asserted by the movant, the movant may succeed on the argument by showing that the argument possesses facial merit, which has appropriately been characterized as a 'modest' burden." *Id.* (citing N.D.N.Y. L.R. 7.1(a)(3) ("Where a properly filed motion is unopposed and the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein. . . ."); *Rusyniak v. Gensini*, 07-CV-0279, 2009 WL 3672105, *1, n.1 (N.D.N.Y. Oct. 30, 2009) (Suddaby, J.) (collecting cases); *Este-Green v. Astrue*, 09-CV-0722, 2009 WL 2473509, at *2 & n.3 (N.D.N.Y. Aug. 7, 2009) (Suddaby, J.) (collecting cases)).

Based on Plaintiff's failure to oppose Defendants' motion to dismiss the §§ 1985 and 1986 conspiracy claims and because Defendants have met their modest burden of demonstrating the facial merit to their arguments in this regard, the Court grants Defendants' motion to dismiss Plaintiff's §§ 1985 and 1986 conspiracy claims.

**G.     42 U.S.C. § 1981 Claims**

Plaintiff alleges claims pursuant to 42 U.S.C. § 1981.  *See* Am. Compl. at ¶¶ 117-123. He asserts that "[t]he the conduct of Defendants Zarnowski, Romano, and Fuentes . . . in entering Plaintiff's classroom while he was giving a presentation in front of his peers, knocking him to the floor violently, restraining him for several minutes while false [sic] accusing him of having a weapon, forcefully handcuffing him, and walking him through an academic building, was substantially motivated by racial animus."  *See* Am. Compl. at ¶ 120.  Plaintiff also alleges that "Defendants SU and SU Board's actions in ratifying the conduct of Defendants Zarnowski, Romano, and Fuentes, filing criminal charges against Plaintiff, and imposing a suspension on Plaintiff were also substantially motivated by racial animus."  *See id.* at ¶ 121; *see* Dkt. No. 43,

70

Plaintiff's Memorandum of Law, at 32.  Plaintiff also claims that he has adequately alleged that

the University and its disciplinary officials, including Defendant Hradsky, engaged in racial

discrimination when they ratified the acts of Defendants Zarnowski, Fuentes, and Romano and

imposed disciplinary penalties on Plaintiff which were 'substantially motivated by racial

animus.'"  *See* Am. Compl. at ¶¶ 68-87; 121-122; *see also Faiaz*, 64 F. Supp. 3d at 365 (stating

that "'[t]he personal involvement of a supervisory defendant may be shown by evidence that . . .

the defendant, after being informed of the violation through a report or appeal, failed to remedy

the wrong . . . or . . . exhibited deliberate indifference to the rights of [the plaintiff] by failing to

act on information indicating that unconstitutional acts were occurring'" (quotation omitted)).

Finally, Plaintiff contends that "Defendants' actions infringed on [his] right to enjoy the equal

benefits as similarly situated non-Black students of [Defendant] SU."  *See id.* at ¶ 122.

  Section 1981 provides that "[a]ll persons within the jurisdiction of the United States shall

have the same right . . . to make and enforce contracts, to sue, be parties, give evidence, and to

the full and equal benefit of all laws and proceedings for the security of persons and property as

is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes,

licenses, and exactions of every kind, and to no other."  42 U.S.C. § 1981(a).  Plaintiff brings his

Section 1981 claims under subsection (c) of the statute, *see* Am. Compl. at ¶ 119, which provides

that "the rights protected by this section are protected against impairment by nongovernmental

discrimination and impairment under color of State law."  42 U.S.C. § 1981(c).

  The equal benefit clause of §1981 does not require state action.  *See Phillip v. Univ. of*

*Rochester*, 316 F.3d 291, 295 (2d Cir. 2003); *Wong v. Yoo*, 649 F. Supp. 2d 34, 68 (E.D.N.Y.

2009) (concluding that 42 U.S.C. § 1981 "provides a remedy 'against private actors who

intentionally discriminate on the basis of race or ethnicity'" (quotation and other citations

omitted)).  However, in *Duplan v. City of New York*, the Second Circuit "expressly held that '42 U.S.C. § 1983 provides the sole cause of action available against state actors alleged to have violated § 1981.'"  *Smalls v. Collins*, 10 F.4th 117, 144 (2d Cir. 2021) (quoting *Duplan*, 888 F.3d [612,] 616 [(2d Cir. 2018)]).  In reaching this conclusion, the Second Circuit stated, among other things, "[b]ecause § 1983 already provides a remedy against state actors, there is no reason to infer from the rights-conferring language of § 1981(c) that it creates an additional, and duplicative, remedy."  *Duplan v. City of New York*, 888 F.3d 612, 620-21 (2d Cir. 2018) (footnote omitted).  Moreover, as the Second Circuit explained, the Supreme Court, in *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701 (1989), "held that 'the express cause of action for damages created by § 1983 constitutes the *exclusive federal remedy* for violation of the rights guaranteed in § 1981 by state governmental units.'"  *Duplan*, 888 F.3d at 619 (quoting [*Jett*, 491 U.S.] at 733, 109 S. Ct. 2702) (emphasis added)).

As stated above, Defendants Zarnowski, Romano, and Fuentes' actions of entering Plaintiff's classroom, arresting him, and recommending criminal charges were taken under color of state law.  Thus, Plaintiff's Section 1981 claims, to the extent they challenge Defendants Zarnowski, Romano, and Fuentes' actions of arresting Plaintiff and recommending criminal charges against Plaintiff, *see* Am. Compl. at ¶¶ 120-121, are barred as Section 1983 is the exclusive federal remedy for violations of Plaintiff's rights arising from this conduct.  To this extent, the Court grants Defendants' motion to dismiss Plaintiff's Section 1981 claims against Defendants Zarnowski, Romano, and Fuentes.

Plaintiff also alleges a § 1981 claim against Defendant Hradsky, [who is not a state actor and whom he alleges,] engaged in racial discrimination when he, in his supervisory capacity, ratified the acts of Defendants Zarnowski, Fuentes, and Romano and imposed disciplinary

penalties on Plaintiff which were 'substantially motivated by racial animus.'"  *See* Dkt. No. 43, Plaintiff's Memorandum of Law, at 32 (citing Am. Compl. at ¶¶ 68-87, 121-22; *Faiza*, 64 F. Supp. 3d at 365 (stating that "[t]he personal involvement of a supervisory defendant may be shown by evidence that…the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong . . . or . . . exhibited deliberate indifference to the rights of [plaintiff] by failing to act on information indicating that unconstitutional acts were occurring"). Plaintiff's reliance on *Faiza* for the proposition that he states a plausible supervisory liability claim against Defendant Hradsky is misplaced.  In addressing supervisory liability in *Faiza*, the district court relied on the holding in *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir.1995).  *See Faiaz*, 64 F. Supp. 3d at 366.  *Colon's* supervisory liability standard, however, was abrogated by *Tangreti v. Bachmann*, 983 F.3d 609 (2d Cir. 2020).  Thus, because Plaintiff has not plausibly alleged that Defendant Hradsky violated 42 U.S.C. § 1981 by his own conduct -- which, at present, is the proper standard for personal involvement by a supervisor – Plaintiff's argument fails.  *See Stoutenger v. City of Fulton*, 605 F. Supp. 3d 432, 457 (N.D.N.Y. 2022) (dismissing claim against supervisor when "[t]his allegation does not, by itself, allege that Mayor Michaels was directly involved in any of the acts…."").  Thus, the Court grants Defendants' motion to dismiss the Section 1981 claims against Defendant Hradsky.

Alternatively, even had Plaintiff plausibly alleged that Defendant Hradsky violated § 1981 by this own conduct, Plaintiff's claim would still be insufficient to withstand a motion to dismiss.  To establish a § 1981 claim, a plaintiff must adequately plead the following elements: "'[i] the plaintiff is a member of a racial minority; [ii] [there was] an intent to discriminate on the basis of race by the defendant; and [iii] the discrimination concerned one or more of the activities enumerated in the statute . . . '"  *Benzinger v. NYSARC, Inc. N.Y.C. Chapter*, 385 F. Supp. 3d

224, 231 (S.D.N.Y. 2019) (quoting *Mian v. Donaldson, Lufkin & Jenrette Secs. Corp.*, 7 F.3d 1085, 1087 (2d Cir. 1993)).  Section 1981 covers only intentional discrimination.  *See, e.g.*, *id.* (stating that "'a plaintiff must show that a defendant's acts were purposefully discriminatory and racially motivated'" (quoting *Weiss v. La Suisse*, 141 F. App'x 31, 33 (2d Cir. 2005) (summary order) (internal citations omitted)).

Although courts in the Second Circuit "previously required a plaintiff to show that a defendant's discriminatory intent was a substantial or motivating factor behind the conduct complained of to establish liability under § 1981 . . . the Supreme Court recently held that 'a plaintiff must initially plead and ultimately prove that, but for race, [plaintiff] would not have suffered the loss of a legally protected right.'"  *Taylor v. New York City Fresh Mkt.*, No. 19 CV 4797 (EK) (LB), 2020 WL 10356230, *4 (E.D.N.Y. Dec. 23, 2020), *report and recommendation adopted*, 2021 WL 2940832 (E.D.N.Y. July 13, 2021) (quoting *Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media*, 140 S. Ct. 1009, 1014, 1019 (2020) (internal citations omitted).  "Thus, plaintiff now bears the burden of plausibly alleging that race was a but-for cause of his injury even at the pleading stage."  *Id.* (citing [*Comcast Corp.*, 140 S. Ct.] at 1014).

Furthermore, "[a] plaintiff alleging racial . . . discrimination . . . must do more than recite conclusory assertions.  In order to survive a motion to dismiss, the plaintiff must specifically allege the events claimed to constitute intentional discrimination as well as circumstances giving rise to a plausible inference of racially discriminatory intent."  *Yusuf v. Vassar Coll.*, 35 F.3d 709, 713 (2d Cir. 1994) (citations omitted); *see Bentley v. Mobil Gas Station*, 599 F. App'x 395, 396 (2d Cir. 2015) (stating that, "[t]o survive a motion to dismiss, a plaintiff must specifically allege the 'circumstances giving rise to a plausible inference of racially discriminatory intent'" (quoting *Yusuf v. Vassar Coll.*, 35 F.3d 709, 713 (2d Cir. 1994))).  This requires more than

"naked allegation[s]" that the defendant "acted based on the plaintiff's race and color" which are "too conclusory to survive a motion to dismiss." *Bentley,* 599 F. App'x at 396 (citing *Albert v. Carovano*, 851 F.2d 561, 571 (2d Cir. 1988) (en banc)).  As stated, the Supreme Court has held that to prevail on a § 1981 claim, "a plaintiff must initially plead and ultimately prove that, but for race, [he] would not have suffered the loss of a legally protected right." *Comcast Corp. v. Nat'l Ass'n of African-Am.-Owned Media*, 589 U.S. 327, 341 (2020).  "Accordingly, it is insufficient to merely plead that race was a motivating factor in the discriminatory action." *Brown v. Montefiore Med. Ctr.*, No. 19 CV 11474 (ALC), 2021 WL 1163797, *5 (S.D.N.Y. Mar. 25, 2021) (citing [*Comcast Corp.*, 589 U.S. 327, 140 S. Ct.] at 1017-18); *see Smith v. JP Morgan Chase Bank N.A.*, No. 22-CV-4994 (LTS), 2024 WL 167194, *3 (S.D.N.Y. Jan. 16, 2024) (explaining that "for a claim of race discrimination under Section 1981, 'it is insufficient to merely plead that race was a motivating factor in the discriminatory action.'" (quotation omitted)).

For all the above-stated reasons, the Court grants Defendants' motion to dismiss Plaintiff's § 1981 claims against all Defendants.


## H.   Title IX Claims[15]

Title IX provides in relevant part that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to

---

[15] Plaintiff originally asserted this claim against all Defendants.  However, he subsequently voluntarily withdrew his Title IX claim against the individual Defendants. Accordingly, the Court dismisses with prejudice Plaintiff's Title IX claim against Defendants Zarnowski, Romano, Fuentes and Hradsky in their individual capacities.  To the extent that Plaintiff states a plausible Title IX claim, the Court will consider Defendant SU Board and Defendant Hradsky in his official capacity to have acted on behalf of Defendant SU.

discrimination under any education program or activity receiving Federal financial assistance[.]" 20 U.S.C. § 1681(a).  "Hence, 'Title IX bars the imposition of university discipline where gender is a motivating factor in the decision to discipline.'"  *Roe v. St. John's Univ.*, 91 F.4th 643, 652 (2d Cir. 2024) (quoting *Yusuf v. Vassar Coll.*, 35 F.3d 709, 715 (2d Cir. 1994)); *see Doe v. Columbia Univ.*, 831 F.3d 46, 53 (2d Cir. 2016) (stating that, "[b]ecause Title IX prohibits (under covered circumstances) subjecting a person to discrimination on account of sex, it is understood to 'bar[ ] the imposition of university discipline where gender is a motivating factor in the decision to discipline'" (quoting [*Yusuf*, 35 F.3d at] 715)).

Title IX, "which is enforceable through an implied private right of action, was enacted to supplement the Civil Rights Act of 1964's bans on racial discrimination in the workplace and in universities."  *Columbia Univ.*, 831 F.3d at 53 (citation omitted).  A plaintiff bringing a Title IX claim must show "'the defendant discriminated against him because of his sex; that the discrimination was intentional; and that the discrimination was a "substantial" or "motivating factor" for the defendant's actions.'"  *Prasad v. Cornell Univ.*, No. 5:15-cv-322, 2016 WL 3212079, *14 (N.D.N.Y. Feb. 24, 2016) (quotation omitted).

The *McDonnell Douglas* burden-shifting framework governs the pleading standard for sex discrimination under Title IX.  *See Menaker v. Hofstra Univ.*, 935 F.3d 20, 30 (2d Cir. 2019) (explaining that, "[b]ecause it is often difficult to obtain direct evidence of discriminatory intent, we employ a 'burden-shifting framework' (commonly identified by reference to the Supreme Court case from which it derives, *McDonnell Douglas Corp. v. Green*) to 'progressively sharpen[ ] the inquiry into the elusive factual question of intentional discrimination'").  "A Title IX complaint alleging that a university discriminated against a plaintiff on the basis of the plaintiff's sex when disciplining the plaintiff sufficiently alleges that the university acted with the

discriminatory intent required for a successful Title IX claim when, 'like a complaint under Title VII, . . . it pleads specific facts that support a minimal plausible inference of such discrimination.'" *St. John's Univ.*, 91 F.4th at 652 (quoting *Doe v. Columbia Univ.*, 831 F.3d 46, 56 (2d Cir. 2016)).  "This minimal-plausible-inference-of-discrimination standard is 'low,' . . . but failure to meet it is fatal. . . ." *Id.* (quoting [*Doe v. Columbia Univ.*, 831 F.3d] at 48) (citing *Doe v. N.Y. Univ.*, 438 F. Supp. 3d 172, 181, 183-86 (S.D.N.Y. 2020) (noting that "Title IX claims require evidence of intentional discrimination" and granting motion to dismiss the plaintiff's Title IX claim in part because the plaintiff's allegations failed to establish a plausible inference of intentional discrimination)).

"'[G]enerally,' a plaintiff 'attacking a university disciplinary proceeding on grounds of gender bias' asserts that the university is liable under one or both of two separate theories: an erroneous outcome theory or a selective enforcement theory." *St. John's Univ.*, 91 F.4th at 652 (quoting *Yusuf*, 35 F.3d at 715); (citing *Doe v. Colgate Univ.*, 760 F. App'x 22, 30 (2d Cir. 2019) (summary order)).

Plaintiff contends he has sufficiently alleged Title IX claims under both "erroneous outcome" and "selective enforcement" theories.  *See* Dkt. No. 43, Plaintiff's Memorandum of Law, at 25-30.  Defendants contend that the Court should dismiss these claims for failure to plead sufficient allegations to state plausible claims.  *See* Dkt. No. 22, Defendants' Memorandum of Law, at 22-25.

### 1. Erroneous Outcome Claim

Plaintiff asserts that "[t]he conduct of Defendants in imposing disciplinary sanctions against [him] based on findings that were erroneous and contrary to the weight of the evidence,

as well as their failure to consider evidence discrediting Jane Roe and supporting Plaintiff's account of the events of February 8, 2022, supports a reasonable inference that Defendants acted out of discriminatory bias and that gender was a motivating factor in their decision to suspend Plaintiff." *See* Am. Compl. at ¶ 114.

"To successfully plead [an erroneous outcome] claim, the plaintiff must allege (1) 'facts sufficient to cast some articulable doubt on the accuracy of the outcome of the disciplinary proceeding' and (2) 'circumstances suggesting that gender bias was a motivating factor behind the erroneous finding.'" *St. John's Univ.*, 91 F.4th at 652 (quoting *Yusuf*, 35 F.3d at 715). "[T]he issue before [the Court] is not whether [Defendant SU's] determination[] respecting [Plaintiff's] behavior [was] incorrect, but if so, whether [it was] incorrect *as a result of* gender bias on the part of [Defendant SU]." *St. John's Univ.*, 91 F.4th at 653 n.10.

### (a). Disciplinary Proceedings[16]

Plaintiff was alleged to have violated four (4) sections of the SU Code of Student Conduct for allegedly assaulting Jane Roe and resisting arrest: § 1 (Physical harm or threat of physical harm to any person or persons, including but not limited to: assault, sexual abuse, or other forms of physical abuse); § 3 (Assistance, participation in, promotion of, or perpetuation of conduct, whether physical, electronic, oral, written or video, which threatens the mental health, physical health, or safety of anyone); § 12 (Failure to comply with the lawful directives of University officials who are performing the duties of their office,

---

[16] The Court may review the contents of the disciplinary adjudications because these records are integral to the Amended Complaint and because Plaintiff relies upon these records in contesting Defendants' motion.

especially as they are related to the maintenance of safety or security); and §18 (Violation of any international, federal, state, or local law).  *See* Am. Compl. ¶ 70; Dkt. No. 21-6, University Conduct Board Decision, at 1.

The University Conduct Board conducted a hearing on June 15, 2022, in which James Hill, Detective with the SU Department of Public Safety, served as the Complainant and Plaintiff was the Respondent.  *See generally* Dkt. No. 21-6.  At the hearing, Complainant argued that Respondent assaulted Jane Roe (referred to as "the Impacted Party") by first pushing and then striking her and resisted arrest after officers confronted him in his class.  *See id.* at 8.  In support of these claims, the Complainant presented the "case file, body camera footage, and reports."  *See id.*[17]  Respondent argued, among other things, that he did not assault Jane Roe, that he pushed Jane Roe's phone away in self-defense, that Jane Roe had a history of targeting him with bullying and harassment, that he did not resist arrest but only wanted to know what DPS wanted to talk to him about and where they were taking him, that he "reacted because he felt threatened and humiliated in front of his peers," and that Jane Roe "is inconsistent, and she is not a credible source."  *See id.*  Respondent presented the body camera footage and his statement in support of his claims.  *See id.* at 9.

The Conduct Board indicated that it "considered all of the information provided in the file and all of the testimony provided by both parties during the hearing."  *See id.* at 10. Regarding credibility, the Conduct Board found that the Complainant "is credible.  He reported

---

[17] Items provided for the Conduct Board's consideration in the case file included the relevant DPS incident reports, relevant DPS BWC footage, video from Jane Roe's phone, video footage from the "111 Waverly security camera," interview footage from DPS, Respondent's written statement, videos of incident provided by Respondent, the NCO between Respondent and Jane Roe (referred to as the "Impacted Party"), and Respondent's questions for the Complainant. *See* Dkt. No. 21-6 at 7.

on the information in the case file and did not provide answers to questions that he did not have

answers to." *See id.* at 9.  The Conduct Board found that the Respondent "is credible related to

the information that he was able to present.  His information has been consistent." *See id.*

The Conduct Board concluded that Plaintiff was responsible for violating Code of

Student Conduct sections 1, 3, and 18, and not responsible for violating section 12.  *See id.* at 10.

As a rationale for its decision, the Conduct Board indicated the following:

> The Board found the Respondent responsible for Codes 1 and 3
> because his action of reaching out to push the phone away from
> him was excessive and likely was the cause of the mental and
> physical injury suffered by Impacted Party.  While it might be an
> instinctual reaction to reach out and push a phone away, the
> Respondent had other avenues with which he could have managed
> the situation, including informing his professor of the interaction,
> notifying OCS, or contacting DPS.  The Board finds that the
> Respondent caused physical harm to Impacted Party by causing
> contusions to her face, causing injury to her eye, and causing her to
> have a concussion.  The Board was unclear as to whether or not the
> Respondent pushed the phone away with an open hand or if he
> reached out to punch Impacted Party.  The video does not clearly
> show his hand.  There are no witness statements in the file,
> although there were at least three witnesses present at the incident,
> including Impacted Party, her friend, and her boyfriend.
>
> The Board found the Respondent not responsible for Code 12
> because there is no evidence that the Respondent violated the No
> Contact Order.  There are no witness statements, nor is there a
> statement from Impacted Party in the file regarding what occurred.
> Based on the video footage from the Waverly camera, it appears
> that Impacted Party approached the Respondent.  Impacted Party's
> video documents that she called him by name and attempted to
> record him.  Additionally, the Board found that the Respondent did
> not resist arrest.  The Respondent was not informed that he was
> being arrested but was told that he needed to come outside, after
> which the officers would tell him why he needed to leave with
> them.  He was not read his rights, and the body camera footage
> clearly documents his confusion about what was happening.
>
> The Board finds the Respondent responsible for violating Code 18
> due to his action of reaching out to push the phone away and
> causing injury to Impacted Party; therefore, he assaulted Impacted

> Party.  The Board does not find that the Respondent is responsible
> for resisting arrest, given that he was never informed that he was
> being arrested.

*See id.* at 10-11.

The Conduct Board recommended that Respondent be given a one-semester suspension "due to the severity of the incident and based on [Plaintiff's] prior conduct history, which includes a current suspension."  *See id.* at 11.  As a rationale for the proposed sanction, the Conduct Board indicated as follows:

> The Board has assigned the Respondent a one-semester suspension
> in light of the injury caused to Impacted Party and because the
> Respondent is currently suspended from the University.
> Regardless of his intent, he did cause harm to Impacted Party.
> Although Impacted Party did not lose consciousness and was not
> immediately transported to the hospital, she did have two
> contusions, a red-eye, and a concussion. . . . Additionally, this
> incident involved two individuals, the Respondent and Impacted
> Party, both of whom were involved in a prior incident in 2019 in
> which Mr. Williams was also Respondent.  The Board finds that
> given the years between this incident and the prior incident and the
> fact that Impacted Party will be graduating in May 2022, the
> likelihood that there will be a repeat incident between them in the
> future will be significantly reduced.  There was no evidence that
> the Respondent's actions were motivated by bias.  His actions
> appeared to the Board to be motivated by anger or frustration that
> Impacted Party was recording him while he was headed to class.

*See id.* at 11-12.

Plaintiff appealed the Conduct Board's decision, contending that the evidence presented at the hearing was insufficient to show that Jane Roe sustained an injury to her eye, *see* Dkt. No. 21-8, Appeal, at 90-92, and that Roe's medical records (which were unavailable at the time of the Conduct Board's decision) "conclusively show" that Jane Roe did not sustain a "concussion or any sort of eye or head injury from the incident."  *See id.* at 88.  Therefore, Plaintiff argued, his "instinctual reaction" of reaching out and pushing Roe's phone away when she violated the NCO

"should amount to a determination that [Plaintiff] did not cause or threaten the mental or physical health or safety of [Roe] and did not engage in an assault." *See id.* at 93.

Plaintiff also argued that the Conduct Board did not apply the preponderance of the evidence standard as required by the SU Code of Student Conduct. *See id.* at 93-95. In this regard, Plaintiff argued that his "instinctual reaction" of reaching out and pushing Jane Roe's cell phone away, without evidence that he punched Roe and without witness statements or testimony to support the Complainant's allegation that he pushed and struck Roe, is insufficient to support a conclusion that he acted intentionally or recklessly to cause physical injury to another person, as required to establish an assault under New York Penal Law § 120.00. Plaintiff also maintained that the sanction of a one-semester suspension was grossly inappropriate because Jane Roe did not suffer any injury. *See id.* at 95-96.

The Appeals Board sustained the Conduct Board's decision, finding Plaintiff responsible for violating Code of Student Conduct sections 1, 3 and 18, and sustained the recommendation of a one (1) semester suspension. *See* Dkt. No. 21-12, Appeals Board Decision, at 1. The Appeals Board explained the rationale for its decision as follows:

> • Based on the new evidence the Respondent provided, the Impacted Party's medical records stated (page 53) that the Impacted Party did receive a diagnosis of a headache and dizziness and the external cause of the injury was "Assault by strike against or bumped into by another person, initial encounter." The Appeals Board determined that the medical records demonstrated that the student was in violation of Codes #1, #3, & #18. The Appeals Board determined the Respondent's action of "reaching out to push the phone away" (p. 9 of Respondent's appeal), which more likely than not caused an injury to the Impacted Party, is assault.
>
> • The Appeals Board determined there was no error of interpretation regarding the standard of proof. The Appeals Board determined the standard of proof (preponderance of evidence – more likely than not) was met using the following evidence:

o Medical records;
o Video evidence of incident;
o Respondent's acknowledgment of pushing phone away in page 10 of his appeal.  The action to push the phone away was excessive, more likely than not causing injury to the impacted party.

• The Appeals Board sustains the decision of the Respondent's one (1) semester suspension.  The Appeals Board determined that due to the circumstances involved in this case, as well as the Respondent's prior conduct history and disciplinary status, that a one (1) semester suspension is appropriate.

*See id.* at 8-9.


### *(b). Articulable Doubt as to Accuracy of Outcome*

As noted, a plaintiff who brings an erroneous outcome Title IX claim "must allege particular facts sufficient to cast some articulable doubt on the accuracy of the outcome of the disciplinary proceeding." *Yusuf*, 35 F.3d at 715.  "If no such doubt exists based on the record before the disciplinary tribunal, the claim must fail." *Id.*  Congress did not intend "Title IX to impair the independence of universities in disciplining students against whom the evidence of an offense, after a fair hearing, is overwhelming, absent a claim of selective enforcement." *Id.*

However, the pleading burden in this regard is not heavy.  For example, a complaint may allege particular evidentiary weaknesses behind the finding of an offense such as a motive to lie on the part of a complainant or witnesses, particularized strengths of the defense, or other reason to doubt the veracity of the charge.  A complaint may also allege particular procedural flaws affecting the proof.  However, allegations of a procedurally or otherwise flawed proceeding that has led to an adverse and erroneous outcome combined with a conclusory allegation of gender discrimination is not sufficient to survive a motion to dismiss.  The fatal gap is, again, the lack of a particularized allegation relating to a causal connection between the flawed outcome and gender bias.  A plaintiff must thus also allege particular circumstances suggesting that gender bias was a motivating factor behind the erroneous

> finding.  Allegations of a causal connection in the case of
> university disciplinary cases can be of the kind that are found in
> the familiar setting of Title VII cases. . . . Such allegations might
> include, *inter alia*, statements by members of the disciplinary
> tribunal, statements by pertinent university officials, or patterns of
> decision-making that also tend to show the influence of gender.  Of
> course, some allegations, such as statements reflecting bias by
> members of the tribunal, may suffice both to cast doubt on the
> accuracy of the disciplinary adjudication and to relate the error to
> gender bias.

*Id.* (internal citations omitted).  "[T]he inference of discriminatory intent supported by the

pleaded facts [need not] be the most plausible explanation of the defendant's conduct.  It is

sufficient [at the Rule 12(b)(6) stage] if the inference of discriminatory intent is plausible."

*Columbia Univ.*, 831 F.3d at 57.

Defendants contend that Plaintiff fails to identify any "clearly irregular" investigative or

adjudicative procedures in his disciplinary hearing, or any procedural rule violated by the

Conduct Board or the Appeals Board.  *See* Dkt. No. 22, Defendants' Memorandum of Law, at 24.

Rather, Defendants maintain, Plaintiff merely argues that the outcome should have been different

and that the evidence against him should not have been credited, which is not enough to make

out an erroneous outcome claim.  *See id.* (citing *Xiaolu Peter Yu v. Vassar Coll.*, 97 F. Supp. 3d

448, 462 (S.D.N.Y. Mar. 31, 2015) ("To the extent that Yu simply disagrees with the IVP's

decision, the Court cannot now -- absent flawed process and gender discrimination -- second-

guess the panelists' credibility determinations and factual conclusions.")).

In response, Plaintiff argues that that "the University followed irregular investigative and

adjudicative processes on two separate occasions – first, in connection with a proceeding which

took place in July of 2019, in which it refused to review available camera footage relating to an

incident between Plaintiff and Roe (Am. Compl. at ¶¶ 22-29);[18] and second, in connection with

its most recent disciplinary proceeding in July of 2022, in which it willfully disregarded

compelling and conclusive evidence that Plaintiff did not strike Jane Roe and that she was not, in

fact, injured during their encounter (Am. Compl. at ¶¶ 67-87)." *See* Dkt. No. 43, Plaintiff's

Memorandum of Law, at 26-27.  Plaintiff further argues:

> In the July 2022 proceeding, Plaintiff alleged that he presented
> evidence to the Conduct Board proving that it was Jane Roe, and
> not him, who violated the parties' mutual no-contact order, and that
> he merely pushed her phone out of his face with his open, non-
> dominant hand in self-defense.  [Am. Compl.] at ¶ 72.  He further
> alleged that Roe had a motive to lie to the Conduct Board
> regarding the events of February 8, 2022, as she had threatened
> several times to "have him arrested." *See id.* at ¶¶ 26, 30, 36; *see
> also Yusuf v. Vassar Coll.*, 35 F.3d 709, 715 (2d Cir. 1994)
> (recognizing that erroneous outcome claim may be supported and
> survive a motion to dismiss with allegations that a complainant or
> witness had a motive to lie).  On appeal, Plaintiff presented
> evidence that Jane Roe did not suffer a concussion, a falsehood
> relied upon by the Conduct Board in finding Plaintiff responsible
> and suspending him.  *Id.* at ¶¶ 79-81.  Because the evidence
> "substantially favor[ed]" Plaintiff's version of events, the
> University's sustaining him of disciplinary charges against him arising
> out of the February 8, 2022 incident was "clearly irregular" and
> suffices to state a claim for a Title IX erroneous outcome claim.
> *Doe v Columbia Univ.*, 2022 WL 16856158, at *5 (S.D.N.Y. Nov.
> 10, 2022) ("[I]t is plausible to infer" that an "evaluator has been
> influenced by bias" -- and thus to that there were procedural
> irregularities -- where "the evidence substantially favors one
> party's version of a disputed matter, but an evaluator forms a
> conclusion in favor of the other side (without an apparent reason
> based in the evidence)") (citations omitted); *see also Yusuf* , 35

---

[18] Although a claim based on the July 2019 proceeding would be barred by the applicable
three-year statute of limitations for Title IX claims, *see Kane v. Mt. Pleasant Cent. Sch. Dist.*, 80
F.4th 101, 104 (2d Cir. 2023) ( concluding that, "[u]nder well-settled law, claims under . . . Title
IX are governed by New York's general statute of limitations for personal injury actions . . .
which is three years"), Defendant SU Conduct Board expressly relied upon this proceeding in
assessing the disciplinary sanction in the July 2022 proceeding.  *See* Def. Ex. E, Dkt. No. 21-6 at
11-12.  Thus, the determinations made at the July 2019 proceeding are relevant to the Court's
determination at this stage of the proceedings.

F.3d at 715 ("A complaint may also allege particular procedural flaws affecting the proof.") (emphasis added).

The University also followed [] irregular investigative and adjudicative processes by failing to apply the "preponderance of the evidence (more likely than not)" standard in its adjudication of the disciplinary charges against Plaintiff.  *See* Powers Decl. Ex. E at 9.  The Conduct Board found that it was "unclear" whether Plaintiff pushed Jane Roe's phone away with an open hand or punched her.  *Id.* at p. 11.  It also acknowledged that there were no witness statements in the disciplinary file that supported Jane Roe's version of events.  *Id.*  And yet, despite major weaknesses in the University's evidence against him, the Conduct Board nonetheless imposed a one-semester suspension against him.  *Id.*

*See* Dkt. No. 43, Plaintiff's Memorandum of Law, at 27-28 (footnotes omitted).

Accepting Plaintiff's factual allegations as true and drawing all reasonable inferences in his favor, he has alleged particular facts sufficient to cast some articulable doubt on the accuracy of the outcome of the 2022 disciplinary proceeding.  In this regard, the alleged facts plausibly indicate that the Conduct Board discounted the version of events that Plaintiff, a male, presented in favor of the version presented for Jane Roe, a female.  "Because the outcome of the proceeding in large part hinged on the parties' credibility, Plaintiff has raised an articulable doubt as to the accuracy of the outcome."  *Doe v. Siena Coll.*, No. 1:22-CV-1115 (BKS/TWD), 2023 WL 197461, *15 (N.D.N.Y. Jan. 17, 2023) (*Cf. Doe v. Trs. of Dartmouth Coll.*, No. 22-cv-18, 2022 WL 2704275, at *7, 2022 U.S. Dist. LEXIS 122459 (D.N.H. July 12, 2022) (finding that the plaintiff had plausibly alleged articulable doubt where the university discounted the plaintiff's credibility and "the evidence was largely [the complainant's] word against [the plaintiff's]")).  These alleged facts, while straddling the line between challenging the outcome of the proceeding and pointing to facts demonstrating articulable doubt as to the accuracy of the outcome of the proceeding, are sufficient to meet the plausibility standard for the first element of an erroneous

outcome claim.  *See Yusuf*, 35 F.3d at 715 (noting that "the pleading burden in this regard is not heavy").

### *(c). Gender Bias as Motivating Factor*

The Court next turns to whether Plaintiff has offered sufficient allegations  to support his claim that gender bias was a motivating factor behind the erroneous finding.  *See St. John's Univ.*, 91 F.4th at 652.

"The Second Circuit has found that evidence of sex bias may be gleaned from a variety of sources.  Of course, this includes 'statements by members of the disciplinary tribunal, statements by pertinent university officials, or patterns of decision-making that also tend to show the influence of gender.'"  *Doe v. Rochester Inst. of Tech.*, No. 21-CV-6761-FPG, 2024 WL 1051953, *10 (W.D.N.Y. Mar. 11, 2024) (quoting *Yusuf*, 35 F.3d at 715).  Plaintiff does not point to statements by members of the disciplinary tribunal or by pertinent university officials that could plausibly raise an inference of gender discrimination.[19]

"An inference of gender bias may also be permissible where there is a combination of (1) procedural irregularities that show a biased process, and (2) surrounding circumstances that suggest that 'this bias was likely a sex-based bias.'"  *Doe*, 2024 WL 1051953, at *10 (quoting *Menaker v. Hofstra Univ.*, 935 F.3d 20, 31 (2d Cir. 2019)).  "In *Doe v. Columbia Univ.*, for example, the Second Circuit found a complaint sufficient to allege a biased process where the

---

[19] Although not pled in his Amended Complaint, Plaintiff asks the Court to take judicial notice of various newspaper articles, comments, and public criticisms of Defendant SU's handling of sexual harassment and sexual abuse cases.  However, despite Plaintiff's contention to the contrary, his disciplinary proceeding did not involve claims of sexual harassment, sexual assault, or sexual abuse, but rather were claims of simple assault and resisting arrest.  Thus, these newspaper articles, public comments, and public criticisms of Defendant SU's handling of sexual abuse and sexual harassment cases are inapplicable to the instant case.

plaintiff alleged that the Title IX panel 'chose to accept an unsupported accusatory version over [the plaintiff's]' -- which was substantially more supported by the evidence -- and 'declined even to explore the testimony of [the plaintiff's] witnesses.'" *Id.* (quoting *Columbia*, 831 F.3d at 57). "The complaint plausibly alleged that this bias was 'bias *on account of sex*' insofar as it alleged that the university had been dealing with 'substantial criticism' for its failure to '[take] seriously complaints of female students alleging sexual assault by male students.'" *Id.* (quoting *Columbia*, 831 F.3d at 57 (emphasis added)).   "'Against this factual background, it [was] entirely plausible that the University's decision-makers and its investigator were motivated to favor the accusing female over the accused male, so as to protect themselves and the University from accusations that they had failed to protect female students from sexual assault.'" *Id.* (quoting [*Columbia*, 831 F.3d at 57]). "The Second Circuit has emphasized that even '*minimal* evidence of pressure on the university to act based on invidious stereotypes will permit a plausible inference of sex discrimination.'" *Id.* (quoting *Menaker*, 935 F.3d at 33).

"On the other hand, in the recent case of *Roe v. St. John's University*, the Second Circuit held that evidence of procedural irregularities may not, standing alone, 'automatically permit a factfinder to reasonably infer that a university has committed sex discrimination.'" *Id.* at *11 (quoting *Roe v. St. John's Univ.*, 91 F.4th 643, 654 (2d Cir. 2024)).   "This is because 'procedural errors are not inevitably a sign of sex bias.'" *Id.* (quoting [*St. John's Univ.*, 91 F.4th at 654]).

"In *St. John's*, the court recognized that 'in some cases an erroneous decision is sufficiently "inexplicable" to warrant inferring that the university reached its decision due to sex-based bias.'" *Doe v. Rochester Inst. of Tech.*, 2024 WL 1051953, at 11 n.7 (quoting *St. John's*, 91 F.4th at 655-56).   "The parameters of this exception are not clearly defined in *St. John's*, but the court suggested that the errors must be such as to give 'grave doubts as to the merits of the

decision itself.'" *Id.* (quoting [*St. John's*, 91 F.4th] at 656 (internal quotation marks omitted); *see also Doe v. Oberlin Coll.*, 963 F.3d 580, 588 (6th Cir. 2020) (rationale for university's decision supported inference of sex bias, where disciplinary panel found that complainant could not consent because she was "not sober," despite the fact that, under university policy, intoxication "does not negate consent")).

Plaintiff does not point to statements by members of the disciplinary tribunal or by pertinent university officials that could plausibly raise an inference of gender discrimination or to facts plausibly indicating that Defendant SU was motivated by public pressure to find against male respondents in cases of simple assault.  Further, in light of the fact that the Appeals Board found some identifiable injury to Jane Roe in her medical records and that Plaintiff conceded that he reached out and pushed Jane Roe's phone away, the Court does not have grave doubts about the merits of the disciplinary decision.  The fact that Defendant SU may have conducted its disciplinary proceedings in a less-than-flawless manner, or even with potentially serious flaws, does not automatically permit a factfinder to reasonably infer that  SU has committed sex discrimination.  *See St. John's*, 91 F.4th at 653.

Nevertheless, the Court finds that a combination of pleaded facts sufficiently meets the minimum burden of presenting circumstances suggesting that gender bias was a motivating factor behind the alleged erroneous finding.  These pleaded facts are that, in the July 2019 disciplinary proceeding, the Conduct Board found that Jane Roe was not credible and downplayed her role in the February 12 and March 4 incidents, yet issued Plaintiff a one-year disciplinary probation, *see* Am. Compl. at ¶¶ 24-25; in the July 2020 disciplinary proceeding, the Conduct Board found that Plaintiff did not violate the NCO and did not resist arrest, yet recommended that Plaintiff be given a one-semester suspension even though it was undisputed

that Jane Roe violated the NCO, *see id.* at ¶¶ 75-85; and that the disciplinary Boards relied upon the results of the 2019 disciplinary proceeding in assessing the disciplinary sanction in the July 2022 proceeding. *See* Dkt. No. 21-6, Conduct Board Decision, at 11-12.  It is a reasonable inference from these alleged facts that Plaintiff's gender played some role in the results of the July 2022 disciplinary proceeding.

As indicated above, the case concerning Plaintiff striking Jane Roe came down to a dispute between Plaintiff's version of events presented in his written statement and his appeal and Jane Roe's version of events presented through the Complainant based on evidence in the case file.  Accepting as true for purposes of this motion that Plaintiff merely reached out and pushed Jane Roe's phone away from his face but did not strike her, and in light of Jane Roe's relatively minor injury from the conduct, a reasonable factfinder could conclude that the one-semester suspension was excessive and arrived at only because of the genders of the two involved individuals.  In this regard, a reasonable factfinder could conclude that the Defendant SU's decision to credit Jane Roe's account of the events and to impose a significant suspension based in part on Plaintiff's prior discipline in which Defendant SU found Jane Roe incredible and downplayed her involvement in the underlying events, plausibly indicates that Defendant SU's disciplinary tribunals are prepared to accept a female student's version of events over that of a male student's version of events.

There is also a plausible inference that Plaintiff's gender influenced the disciplinary decision because Jane Roe precipitated offensive conduct underlying both the 2019 and 2022 disciplinary proceedings, but only Plaintiff was disciplined, and was disciplined relatively harshly given that, at that time, he was otherwise scheduled to graduate in short order.  *See* Am. Compl. at ¶ 84 ("At the time that SU suspended plaintiff, he had only 13 credits left to

graduate."). This presents circumstances plausibly suggesting that gender bias was a motivating factor behind the allegedly erroneous finding. Accordingly, the Court denies Defendants' motion to dismiss Plaintiff's Title IX erroneous outcome claim.

### 2. Selective Enforcement Claim

Plaintiff alleges that "Defendants' failure to take appropriate disciplinary action against Jane Roe and other similarly situated female students, even though they committed offenses that were more egregious than the offense which Plaintiff was alleged to have committed, further supports an inference that gender was a motivating factor in Defendants' actions." *See* Am. Compl. at ¶ 115.

"The essence of a selective enforcement claim is that 'regardless of the [plaintiff's] guilt or innocence,' the university initiated disciplinary proceedings against the plaintiff or disciplined the plaintiff more severely at least in part because of the plaintiff's sex." *St. John's Univ.*, 91 F.4th at 652 (quoting *Yusuf*, 35 F.3d at 715). As with an erroneous outcome claim, "wholly conclusory allegations [do not] suffice for purposes of Rule 12(b)(6)." *Yusuf,* 35 F.3d at 715 (citation omitted). To prevail on such a claim, "''[a male plaintiff] must demonstrate that a female was in circumstances sufficiently similar to his own and was treated more favorably by the University.''" *Doe v. Colgate Univ.*, 457 F. Supp. 3d 164, 172 (N.D.N.Y. 2020) (quoting *Yu v. Vassar Coll.*, 97 F. Supp. 3d 448, 480 (S.D.N.Y. 2015) (quotation omitted)). A plaintiff must also "'show that "the University's actions against [the male plaintiff] were motivated by his gender and that a similarly situated woman would not have been subjected to the same disciplinary proceedings."'" *Id.* (quoting [Yu, 97 F. Supp. 3d at 480] (quotation omitted)). A plaintiff must "''allege particular circumstances suggesting a meaningful inconsistency in

punishment and particular circumstances suggesting that gender bias was a motivating factor behind the inconsistency."'" *Id.* (quoting *Prassad v. Cornell Univ.*, No. 5:15-CV-322, 2016 WL 3212079, *18 (N.D.N.Y. Feb. 24, 2016) (quoting *Doe v. Columbia [Univ.]*, 101 F. Supp. 3d [356,] 374 [(S.D.N.Y. 2015)]) (quoting *Scott v. WorldStarHipHop, Inc.*, 2011 WL 5082410, at *5 (S.D.N.Y. Oct. 25, 2011), *aff'd sub nom. Scott v. Berkeley Coll.*, 599 Fed. Appx. 8 (2d Cir. 2015) (summary order)) (other citation omitted))); *see St. John's Univ.*, 91 F.4th at 660 (stating that "[t]he district court correctly ruled that Roe's claim of selective enforcement 'fail[s] in the absence of allegations that SJU treated a similarly situated student [of the opposite sex] differently.'" (quoting *Roe*, 2021 WL 1224895, at *17)). "As another district court in our Circuit recently explained, 'following *Columbia*, [831 F.3d at 56,] courts in this circuit have consistently dismissed selective enforcement claims absent allegations that a school treated similarly situated members of the opposite sex -- that is, members of the opposite sex facing comparable disciplinary charges -- differently.'" *St. John's Univ.*, 91 F.4th at 660 (quoting *New York Univ.*, 438 F. Supp. 3d 172, 182 (internal quotation marks and citation omitted) (collecting cases)).

Plaintiff argues that "there is one obvious comparator identified within the Amended Complaint – Jane Roe." *See* Dkt. No. 43, Plaintiff's Memorandum of Law, at 29. Plaintiff maintains that he "has alleged sufficient facts to show that Roe engaged in the offense of 'stalking,' as defined within the Title IX Policy, by threatening to have Plaintiff arrested and destroy his academic career, harassing him and attempting to physically attack him, and spreading false and incendiary rumors on social media that he was a 'rapist.'" *See id.* at 30 (citing Am. Compl. at ¶¶ 26, 31). Plaintiff contends that, "[c]oupled with [his] allegations that the University did not take any disciplinary action against Jane Roe in response to Plaintiff's complaints about Roe's actions, these allegations are sufficient to meet the Second Circuit's

pleading requirements for a selective enforcement Title IX gender discrimination [claim]." *Id.* (citing Am. Compl. at ¶¶ 31-32, 87).

Plaintiff also argues that, even if the accusation that Roe made against him amounts only to a "simple assault," Roe is still an appropriate comparator. *See* Dkt. No. 43 at 30. In this regard, Plaintiff contends that, "[a]s alleged in the Amended Complaint, Roe previously attempted to physically attack [him] and, at one point, leapt out of her seat to spray him with ketchup." *See id.* (citing Am. Compl. at ¶¶ 17, 28). "On February 8, 2022, it was Roe, not Plaintiff, who violated the parties' mutual no contact order when she pursued Plaintiff outside of the Whitman School, put her phone camera in his face, and stated, 'This is Brandon Williams!' and continued to follow him." *See id.* (citing Am. Compl. at ¶ 38). "And yet, no disciplinary action was taken against her by the University." *See id.* (citing Am. Compl. at ¶ 85).

Plaintiff also indicates that, "[i]n addition to threatening and harassing [him], Jane Roe also encouraged other students, mostly female students, to spread false and incendiary rumors about [him]. In one such instance, Jane Roe and a group of her female friends called Plaintiff a 'rapist' on YikYak (a social media platform). As a result of this action, numerous students threatened to physically harm him." *See* Am. Compl. at ¶ 31. He further contends that, "[o]n several occasions, Plaintiff and his family reported this conduct to SU. However, upon information and belief, SU did not take disciplinary action against Jane Roe and the other female students who threatened and harassed Plaintiff." *See id.* Finally, Plaintiff alleges that, within his appeal, he "reiterated that it was Jane Roe -- not he -- who violated the No Contact Order." *See* Am. Compl. at ¶ 82.

Defendants argue that Jane Roe and the other unidentified students are not similarly situated for purposes of a Title IX selective enforcement claim because "Plaintiff fails to identify

any facts establishing that any complaint was made against Jane Roe at all, let alone a similar

one, or otherwise identify any particulars regarding the other unnamed comparators." *See* Dkt.

No. 22, Defendants' Memorandum of Law, at 25.  Defendants note that Plaintiff was not charged

with stalking in the disciplinary proceedings and was found not responsible for violating the

NCO.  Thus, Defendants argue, the Court must dismiss the selective enforcement claim because

Plaintiff fails to identify female comparators who faced similar assault charges in similar

circumstances whom Defendant SU treated differently.  *See id.* (citing *Doe v. Columbia Univ.*,

551 F. Supp. 3d 433, 471 (S.D.N.Y. Aug. 1, 2021) (A pleading must identify comparators of the

opposite gender and establish that the comparators were "in circumstances sufficiently similar to

his own" including facing "comparable disciplinary charges" and were "treated more favorably

by the University.")).

"[A]lthough a comparator must be similarly situated to [Plaintiff] in material respects, . . .

they need not be *identically* situated."  *Radwan v. Manuel*, 55 F.4th 101, 138 (2d Cir. 2022)

(citing *McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 283 n.11, 96 S. Ct. 2574, 49 L.

Ed. 2d 493 (1976) ("[P]recise equivalence in culpability between employees is not the ultimate

question.")).  "Instead, the 'similarly situated' requirement can be met if the plaintiff and the

comparator 'were (1) "subject to the same performance evaluation and discipline standards" and

(2) "engaged in comparable conduct."'"  *Id.* (quoting *Ruiz [v. County of Rockland]*, 609 F.3d

[486,] 493-94 [(2d Cir. 2010),] (quoting *Graham [v. Long Island R.R.]*, 230 F.3d [34,] 40 [(2d

Cir. 2000)])).

As the Southern District explained, because "there is [a] dearth of law about [the degree

of similarity that must be pleaded - in the Title IX context in this Circuit[,] . . . the Court looks to

Title VII case law to determine what degree of similarity is required at this stage in the

94

litigation." *Doe v. Columbia Univ.*, 551 F. Supp. 3d 433, 471 (S.D.N.Y. 2021).  Thus, "[t]o

assert a Title VII claim, a plaintiff must allege that '[]he was similarly situated in all material

respects to the individuals with whom []he seeks to compare [him]self.'" *Id.* (quoting *Brown v.*

*Daikin Am. Inc.*, 756 F.3d 219, 230 (2d Cir. 2014) (quoting *Graham v. Long Island R.R.*, 230

F.3d 34, 39 (2d Cir. 2000))).  Moreover, "'[t]he plaintiff's and comparator's circumstances must

bear a "reasonably close resemblance," but need not be "identical."'" *Id.* (quoting [*Brown*, 756

F.3d at 230] (quoting *Graham*, 230 F.3d at 40)).  "'Ordinarily, "[w]hether two [individuals] are

similarly situated . . . presents a question of fact," rather than a legal question to be resolved on a

motion to dismiss.'" *Id.* (quoting *Brown*, 756 F.3d at 230 (alterations in original) (quoting

*Graham*, 230 F.3d at 39)).  Therefore, "[o]n a motion to dismiss, a court must 'determine

whether, based on a plaintiff's allegations in the complaint, it is plausible that a jury could

ultimately determine that the comparators are similarly situated.'" *Id.* (quoting *Rodriguez v.*

*Town of Ramapo*, 412 F. Supp. 3d 412, 436 (S.D.N.Y. 2019) (quoting *Weslowski v. Zugibe*, 14 F.

Supp. 3d 295, 319 (S.D.N.Y. 2014))).

   Accepting Plaintiff's allegations as true, the Court finds that Plaintiff and Jane Roe were

similarly situated in that both engaged in conduct violative of the existing NCO and engaged in

harassing and assaultive behavior.  Moreover, both were subject to the same disciplinary

standards and engaged in comparable conduct.

   Nevertheless, whether Plaintiff asserts a plausible selective enforcement claim turns on

the question of whether Defendant SU was on notice of Jane Roe's behavior yet took no action

against her.  *See St. John's Univ.*, 91 F.4th at 656 (explaining that, "[a]lthough Roe's complaint

alleges that it was Doe who initiated sexual contact with Roe, Roe does not allege that he

reported Doe to SJU for sexual misconduct" (*Cf. Doe v. Rollins Coll.*, 77 F.4th 1340, 1354 (11th

Cir. 2023) (affirming rejection of male plaintiff's selective enforcement theory of discrimination
in part because male plaintiff did not file a sexual misconduct complaint against alleged female
victim))); *cf. Doe v. Syracuse Univ.*, 341 F. Supp. 3d 125, 139 (N.D.N.Y. 2018) (concluding that,
"[a]lthough the fact that Doe filed no complaint against Roe would ordinarily defeat a selective
enforcement claim, . . . here the University took the initiative to transform Roe's complaint into a
claim that she did not intend.  Because the University *sua sponte* took this action against Doe,
but took no similar *sua sponte* action against Roe, a plausible selective enforcement claim is set
forth." (citations and footnotes omitted)).

    Plaintiff contends that, "[o]n several occasions," he and his family reported Roe and the
other females' conduct to Defendant SU, but Defendant SU did not take disciplinary action
against them.  *See* Am. Compl. at ¶ 31.  Moreover, Plaintiff alleges that, within his appeal, he
"reiterated that it was Jane Roe -- not he -- who violated the No Contact Order."  *See* Am.
Compl. at ¶ 82.  Plaintiff argues in support of his motion to file a Second Amended Complaint
("SAC") that he could not file a formal complaint about Roe violating the NCO or "engaging in
stalking conduct" because "[Defendant] SU failed to meet its contractual obligation to engage in
an intake and outreach procedure required under [Code of Student Conduct] Section 10.2."  *See*
Dkt. No. 51, Plaintiff's Reply Memorandum, at 8.  Plaintiff also argues that "both the Handbook,
at Section 10.9, and the Title IX Policy, at Section III.M (p. 21), require the University to
investigate and potentially discipline students who are alleged to have engaged in Prohibited
Conduct, such as 'stalking.'  The Title IX Policy provides that '[a] person who commits a
violation of this policy will be subject to disciplinary action[.]'"  *See id.* at 7-8 (quoting Dkt. 38-
8, § III.M).

Accepting Plaintiff's allegations as true, and drawing all reasonable inferences in his favor, the Court finds that he has plausibly alleged that Jane Roe, and perhaps some other female students at SU, engaged in assaultive, harassing and threatening conduct violative of the Code of Student Conduct, that Plaintiff complained to Defendant SU about this conduct, and yet Defendant SU took no action against these other students.  At this stage, this is sufficient to state a plausible Title IX selective enforcement claim.  Accordingly, the Court denies Defendants' motion to dismiss Plaintiff's Title IX selective enforcement claim.

## I.      Emotional Distress Claims

Plaintiff's Ninth and Tenth Causes of Action set forth claims for intentional infliction of emotional distress ("IIED") and negligent infliction of emotional distress ("NIED"), respectively. Plaintiff alleges that Defendants Zarnowski, Romano, and Fuentes committed IIED "by assaulting and battering Plaintiff, falsely arresting Plaintiff, subjecting Plaintiff to humiliation, and knowingly and maliciously initiating criminal proceedings against Plaintiff without cause or justification."  *See* Am. Compl. at ¶ 143.  Plaintiff asserts that these actions "are extreme and outrageous and are well outside the realm of human decency," *see id.* at ¶ 144, and "caused Plaintiff to suffer severe emotional distress, mental trauma, and bodily harm," *see id.* at ¶ 145. Plaintiff further contends that, as a result of these actions, he "suffered, and continues to suffer, severe emotional distress and mental trauma, and has incurred monetary damages."  *See id.* at ¶ 147.

Plaintiff also alleges Defendants Zarnowski, Romano, and Fuentes committed NIED "by knocking [him] to the floor violently, restraining him for several minutes, forcefully handcuffing him, and inflicting additional offensive bodily contact through a violent and menacing act."  *See*

*id.* at ¶ 149.  Plaintiff asserts that "Defendants' actions were, at a minimum, negligent, in that they failed to exercise reasonable care in the performance of their job duties." *See id.* at ¶ 150. Plaintiff further maintains that, as a result of these actions, he "suffered, and continues to suffer, severe emotional distress and mental trauma, and has incurred monetary damages."  *See id.* at ¶ 152.

Defendants argue that the Court must dismiss Plaintiff's IIED and NIED claims because they are based on conduct that constitutes the basis for Plaintiff's state law claims for assault, battery, and false arrest/imprisonment and, therefore, are improperly duplicative.  *See* Dkt. No. 22, Defendants' Memorandum of Law, at 28-29 (citing, *inter alia*, *Druschke v. Banana Republic, Inc.*, 359 F. Supp. 2d 308, 316 (S.D.N.Y. 2005) ("There are no allegations of injuries that may not be redressed through Druschke's other causes of action.  Therefore, the Court determines that Druschke's claims for IIED and NIED are duplicative and must be dismissed on that basis.")).

Plaintiff counters that his IIED and NIED claims are not duplicative "of his tort claims for assault and battery" because he "alleges facts and damages beyond the physical actions of Defendants Zarnowski, Fuentes, and Romano on February 8, 2022 that comprise [his] assault and battery claims."  *See* Dkt. No. 43, Plaintiff's Memorandum of Law, at 34-35; *see id.* at 34 (arguing that the Second Circuit has affirmed a lower court's decision to allow an IIED claim whose conduct falls within the ambit of other torts, where the IIED claim "could be found to involve additional elements not necessarily comprehended by the torts alleged." (quoting *Bender v. City of New York*, 78 F.3d 787, 792 (2d Cir. 1996)).  In this regard, Plaintiff argues he suffered harm from Defendants' actions of "knowingly and maliciously initiating criminal proceedings against [him] without cause or justification," *see id.* at 25 (citing Am. Compl. at ¶ 143), and was dehumanized and humiliated when he was arrested during class, in front of his peers while

attempting to give a presentation, and then paraded through the Whitman Building while in

Defendants' custody as other students watched," *see id.* (citing Am. Compl. at ¶¶ 45-55).  He

contends that "[t]hese allegations constitute conduct that is not within the ambit of [his] causes of

action for assault and battery, both of which require either the threat or use of physical force."

*See id.* (citing *Gonzalez v. Bratton*, 48 F. App'x 363, 365 (2d Cir. 2002), for the proposition that

an arrestee's allegations that she was humiliated and subject to unwarranted criminal charges

stated IIED claim distinct from false imprisonment claim).

Under New York law, in order to state a claim for IIED, a plaintiff must plead "(1)

extreme and outrageous conduct; (2) intent to cause, or reckless disregard of a substantial

probability of causing, severe emotional distress; (3) a causal connection between the conduct

and the injury; and (4) severe emotional distress."  *Stuto v. Fleishman*, 164 F.3d 820, 827 (2d

Cir. 1999) (citation omitted).  The "outrageousness element . . . is designed to filter out petty

complaints and assure that the emotional distress is genuine," thus the standard for this element

is "rigorous" and "difficult to satisfy."  *Chanko v. Am. Broad. Cos. Inc.,* 27 N.Y.3d 46, 57 (NY

2016).  That is, the alleged conduct must be ""so outrageous in character, and so extreme in

degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and

utterly intolerable in a civilized community.""  *Id.* at 56 (quotation omitted); *see Moraes v.

White*, 571 F. Supp. 3d 77, 104 (S.D.N.Y. 2021) ("These requirements, especially that of extreme

and outrageous conduct, 'are rigorous and difficult to satisfy.'" (quoting *Howell [v. N.Y. Post

Co.]*, 596 N.Y.S.2d 350, 612 N.E.2d [699,] 702 [(1993)])).

Furthermore, IIED is a "'highly disfavored tort under New York law' . . . 'to be invoked

only as a last resort.'"  *Turley v. ISG Lackawanna, Inc.*, 774 F.3d 140, 158 (2d Cir. 2014)

(quotations and citations omitted).  "'[W]here the conduct complained of falls well within the

ambit of other traditional tort liability,'" the New York Court of Appeals "has cautioned that a claim for IIED may not be sustainable." *Id.* at 159 (quoting *Fischer v. Maloney*, 43 N.Y.2d 553, 557-58, 402 N.Y.S.2d 991, 373 N.E.2d 1215, 1217 (1978)) (footnote omitted).  "This is so because the 'clear purpose' of an IIED claim 'is to supplement existing forms of recovery by providing a cause of action for egregious conduct that might otherwise go unremedied.'" *Doe v. AR*, No. 21-CV-06353-FPG, 2022 WL 1624081, *11 (W.D.N.Y. May 23, 2022) (quoting *Turley*, 774 F.3d at 159 n.18).

"[C]ourts in this Circuit 'have consistently held that the tort of intentional infliction of emotional distress may not be used as a substitute for an available traditional tort theory.'" *Caravalho v. City of New York*, No. 13-cv-4174 (PKC) (MHD), 2016 WL 1274575, *23 (S.D.N.Y. Mar. 31, 2016) (quoting *Brewton v. City of New York*, 550 F. Supp. 2d 355, 370 (E.D.N.Y. 2008)) (other citations omitted), *aff'd*, 732 F. App'x 18 (2d Cir. 2018) (summary order).  Moreover, "the New York Court of Appeals has questioned whether an intentional infliction claim can ever be brought where the challenged conduct 'falls well within the ambit of other traditional tort liability.' . . . All four Appellate Division courts have answered the question and held that it cannot. . . ." *Salmon v. Blesser*, 802 F.3d 249, 256 (2d Cir. 2015) (quotation and other citations omitted).  Therefore, "'IIED claims that are duplicative of other tort claims should . . . be dismissed.'" *Crews v. Cnty. of Nassau*, 996 F. Supp. 2d 186, 214 (E.D.N.Y. 2014) (quoting [*McGrath v. Nassau Health Care Corp.*, 217 F. Supp. 2d 319, 335 (E.D.N.Y. 2002)] (citing *Lian,* 992 F. Supp. at 651)).

"Thus, '[t]he tort of IIED simply has no application when the actor intends to invade some other legally protected interest, even if emotional distress results,' or, in other words, 'where the gravamen of a complaint is another tort, IIED is not available as a cause of action.'"

*Doe v. AR*, 2022 WL 1624081, at *11 (quoting [*Turley*, 774 F.3d at 159 n.18]).  "This includes where a plaintiff brings an IIED claim and 'tort claims for ... false imprisonment, assault and battery.'"  *Id.* (quoting *Rubio v. Cnty. of Suffolk*, No. 01-CV-1806, 2007 WL 2993830, at *5 (E.D.N.Y. Oct. 9, 2007) (dismissing plaintiff's IIED claim as "duplicative of plaintiffs' State tort claims for false arrest, false imprisonment, assault and battery")).

"Under New York law, a plaintiff can establish a claim for negligent infliction of emotional distress if [his] injuries arise out of one of three theories: (i) the bystander theory, (ii) the 'zone of danger' theory, or (iii) the direct duty theory." *Doe v. Doe*, No. 16 Civ. 0332 (NSR), 2017 WL 3025885, *8 (S.D.N.Y. July 14, 2017) (citations omitted).  Plaintiff proceeds under the direct duty theory.  *See* Dkt. No. 43, Plaintiff's Memorandum of Law, at 38.  To state a claim for negligent infliction of emotional distress under that theory, "a plaintiff must allege (1) a breach of a duty owed to the plaintiff; (2) emotional harm; (3) a direct causal connection between the breach and the emotional harm; and (4) circumstances providing some guarantee of genuineness of the harm." *Francis v. Kings Park Manor, Inc.*, 992 F.3d 67, 81 (2d Cir. 2021) (footnote omitted).  Like an IIED  claim, "'a claim for [NIED] should be dismissed where the conduct for the underlying claim may be redressed by way of traditional tort remedies.'" *Crews v. Cnty. of Nassau*, 996 F. Supp. 2d 186, 214 (E.D.N.Y. 2014) (quoting *Deronette v. City of New York,* No. 05 CV 5275(SJ), 2007 WL 951925, at *5-6 (E.D.N.Y. Mar. 27, 2007) (dismissing NIED claim that was "clearly encompassed in Plaintiff's claims for false arrest, false imprisonment, malicious prosecution, abuse of process, and libel and slander")) (other citation omitted).  In *Hays v. City of New York*, No. 14-CV-10126 (JMF), 2017 WL 782496 (S.D.N.Y. Feb. 28, 2017), the Southern District of New York dismissed the plaintiff's IIED and NIED claims, reasoning that, "under New York law, a person may not bring claims for . . . negligent infliction of emotional distress

where . . . there are more traditional theories of tort liability available." *Id.* at *5 (citations omitted).  Moreover, "[t]he applicable federal rules of procedure authorize alternative claims in a pleading, . . . [b]ut . . .  IIED and NIED 'may not be used as a substitute for an available traditional tort theory.'" *Powell v. City of Jamestown*, No. 1:21-cv-721, 2022 WL 1913581, *21 (W.D.N.Y. June 3, 2022) (quotation omitted).

Plaintiff's IIED and NIED claims are based on the same facts that support his claims for false arrest, assault, and battery.  *See* Am. Compl. at ¶¶ 124-152.  Further, Plaintiff seeks the same damages with regard to each of these claims.  *Compare id.* at ¶ 147; *id.* at ¶ 156 *with id.* at ¶ 123; *id.* at ¶ 134; *id.* at ¶ 141.

Finally, the conduct about which Plaintiff complains in his IIED and NIED claims is embraced entirely within the ambit of other traditional tort liability, including his false arrest/false imprisonment, assault, and battery claims, as well as a putative malicious prosecution claim which was available although he elected not to bring such a claim.  *See, e.g.*, *Josie v. City of New York,* No. 21-CV-2486 (ARR) (RER), 2023 WL 3765063, *15 (E.D.N.Y. June 1, 2023); *Johnson*, 2023 WL 5585139, at *9; *Doe v. AR*, 2022 WL 1624081, at *11; *Rubio*, 2007 WL 2993830, at *5; *Brewton,* 550 F. Supp. 2d at 370*; Crews*, 996 F. Supp. 2d at 214.  Furthermore, Plaintiff has not alleged any element of his IIED and NIED claims that is different or in addition to what is recoverable under the traditional torts alleged or that were available to him.  *See Blount v. Kelly,* No. 15-CV-5599 (PKC) (JO), 2018 WL 3382906, *16 (E.D.N.Y. July 10, 2018). Accordingly, the Court grants Defendants' motion to dismiss Plaintiff's IIED and NIED claims as duplicative of his other tort claims.

## V. CROSS-MOTION TO AMEND

Plaintiff seeks leave to amend his Amended Complaint to add a cause of action for breach of contract (to be pled in the alternative of his tort causes of action for IIED and NEID) and a cause of action for breach of the implied covenant of good faith and fair dealing (to be pled in the alternative of the IIED, NEID, and breach of contact claims).  *See* Dkt. No. 43, Plaintiff's Memorandum of Law, at 40.  Defendants argue that the Court should deny leave to amend as futile because the proposed claims are barred by the applicable statute of limitations and fail to state claims upon which relief can be granted.  *See* Dkt. No. 47, Defendants' Reply Memorandum, at 19-25.

### A.      Leave to Amend Standard

"'Leave to amend should be freely granted, but the district court has the discretion to deny leave if there is a good reason for it, such as futility . . . .'"  *Kohn v. Esposito*, No. 19-CV-2163 (LDH) (VMS), 2021 WL 1163071, *3 (E.D.N.Y. Mar. 26, 2021) (quoting *Jin v. Metro. Life Ins. Co.*, 310 F.3d 84, 101 (2d Cir. 2002)).  "An amendment to a pleading is futile if it could not withstand a motion to dismiss under Rule 12(b)(6)."  *Bull v. Cnty. of Erie*, No. 22-CV-00704-JLS-LGF, 2024 WL 1607001, *2 (W.D.N.Y. Mar. 20, 2024) (citation omitted), *report and recommendation adopted,* 2024 WL 1606559 (W.D.N.Y. Apr. 11, 2024).  A party opposing a motion to amend on this ground bears the burden of establishing futility.  *See Wimberly v. Stern*, No. 22-cv-7581 (VSB), 2023 WL 6466465, *3 (S.D.N.Y. Oct. 4, 2023) (quotation omitted).

B.      **Statute of Limitations**

Defendants argue that both proposed claims challenge the outcome of Plaintiff's student disciplinary proceedings.  Defendants point out that both claims allege the Conduct Board did not correctly apply the preponderance of the evidence standard and reached an irrational result by crediting false accusations by the victim and discrediting exculpatory evidence in his favor. *See* Dkt. No. 47, Defendants' Reply Memorandum, at 19 (citing Proposed Second Am. Compl. ("SAC") ¶¶ 142(d) & 148).  Defendants further note that both claims allege an injury consisting of Plaintiff's delay in graduation associated with the suspension that resulted from the disciplinary process.  *See id.*  (citing SAC at ¶¶ 144 & 149).  Thus, Defendants maintain, the claims "can only be properly evaluated under the standard set forth in CPLR Article 78, which is the proper procedural vehicle." *See id.* at 20.  Finally, Defendants argue that the claims are subject to Article 78's four-month statute of limitations, which had already expired at the time Plaintiff commenced this action.  *See id.*

Plaintiff counters that his proposed Ninth and Tenth Causes of Action "only seek monetary damages, arising out of his delayed entry into the workforce, reputational damage, diminished career opportunities, costs associated with defending himself against false charges, and other direct and consequential damages, and not any injunctive or declaratory relief which would require the University to reverse or otherwise alter its disciplinary actions." *See* Dkt. No. 51, Plaintiff's Reply Memorandum, at 3 (citing Dkt. 38-9, at ¶¶ 144, 149).  These damages, Plaintiff contends, fall within a breach of contract claim cognizable as a plenary action and not an Article 78 proceeding.  *See id.*  Thus, Plaintiff maintains, "because [his] claims for breach of contract do not seek to 'reexamine' or reverse his suspension, but instead seek only monetary

damages, his breach of contract claims are not time-barred, and the Court should permit Plaintiff to amend his Complaint to allege breach of contract and breach of implied covenant of good faith and fair dealing claims against Defendants." *See id.* at 4.

"Under New York law, Article 78 proceedings 'are typically the avenue for parties challenging administrative actions by governmental agencies or by the decisionmaking [*sic*] bodies of private entities.'" *Doe v. Columbia Univ.*, No. 19 Civ. 5357 (ER), 2020 WL 1528545, *3 (S.D.N.Y. Mar. 31, 2020) (quoting *Gally v. Columbia Univ.*, 22 F. Supp. 2d 199, 205 (S.D.N.Y. 1998)). "Entities subject to Article 78 include both public and private universities." *Id* (citing N.Y. C.P.L.R. § 7802(a) (McKinney)) (other citation omitted). "Challenges brought under Article 78 are subject to a four-month statute of limitations." *Id.* (citing N.Y. C.P.L.R. § 217 (McKinney)).

"While claims challenging [academic decisions made by private educational institutions] have often been 'couched in terms of "contract" and "tort" to avoid the applicable statutes of limitations,' courts have been careful to dismiss them as time-barred under Article 78's four-month statute of limitations where appropriate." *Id.* (citations omitted). "Looking to New York law, state court decisions establish that 'to the extent [a] plaintiff's causes of action are, in essence, a challenge to the determination' to discipline her, she is 'only entitled to article 78 review.'" *Doe v. New York Univ.*, 537 F. Supp. 3d 483, 493-94 (S.D.N.Y. 2021) (quoting *Kickertz v. New York Univ.*, 110 A.D.3d 268, 272, 971 N.Y.S.2d 271 (N.Y. App. Div. 2013)) (citing *Ansari v. New York Univ.*, 1997 WL 257473, at *2 (S.D.N.Y. 1997) (noting that state-court review of suspensions "has been limited to Article 78 proceedings")).

Plaintiff's claims, at least as alleged in his proposed Second Amended Complaint ¶¶ 142(d) and 148, are close to challenging Defendant SU's suspension decision and thus

arguably subject only to Article 78 review.  *See Prasad v. Cornell Univ.*, No. 5:15-cv-322, 2016 WL 3212079, *20 (N.D.N.Y. Feb. 24, 2016) (explaining that, "[t]o the extent Plaintiff intends his breach of contract claim to be a reexamination of the result or penalty of his disciplinary hearing because Cornell acted arbitrarily during the proceeding, repleading will not be allowed. Plaintiff's remedy to challenge the disciplinary determination on this basis is through a New York Civil Practice Law and Rules Article 78 proceeding, not a breach of contract claim" (citing *Maas v. Cornell Univ.*, 94 N.Y.2d 87, 92 (1999))) (footnote omitted).  Under somewhat similar circumstances, courts have converted breach-of-contract actions to Article 78 proceedings.  *See Doe v. New York Univ.*, 537 F. Supp. 3d 483, 493-94 (S.D.N.Y. 2021) (citations omitted).

However, Plaintiff's claims for breach of contract and breach of implied covenant of good faith and fair dealing, as pled, are contractual in nature and cannot be brought in an Article 78 proceeding.  *See Columbia Univ.*, 2020 WL 1528545, at *4 (finding that "Doe's claims for breach of contract, breach of implied covenant of good faith and fair dealing, and unjust enrichment are contractual in nature and *cannot* be brought in an Article 78 proceeding" (citing *Sarwar v. New York Coll. of Osteopathic Med. of New York Inst. of Tech.*, 150 A.D.3d 913, 914 (N.Y. App. Div. 2d Dep't 2017) (affirming New York Supreme Court's decision to not convert plaintiff's action, alleging breach of contract and unjust enrichment claims, into an Article 78 proceeding))); *see also Prasad*, 2016 WL 3212079, at *21 (noting that, "[t]o the extent Plaintiff intends his breach of contract claim to be for the recovery of monetary damages because a specific agreement was breached, repleading *may* be allowed" (citing *Habitzreuther [v. Cornell Univ.]*, 2015 WL 5023719, at *4 [(N.D.N.Y. Aug. 25, 2015)] ("[C]ourts also look to the relief sought by the plaintiff, and where the plaintiff seeks monetary damages, rather than to prohibit or

compel an action, a breach of contract action may be cognizable." (citing *Gally v. Columbia Univ.*, 22 F. Supp. 2d 199, 205-06 (S.D.N.Y. 1998)))).

## C.     Proposed Contract Claims

Alternatively, Defendants argue that Plaintiff's proposed contract claims are futile because they fail to state a claim upon which relief can be granted.  Plaintiff contends that he states legally viable breach of contract claims.

"'In New York, the relationship between a university and its students is contractual in nature.'" *Xiaolu Peter Yu v. Vassar Coll.*, 97 F. Supp. 3d 448, 481 (S.D.N.Y. 2015) (quoting *Papaspiridakos v. Educ. Affiliates, Inc.*, No. 10-CV-5628-RJD, 2013 WL 4899136, at *3 (E.D.N.Y. Sept. 11, 2013), *aff'd*, 580 Fed. Appx. 17 (2d Cir. 2014)).  "The terms of the implied contract are 'contained in the university's bulletins, circulars and regulations made available to the student.'" *Papelino v. Alb. Coll. of Pharm. of Union Univ.*, 633 F.3d 81, 93 (2d Cir. 2011) (quoting *Vought v. Teachers Coll, Columbia Univ.*, 127 A.D.2d 654, 654, 511 N.Y.S.2d 880 (2d Dep't 1987)).  A student plaintiff must identify a "specific breached promise or obligation" in order to state a claim.  *Gally v. Columbia Univ.*, 22 F. Supp. 2d 199, 207 (S.D.N.Y. 1998).  "A college is 'contractually bound to provide students with the procedural safeguards that it has promised.'" *Yu*, 97 F. Supp. 3d at 481 (quoting *Fellheimer v. Middlebury Coll.*, 869 F. Supp. 238, 243 (D. Vt. 1994)).

Courts in this District have held that a Syracuse University student may state a claim for breach of contract when SU fails to adhere to its written policies, namely the Student Conduct System Handbook (the "Handbook") and the Sexual Harassment, Abuse, and Assault Prevention Policy (the "Title IX Policy"), both of which form the basis of Plaintiff's breach of contract

claim.  *See, e.g., Doe v. Syracuse Univ.*, 440 F. Supp. 3d 158, 174-79 (N.D.N.Y. 2020) (finding

that student plausibly alleged a breach of contract arising out of SU's failure to adhere to

Handbook provisions); *Doe v. Syracuse Univ.*, No. 5:18-CV-377, 2019 WL 2021026, *10-*11

(N.D.N.Y. May 8, 2019) (finding that student plausibly alleged that SU failed to guarantee a

preponderance of the evidence standard in a Conduct Board hearing).

In his proposed Second Amended Complaint, Plaintiff alleges that Defendant SU

breached the implied contract formed by the Student Handbook and Title IX Policy by (1) failing

to provide outreach and intake services to him as a victim of stalking when he complained about

such conduct; (2) failing to enforce his right to a mutual NCO with Jane Roe and failing to

discipline Jane Roe for stalking him; and (3) failing to apply a preponderance of the evidence

standard to the charges brought against him.  *See* Dkt. 38-39, Proposed Second Amended

Complaint, at ¶¶ 137-142.  Plaintiff contends that each of these violations constitutes a separate

cognizable basis for his proposed breach of contract claim.

### 1. Failure to Provide Services to Plaintiff as a Victim of Stalking

Section 10.2 of the Handbook provides that the University "will" promptly contact an

individual reporting potential prohibited conduct "upon receipt of a report of potential Prohibited

Conduct."  *See* Dkt. 47-2 at § 10.2.  That section also provides that the "University will provide

the Complainant with written information about resources . . . and reasonably available

Supportive Measures," and then enumerates certain notifications and information that the

University must provide to the Complainant.  *See id.*  "[R]egardless of whether the Complainant

chooses to pursue a Formal Complaint, the Title IX Coordinator (or designee) will provide

Supportive Measures[.]"  *See id.* at § 10.3 (emphasis added).

Plaintiff argues that the obligations set forth in Section 10.2 are precisely the type of "specifically designated and discrete promises" that are enforceable by a breach of contract action, as they are subject to "quantification" and "objective evaluation."  *See* Dkt. No. 51, Plaintiff's Reply, at 5-6 (citing *Nungesser v. Columbia Univ.*, 169 F. Supp. 3d 353, 370 (S.D.N.Y. 2016), in turn citing *Gally*, 22 F. Supp. 2d at 208).  Plaintiff maintains that the requirements of Section 10.2 pertain to procedural safeguards, "which have been consistently deemed to give rise to contractual obligations by a college or university."  *See id.* at 6 (citing *Yu*, 97 F. Supp. 3d at 481; *Syracuse Univ.*, 440 F. Supp. 3d at 176 ("Handbook Part 4.7 [providing for notification of a reciprocal NCO], moreover, 'cannot be characterized as generalized policy statements or unspecified procedures.'")).

In response to Plaintiff's claim that Defendants breached Sections 10.2 and 10.3 of the Handbook by failing to provide him with intake and outreach and supportive measures, Defendants claim that "Plaintiff never pleaded that he reported being stalked or, to the extent that [Roe's] violation of the bilateral NCO is claimed to be stalking conduct, that two or more violations of the NCO occurred."  *See* Dkt. 47, Defendants' Reply Memorandum, at 25.  Plaintiff contends this is untrue in that his Proposed Second Amended Complaint details Jane Roe's conduct, including her multiple threats to have Plaintiff arrested, her attempts to physically assault him, her multiple unprovoked confrontations of Plaintiff in public, and her cyber-bullying, which resulted in physical threats by other students.  *See* Dkt. 38-9, Plaintiff's Proposed Second Amended Complaint, at ¶¶ 17-18, 21, 26-33.  Plaintiff also points out that his Proposed Second Amended Complaint specifically alleges that he and his family reported Jane Roe's conduct to SU "on several occasions."  *See id.* at ¶ 32.  In addition, Plaintiff contends, the Conduct Board Report, which Defendants submitted and claimed to be "incorporated by

reference" into the Amended Complaint, includes his written statement in which he detailed Jane Roe's stalking conduct and specifically requested that Defendant SU take action.  *See* Dkt. No. 51, Plaintiff's Reply Memorandum, at 6 (citing Dkt. 21-08, pp. 4-5, 8; Dkt. 21-06, p. 8 ("Respondent argued that . . . the other student had a history of targeting him with bullying and harassment.")).  Plaintiff maintains that Defendants failed to provide him with supportive measures and intake and outreach services even after he submitted a written statement detailing Jane Roe's stalking conduct; and, therefore, his Proposed Second Amended Complaint properly alleges that Defendants failed to comply with their contractual obligation to provide him with supportive services.  *See id.*

Whether Plaintiff adequately complained about being stalked by Jane Roe and whether Defendant SU failed to provide proper intake services are questions of fact that the Court cannot resolve at the motion to dismiss stage.  The Court reaches the same conclusion with regard to Plaintiff's claim that this breach of contract caused him the damages that he alleges.  Therefore, the Court will allow Plaintiff to amend his Amended Complaint to assert this specific breach of contract claim.

### 2. Failure to Enforce the Mutual NCO with Jane Roe and Failing to Discipline Roe for Stalking Plaintiff

The Handbook provides that no contact orders ("NCOs") are intended to "prohibit all forms of contact including, but not limited to, contact via social media, contact via a third party and/or in person contact."  *See* Dkt. 47-2, Student Conduct Handbook, at § 4.7.  "If a No Contact Order is issued, both parties will receive a written copy of the Order and both parties are expected not to have contact with one another.  No Contact Orders impose mutual restrictions on the parties."  *See id.* at § 4.8.  NCOs "remain in place unless or until amended or rescinded[.]"

*See id.* at § 4.10.  When a student violates an NCO, the student may be subject to "suspension on an interim basis, or Code of Student Conduct charges."  *See id.* at § 4.11.  Courts have found that the above provisions constitute specific contractual promises, which require Defendant SU to enforce the mutual NCO upon a report from Plaintiff that Jane Roe had violated same.  *See Doe v. Syracuse Univ.*, 440 F. Supp. 3d at 176 (holding that "Handbook Part 4.7 . . . 'cannot be characterized as generalized "policy statements" or "unspecified procedures"'").

The Handbook operates in conjunction with the Title IX Policy.  The Title IX Policy defines "Prohibited Conduct" to include stalking, which "occurs when a person engages in a course of conduct directed at a specific person under circumstances that would cause a reasonable person to fear for their own safety . . . or suffer substantial emotional distress. . . . Stalking includes the concept of cyber-stalking, a particular form of stalking in which electronic media such as the internet, social networks, blogs, cell phones, texts, or other similar devices or forms of contact are used."  *See* Dkt. 38-8, Title IX Policy, at § III.B.4 (p. 7).

Finally, both the Handbook, at Section 10.9, and the Title IX Policy, at Section III.M (p. 21), require Defendant SU to investigate and potentially discipline students who are alleged to have engaged in Prohibited Conduct, such as "stalking."  The Title IX Policy provides that "[a] person who commits a violation of this policy will be subject to disciplinary action[.]"  *See* Dkt. 38-8, Title IX Policy, at § III.M.  This provision is subject to "objective evaluation" and is not an unenforceable "general promise about ethical standards," a "general policy statement," or "broad and unspecified procedures and guidelines."  Rather, Defendant SU's Title IX Policy affirmatively promises that violators of the policy "will" be disciplined, making it an enforceable promise.

Plaintiff contends that his Proposed Second Amended Complaint plausibly alleges he reported to Defendant SU that Jane Roe engaged in behavior that fell within the purview of stalking on more than one occasion. *See* Dkt. 38-9, Proposed Second Amended Complaint, at ¶¶ 17-18, 21-33, 82, 85.  Plaintiff also contends that he has plausibly alleged that Defendant SU did not take any action against Jane Roe in response to his reports.  *See id.* at ¶¶ 32, 85, 106, 141, 142(a), (c).  Defendants seek to excuse the failure to investigate Plaintiff's reports and discipline Roe by claiming that Section 10.9, which requires an investigation, is only triggered upon the filing of a "Formal Complaint."  However, Plaintiff asserts that "this argument plainly disregards the fact that [he] could not file a formal complaint because [Defendant] SU failed to meet its contractual obligation to engage in an 'intake and outreach' procedure required under Section 10.2."  *See* Dkt. No. 51, Plaintiff's Reply, at 8 (citing Dkt. 47-2, § 10.2).  Thus, Plaintiff maintains, he has sufficiently alleged that Defendants failed to take required actions to enforce the mutual NCO and discipline Roe for engaging in stalking conduct.  *See id.*

The Court finds that Plaintiff has alleged facts sufficient to state a plausible breach of contract claim.  Accordingly, the Court will allow Plaintiff to amend his Amended Complaint to add this claim.

### 3. Failure to Follow the Preponderance of the Evidence Standard

Plaintiff contends that Defendant SU breached its contract with him by failing to apply the preponderance of the evidence standard in his disciplinary proceedings, as promised by Sections 5.3 and 10.9(A)(xii) of the Handbook.  *See* Dkt. No. 51 at 8-9.  Plaintiff argues that courts in this District have held that the preponderance of the evidence standard applicable to Defendant SU's disciplinary proceedings is an "expressly enumerated" right that can give rise to

a claim for breach of contract. *See id.* at 9 (citing *Doe v. Syracuse Univ.*, 440 F. Supp. 3d at 178-79 (finding that university's determinations were not rationally based on evidence, where university deemed the complainant not credible, thus stating a claim for breach of contract based on failure to apply preponderance standards) (citing *Doe v. Syracuse Univ.*, 2019 WL 2021026, *11)).  Plaintiff contends that, like the plaintiff in *Doe*, 440 F. Supp. 3d at 179, he has alleged that Defendant SU disciplined him despite "compelling and conclusive evidence" that the complainant lacked credibility and provided false  information to Defendant SU.  *See* Dkt. No. 51 at 9 (citing Dkt. 38-9, ¶¶ 74-83, 139, 142(d), 143-44). Thus, Plaintiff contends, his pleading is sufficient to state a claim for breach of contract.  *See id.* (citing *Doe*, 440 F. Supp. 3d at 179).

Defendants argue that, to the extent the claim is reviewable at all, "challenge to the application of the preponderance standard is subject to dismissal upon satisfaction of a minimal standard -- *i.e.*, whether the Conduct Board's decision was supported by some evidence, without regard to credibility determinations."  *See* Dkt. No. 47, Defendants' Reply Memorandum, at 22 (citing *Doe v. Colgate Univ.*, 457 F. Supp. 3d 164, 174 (N.D.N.Y. 2020) ("the Court must only find 'that there was enough evidence, which, if believed, could have supported the board's decision.'" (quoting *Doe v. Colgate Univ.*, No. 5:15-CV-1069, 2017 WL 4990629, *23 (N.D.N.Y. Oct. 31, 2017), *aff'd* 760 F. App'x 22, 30 (2d Cir. 2019))).

In response, Plaintiff contends that, "[a]lthough Defendants note that the Conduct Board purported to follow the preponderance standard, at this stage Plaintiff's allegations are entitled to be construed in the light most favorable to him."  *See* Dkt. No. 51, Plaintiff's Reply Memorandum, at 9 (citing *Doe*, 440 F. Supp. 3d at 179)  Plaintiff also argues that, despite "Defendants' lengthy discussion of the purported 'minimal standard' that the Court will eventually be required to apply, that standard is inapplicable at this preliminary stage of the

proceedings, and the cases they cite in support of their argument were decided at the summary judgment stage after discovery." *See id.* at 9 n.2  (citing *Doe v. Colgate Univ.*, 457 F. Supp. 3d 164 (N.D.N.Y. 2020) (fact issues precluded summary judgment on breach of contract claims); *Doe v. Colgate Univ.*, 2017 WL 4990629 (N.D.N.Y. Oct. 31, 2017) (dismissing breach of contract claim on summary judgment)).

In light of the fact that the Disciplinary Records are integrated in the Amended Complaint, the Court can review these records without converting the motion to one seeking summary judgment.  It appears that the Conduct Board and the Appeals Board made findings of responsibility using the "preponderance of the evidence" standard based on the evidence presented at the Conduct Board hearing.  Further, this appears to indicate that these Boards determined Plaintiff's responsibility based upon the evidence represented in their decisions, thus providing support for the conclusion that "'that [there] was enough evidence, which, if believed, could have supported the board's decision.'"  *Colgate Univ.*, 2017 WL 4990629, at *23 (quoting *Boston Coll.*, 2016 WL 5799297, at *18).  Nevertheless, at this stage, Plaintiff's allegations are entitled to be construed in the light most favorable to him.  *See Doe v. Syracuse Univ.*, 440 F. Supp. 3d 158, 179 (N.D.N.Y. 2020).  Therefore, the Court will allow this claim to go forward on the theory that the Boards used the preponderance of the evidence standard in name only, improperly disregarded Plaintiff's contention of inadvertent conduct occasioned by Jane Roe's conduct, and instead accepted Roe's position despite the lack of her credibility.

**D.      Proposed "Good Faith and Fair Dealing" Claim**

Due to the limited applicability of the breach of contract theory to disputes over student discipline, district courts routinely dismiss students' parallel claims that purport to be premised

114

on the covenant of good faith and fair dealing implied in New York contracts.  *See, e.g.*, *Doe #1 v. Syracuse Univ.*, 468 F. Supp. 3d 489, 508-09 (N.D.N.Y. 2020); *Doe v. Syracuse Univ.*, No. 5:18-CV-377, 2019 WL 2021026, *11-*12 (N.D.N.Y. May 8, 2019).

Defendants argue that Plaintiff's allegations for the "good faith and fair dealing" claim are not discernably different from his implied contract claim.  *See* Dkt. No. 47, Defendants' Reply Memorandum, at 25.  Both claims, Defendants contend, are based on identical conduct.  *See id.* (*comparing* Dkt. No. 38-9, ¶ 142(d), *with id.* ¶ 148).  Accordingly, Defendants assert, the Court should deny as futile Plaintiff's request to amend to add this claim.  *See id.* (citing *Doe v. Syracuse Univ.*, 440 F. Supp. 3d at 180 (dismissing good faith and fair dealing claim, where the "breach of contract and breach of the implied covenant of good faith and fair dealing rest on the same allegations.").

Plaintiff counters that the "Tenth Cause of Action is pled in the alternative to the Seventh, Eighth, and Ninth Causes of Action, and it alleges facts that are separate from Plaintiff's breach of contract claim."  *See* Dkt. No. 51, Plaintiff's Reply Memorandum, at 10 (citing Dkt. 38-9, ¶¶ 145-148).  Plaintiff argues that, "[w]hereas the breach of contract claim alleges specific procedural violations and other discrete contractual promises that were breached, the Tenth Cause of Action alleges that 'Defendants intentionally and in bad faith' breached the implied covenant to conduct disciplinary proceedings 'in a fair and unbiased manner,' without any reference to specific Handbook or Title IX policy provisions."  *See id.* (quoting Dkt. 38-9, at ¶¶ 147-48).

"New York law 'does not recognize a separate cause of action for breach of the implied covenant of good faith and fair dealing when a breach of contract claim, based on the same facts, is also pled.'"  *Doe v. Syracuse Univ.*, 440 F. Supp. 3d 158, 180 (N.D.N.Y. 2020) (quoting

*Nungesser*, 169 F. Supp. 3d at 372-73 (quoting *Yu*, 97 F. Supp. 3d at 482)).  "A 'breach of the implied covenant of good faith and fair dealing claim that is duplicative of a breach of contract claim must be dismissed.'"  *Id.* (quoting [*Nungesser*, 169 F. Supp. 3d at 372-73] (quoting *Yu*, 97 F. Supp. 3d at 482)) (citing *Cruz v. FXDirectDealer, LLC*, 720 F.3d 115, 125 (2d Cir. 2013) ("[W]hen a complaint alleges both a breach of contract and a breach of the implied covenant of good faith and fair dealing based on the same facts, the latter claim should be dismissed as redundant.")).

"A party may plead a claim for breach of the covenant of good faith and fair dealing in the alternative; however, Plaintiff has not done so."  *Id.*  Plaintiff's breach of contract and breach of the implied covenant of good faith and fair dealing rest on the same allegations.  Specifically, Plaintiff realleges in his breach of contract claim that Defendants breached their contractual obligations by "failing to apply a preponderance of the evidence standard to the charges brought against Plaintiff, and instead applying a biased and result-driven standard which credited false accusations by Roe and which was not rationally based on the evidence."  *See* Dkt. No. 38-9, Proposed Second Amended Complaint, at ¶ 142(d).  Plaintiff's allegations in support of his breach of the implied covenant of good faith and fair dealing claim are nearly identical.  *See* Dkt. No. 38-9, Plaintiff's Memorandum, at ¶¶ 147-148.  Therefore, the Court finds that Plaintiff's breach of the implied covenant of good faith and fair dealing claim would not survive a motion to dismiss because that claim and the breach of contract claim are based on the same evidence, making the breach of the implied covenant of good faith and fair dealing claim redundant.  *See Cruz v. FXDirectDealer, LLC*, 720 F.3d 115, 125 (2d Cir. 2013) (stating that "when a complaint alleges both a breach of contract and a breach of the implied covenant of good faith and fair dealing based on the same facts, the latter claim should be dismissed as redundant" (citation

116

omitted)).  Accordingly, the Court denies as futile Plaintiff's motion for leave to amend to add a claim for the breach of the covenant of good faith and fair dealing.

## VI. CONCLUSION

Having reviewed the entire file in this matter, the parties' submissions, and the applicable law, and for the above-stated reasons, the Court hereby

**ORDERS** that Plaintiff's motion to seal Defendants' Exhibits G and H, *see* Dkt. No. 32, is **DENIED**, and Defendants' motion seeking the opposite relief, *see* Dkt. No. 30, is **GRANTED**; and the Court further

**ORDERS** that Defendants' motion to redact the Disciplinary Records to shield from public view personal identifying information protected under 20 U.S.C. § 1232g(a)(4), *see* Dkt. No. 27, is **GRANTED**; and the Court further

**ORDERS** that Defendants' motion pursuant to Federal Rule of Civil Procedure 12(b)(6) to dismiss the claims in this action, *see* Dkt. No. 21, is **GRANTED IN PART** and **DENIED IN PART**.  The motion is **granted** in that (1) the Section 1983 claims against Defendant SU, Defendant SU Board, and Defendant Hradsky in his official capacity are **DISMISSED**; (2) the Section 1983 claims against Defendant Hradsky in his individual capacity is **DISMISSED**; (3) the conspiracy claims brought under 42 U.S.C. §§ 1985 and 1986 are **DISMISSED**; (4) the Section 1981 claims against Defendants Zarnowski, Romano, Fuentes and Hradsky are **DISMISSED**; and (5) the IIED and NEID claims are **DISMISSED**.  The motion is **DENIED in all other respects**; and the Court further

**ORDERS** that Plaintiff's cross-motion for leave to amend his Amended Complaint, *see* Dkt. No. 38, is **GRANTED IN PART** and **DENIED IN PART**.  The motion is **GRANTED** to

the extent Plaintiff will be allowed to plead his breach of contract claims asserted at the Ninth Cause of Action in the Proposed Second Amended Complaint and **DENIED** to the extent Plaintiff will not be allowed to plead the breach of good faith and fair dealing claim asserted in the Tenth Cause of Action in the Proposed Second Amended Complaint; and the Court further

**ORDERS** that Plaintiff shall file his Second Amended Complaint within **twenty (20) days** of the date of this Memorandum-Decision and Order.  Plaintiff's Second Amended Complaint shall include (1) Plaintiff's breach of contract claims (as set forth in his Proposed Second Amended Complaint); (2) Plaintiff's § 1983 excessive force and state law assault and battery claims against Defendants Zarnowski, Romano and Fuentes; (3) Plaintiff's § 1983 failure to intervene claims against Defendants Zarnowski, Romano and Fuentes; and (4) Plaintiff's Title IX erroneous outcome and selective enforcement claims against Defendant SU (including Defendants SU Board and Hradsky in his official capacity).

**IT IS SO ORDERED**.

Dated:  September 30, 2024
       Syracuse, New York

Frederick J. Scullin, Jr.
Senior United States District Judge